


RECEIVED
7/1/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| **UNITED STATES DISTRICT COURT** ) | |
| **FOR THE NORTHERN DISTRICT** ) | |
| **OF ILLINOIS EASTERN DIVISION** ) | 1:26-cv-07715 |
| ) | Judge Sharon Johnson Coleman |
| | Magistrate Judge Karyn L Bass Ehler |
| | RANDOM / Cat. 2 |
| **CHARLES LECLERC,** ) | Case No. _____ |
| **Plaintiff,** ) | |
| **v.** ) | |
| **RED BULL NORTH AMERICA, INC.;** ) | |
| **OGLETREE, DEAKINS, NASH,** ) | |
| **SMOAK & STEWART, P.C.;** ) | |
| **KIM BROOKS, individually; and** ) | |
| **JUAN C. CASTANEDA, individually,** ) | |
| **Defendants.** ) | |


**COMPLAINT AND DEMAND FOR JURY TRIAL**

_____

## I. PRELIMINARY STATEMENT

1. This is an action for fraudulent concealment and common law fraud. Plaintiff alleges that the fraudulent scheme began with a business decision—to terminate Plaintiff Charles Leclerc—and the need to manufacture a pretextual justification for that decision, following Plaintiff's resistance to Red Bull's COVID-19 mandate. In February and March 2022, Plaintiff requested and was denied a religious accommodation to Red Bull's COVID-19 mandate, which required either vaccination or nasal swab testing that was authorized under emergency use only by the FDA. Plaintiff objected to both mandated options on religious grounds; the accommodation was approved only after Plaintiff proposed a spit test as his own alternative, under threat of termination. The close temporal proximity between Plaintiff's resistance and the sudden emergence of supposed complaints about his conduct—complaints for which no contemporaneous documentation has ever been produced—supports the inference that Red Bull had already decided to terminate his employment and needed a cover story. In May 2022, before any litigation was threatened, before any administrative proceeding was filed, before any cease-and-desist letter was sent, before Plaintiff had any counsel, and before Plaintiff's employment was terminated, Red Bull engaged attorney Juan C. Castaneda under a vague "privileged investigation" agreement that did not mention Plaintiff or agree to perform any investigation. Plaintiff alleges that the engagement was the first overt act of the scheme. The engagement was finalized on May 19, 2022. Red Bull's own Slater Letter—the official response of its counsel to Plaintiff's cease-and-desist—later claimed that complaints about Plaintiff were first lodged with HR "on or about May 24, 2022"—five days after the engagement was signed—and that Castaneda was retained because of those complaints. The sequence is facially irreconcilable

with Red Bull's stated explanation: an investigation commissioned before the complaints Red Bull has identified as the reason for it is not plausibly a response to those complaints; it is evidence of a pre-emptive step to create a paper trail for a decision already made. In July 2022, after Plaintiff's termination, through the Slater Letter, Red Bull described that same process as a "neutral investigation"—directly contradicting the "privileged investigation" label the engagement letter had assigned to it—and used it to justify Plaintiff's termination. Red Bull later used the privileged characterization to conceal the underlying materials. Red Bull also used the same investigation as the misconduct basis to contest twice Plaintiff's unemployment benefits before the Illinois Department of Employment Security, a challenge that Plaintiff alleges did not result in the denial or termination of his benefits, as reflected by independent bank records and public IDES process rules. When the employment dispute reached arbitration, Red Bull—represented by Ogletree, Deakins, Nash, Smoak & Stewart, P.C.—submitted a static PDF as the supposed Castaneda Engagement Agreement, a document that lacked the digital certificate, tamper-evident seal, and cryptographic proof of authenticity that a genuine Adobe Sign certified package would contain. At a May 12, 2026 hearing, Red Bull's counsel falsely told the arbitrator that Red Bull was "not even in possession of the Adobe records" and that the records were likely with the outside law firm. That statement was demonstrably false, as established by the facts set forth in this Complaint—including Red Bull's own production of the Adobe Sign audit report. Defendants have never retracted the statement, have never produced the genuine certified package, and have continued to conceal it to this day. Plaintiff alleges that the scheme corrupted the arbitration, preventing Plaintiff from testing the legitimacy of the stated reason

for his termination under the McDonnell Douglas framework, and caused concrete injury independent of any employment remedy.

2. The claims are based on objective, verifiable evidence. The static PDF is not the genuine Adobe Sign certified package. The false statement at the May 12 hearing is captured in a certified transcript. Red Bull itself produced the Adobe Acrobat Sign Final Audit Report for the Castaneda Engagement Agreement, which identifies the transaction by a unique Transaction ID, confirms the platform was Adobe Acrobat Sign, identifies Juan C. Castaneda as the creator and Kim Brooks as the signer, and records the document's completion on May 19, 2022. The production of this Adobe transaction record is difficult to reconcile with Red Bull's later statement that it was "not even in possession of the Adobe records." The facts set forth in this Complaint strongly support the inference that the genuine Adobe Sign certified package, or the complete Adobe transaction record from which authenticity can be confirmed, was in Defendants' possession, custody, control, or immediate retrieval capability, or could be obtained from Adobe using the Transaction ID. Adobe Inc., a neutral third party, can confirm or refute the authenticity of the document definitively, yet Red Bull has refused to consent to a subpoena. The genuine package remains concealed.

3. This lawsuit is not about Plaintiff's employment termination. That dispute is pending in arbitration. This lawsuit is about the fraudulent scheme itself—a scheme that originated before any litigation and before Plaintiff had any counsel, used the arbitration as one of several forums in which to operate, and caused Plaintiff concrete injury independent of any arbitration award. Plaintiff does not seek back pay, front pay, reinstatement, or any termination-based relief in this action. Those remedies remain in arbitration today. Plaintiff seeks damages caused by Defendants' alleged fraud and concealment independent of the termina-

tion remedies pending in arbitration. The harm is not confined to any single forum. It is a continuous injury flowing from a single fraudulent scheme, and it persists to this day.

4. The termination is alleged here solely as context for the origin, motive, chronology, and first manifestation of the fraudulent scheme. The chronology is continuous: (i) Plaintiff's resistance to Red Bull's COVID-19 mandate and the denial of his religious accommodation in February–March 2022; (ii) Red Bull's decision to terminate and the engagement of Castaneda on May 19, 2022—five days before any complaint Red Bull has identified was allegedly received—before Plaintiff had any counsel, under a "privileged investigation" agreement that identified no specific investigation and omitted Plaintiff's name; (iii) the sudden emergence of undocumented complaints on or about May 24, 2022; (iv) Red Bull's description of the same process as a "neutral investigation" in its official July 2022 Slater Letter responding to Plaintiff's cease-and-desist, and its use of that investigation to justify termination; (v) Red Bull's use of the investigation as the misconduct basis to contest Plaintiff's unemployment benefits, and the favorable practical outcome of that challenge as reflected by continued IDES deposits and no repayment, clawback, offset, withdrawal, or reversal shown in Plaintiff's independent bank records; (vi) the submission of a nongenuine static PDF as the Castaneda Engagement Agreement in the arbitration; (vii) the false statement at the May 12, 2026 arbitration hearing; and (viii) the continuing concealment of the genuine Adobe Sign certified package to the present day. This chronology establishes that the arbitration misconduct was not the origin of the fraud but the later forum where an earlier fraudulent scheme was continued and exposed. Plaintiff does not seek back pay, front pay, reinstatement, or termination-based relief in this action. The damages sought are independent of any employment remedy and flow directly from the fraudulent scheme itself.

5. The harm began before any arbitration existed and continues through the concealment of material evidence. Defendants' conduct has forced Plaintiff to expend time and resources investigating and correcting the record, has deprived him of the opportunity to test the legitimacy of his termination under the McDonnell Douglas framework, has caused reputational injury, and has inflicted emotional distress. That harm is the subject of this action.

### The "Mistake" Defense Is Not Supported by the Record

6. Defendants may argue that any false statements were unintentional—misunderstandings, miscommunications, or innocent errors. The facts alleged in this complaint do not support that characterization. The fraudulent scheme was not a single misstep. It was a coordinated pattern of deception that began with the decision to terminate Plaintiff and the engagement of Castaneda to create a pretextual justification—before any litigation was threatened—and that spanned multiple forums over several years. It succeeded in preventing Plaintiff from testing the justification for his termination.

7. First, the scheme involved at least five distinct fraudulent acts, each independently provable. A single mistake might be dismissed as an oversight. Five, concrete, separate acts, coordinated across years and multiple tribunals, cannot reasonably be characterized as innocent error.

8. Second, the false statement at the May 12, 2026 hearing was made by counsel for Red Bull, a partner at a major law firm. He knew what an audit report was. He knew how Adobe Sign worked. He knew his client's retention obligations. He had access to the audit report his client produced—an Adobe transaction record tied to the exact agreement at issue. A

lawyer who makes a factual representation to a tribunal without verifying his own client's production acted with, at minimum, reckless disregard for the truth.

9. Third, the statement has never been corrected. When Plaintiff identified five independent, verifiable facts demonstrating its falsity in his May 19, 2026 Reply, Ogletree Deakins and Red Bull remained silent. No retraction. No clarification. Nothing. A lawyer who makes an honest mistake corrects it immediately when shown the truth. Silence in the face of proof is strong evidence that the original statement was not an innocent error.

10. Fourth, the engagement letter references a "privileged investigation." The Slater Letter describes a "neutral investigation." Plaintiff alleges on information and belief that both documents were drafted, approved, reviewed, or transmitted through the same in-house legal function involving Defendant Kim Brooks. A party that describes the same investigation in contradictory terms to different tribunals—calling it neutral when it serves as a sword, and privileged when it serves as a shield—is not making an innocent mistake. It is executing a deliberate strategy.

11. Fifth, the certification order creates three possible outcomes, each bearing on authenticity and access to the genuine Adobe Sign package: certification after comparison to the genuine package; certification without comparison; or refusal to certify. Each outcome is relevant to whether Defendants had access to the genuine package and whether the static PDF can be authenticated. If the package or complete Adobe transaction record was available all along—as the facts support—their refusal to produce it and their silence in the face of the certification order is not a mistake. It is a choice, made to preserve the scheme.

12. These facts support a strong inference that the false statements were made knowingly or with reckless disregard for the truth, as part of a deliberate fraudulent scheme that began with the decision to terminate Plaintiff and the engagement of Castaneda to create a pretext.

## No Stay Is Warranted

13. Defendants may argue that this civil action should be stayed or that the claims against Red Bull should be compelled to arbitration under the Mutual Arbitration Agreement. Neither a stay nor arbitration is warranted. Nor does the FAA require a different result. Sections 2, 3, and 4 of the FAA enforce arbitration agreements according to ordinary contract and equitable principles, not beyond them. Section 2 preserves generally applicable legal and equitable defenses; Section 3 permits a stay only where arbitration will proceed in accordance with the terms of the agreement and the stay applicant is not in default; and Section 4 authorizes compelled arbitration only in the manner provided for in the agreement. Plaintiff alleges that Red Bull cannot satisfy those requirements on the facts pleaded here, or at minimum that limited discovery is required before Red Bull may invoke the MAA and FAA to force these independent fraud claims back into the same arbitral forum.

14. First, the fraud claims are independent torts, not employment disputes subject to the MAA. The MAA covers claims arising from or related to Plaintiff's employment or its termination. The claims here do not arise from Plaintiff's employment; they arise from a fraudulent scheme to conceal material evidence—a scheme that began before any employment dispute existed, before Plaintiff had any counsel, and before Plaintiff's employment was terminated. The damages sought are not back pay, front pay, reinstatement, or any

other employment remedy. They are tort damages caused by fraudulent concealment: transcript costs, defense costs, investigative expenses, reputational harm, and emotional distress. Although the fraud arose in the chronology of Plaintiff's employment dispute, the claims pleaded here seek relief for independent fraudulent concealment and multi-forum deception, not for termination itself or any employment remedy covered by the MAA. It is a free-standing tort that outlived the employment relationship and continues to cause injury independent of any employment remedy. It belongs in court. Even if the MAA's remedial provision is broad as to employment claims between Plaintiff and Red Bull, it cannot provide complete relief for the independent, multi-defendant fraud alleged here, including adjudication of liability and damages against Ogletree Deakins, Brooks, and Castaneda, who are not parties to the MAA, or federal court preservation and third-party discovery directed at the concealed Adobe package.

15. Second, the claims against the non-signatory defendants should not be compelled to arbitration on the facts alleged. Defendants Ogletree Deakins, Kim Brooks individually, and Juan Castaneda individually are not parties to the MAA. They did not sign it. Any attempt by them to compel arbitration would require a case-specific showing under applicable contract, agency, or equitable estoppel principles, and no such showing can be resolved against Plaintiff on the pleadings. The fraudulent scheme alleged in this Complaint was executed by all four defendants acting in concert. Red Bull is the primary actor and principal beneficiary of the scheme, but it did not act alone. The scheme cannot be fully and fairly adjudicated without Red Bull's presence as a party in the forum where the other three defendants are already required to appear.

16. Third, requiring Plaintiff to litigate the same fraud in two different forums would be fundamentally unfair and would inflict severe prejudice. If Red Bull were compelled to arbitrate while the other three defendants remained in federal court, Plaintiff would be forced to prove the same fraudulent scheme twice—once before an arbitrator who has already declined to address the demonstrably false statement, and again before a federal jury. Plaintiff would bear the financial and emotional burden of dual proceedings. Key evidence controlled by Red Bull would be shielded from federal discovery. The risk of inconsistent rulings on the same core facts would be acute. The arbitrator could find that the investigation was legitimate while the federal jury finds it was a sham—or vice versa. And even if Plaintiff prevailed in arbitration, arbitration alone could not provide complete relief: it could not adjudicate liability or award damages against the non-signatory defendants, could not provide federal court preservation and third-party discovery directed at Adobe, and would leave Plaintiff forced to litigate the remaining fraud issues in federal court anyway. That is not merely inefficient; it is manifestly unjust. Courts have the inherent authority to prevent such prejudice and to ensure that a party is not forced to fight the same battle in two places at once.

17. Fourth, the intertwined nature of the allegations supports keeping all defendants in a single forum. The same facts, the same documents, the same witnesses, and the same legal questions lie at the core of the claims against every defendant. Severing Red Bull into arbitration while the remaining defendants proceed in federal court would create duplicative proceedings, inconsistent factual findings, and unnecessary prejudice. At minimum, the intertwined nature of the allegations counsels against staying the federal claims against the non-signatory defendants and supports resolving any arbitrability dispute on a complete

record rather than on the pleadings. Keeping all four defendants in a single forum serves judicial economy and allows the alleged fraudulent scheme to be adjudicated as a single course of conduct.

18. Fifth, the FAA's vacatur provision, 9 U.S.C. § 10(a)(1), confirms that fraud in the arbitral process is a recognized basis for judicial relief after an award. Plaintiff alleges that the fraud is ongoing, that waiting for post-award vacatur would not provide a complete remedy against all Defendants, and that the court should therefore permit the fraud claims to proceed now rather than deferring them.

19. Sixth, vacatur under the FAA is not a complete remedy for the fraud alleged against any defendant. Even if Plaintiff were to await an arbitration award and then seek vacatur under § 10(a)(1) on the ground that the award was procured by fraud, that remedy would only set aside the award. It would not provide damages for the fraud itself—damages Plaintiff seeks in this action against Red Bull. It would not provide declaratory or injunctive relief. It would not provide punitive damages. And it would not reach Defendants Ogletree Deakins, Brooks, or Castaneda at all, because they are not parties to the arbitration and cannot be held accountable in that forum for their roles in the alleged scheme. The only forum that can provide a complete and meaningful remedy for all claims against all defendants is this Court.

20. Seventh, the arbitrator has been formally notified of the false statement and has taken no corrective action. He has denied authentication, rejected the sword-and-shield doctrine without legal reasoning, and declined to address the demonstrably false statement. A stay or an order compelling arbitration would leave Plaintiff in a proceeding where the arbitrator has declined to address the demonstrably false statement, while the evidence of the

fraud is controlled by the very parties who committed it. The arbitrator's inaction confirms that the arbitration forum is not equipped to resolve the fraud claims. Separately, Plaintiff alleges that the arbitration has not afforded the procedural protections Red Bull invokes as the basis for enforcing the MAA, including reasonable discovery under MAA § 5 and meaningful rulings consistent with the agreement's promised procedural safeguards. These alleged departures further support denying a stay or, at minimum, permitting limited discovery before deciding whether Red Bull may invoke FAA § 3 and the MAA to force these independent fraud claims back into that forum. A party that allegedly corrupted the arbitral process through false statements, concealment of material evidence, and continued refusal to produce the genuine Adobe package is in no equitable position to demand that Plaintiff be forced back into that same corrupted process, and the pleaded facts support a finding that Red Bull is in default of any claimed right to obtain a stay under FAA § 3. At minimum, before granting any stay or compelling Red Bull back to arbitration, the Court should permit limited discovery into whether Red Bull is in default under FAA § 3 and whether the genuine Adobe Sign certified package was within Red Bull's possession, custody, control, or immediate retrieval capability.

21. Eighth, delay would cause irreparable harm. Plaintiff alleges that the genuine Adobe Sign certified package, or the complete Adobe transaction record from which authenticity can be confirmed, remains retrievable through Defendants, the Adobe Sign account holder, or Adobe using the Transaction ID—but if it is deleted during a stay or during an arbitration in which Plaintiff lacks the discovery tools of federal court, whether intentionally or through routine data purge, the best evidence of the fraud will be lost forever. The spoliation risk is real and immediate. Moreover, each day the arbitration continues without the

fraud being resolved deepens the prejudice to Plaintiff, who is forced to litigate in a forum where the central evidence is concealed and the opposing party's misrepresentations remain uncorrected.

22. Ninth, the fraud claims are pleaded against parties who never agreed to arbitrate them and seek damages that no arbitrator can award against the non-signatory defendants. The MAA was designed to resolve employment disputes between Plaintiff and Red Bull, not multi-defendant fraud claims seeking relief against non-signatories for conduct that allegedly began before any employment dispute existed. Keeping all four defendants in federal court is the only way to resolve this controversy fully, fairly, and finally.

**The Illinois Litigation Privilege Does Not Shield the Fraudulent Scheme**

23. Plaintiff alleges the conduct was not protected advocacy but independent fraudulent concealment of material evidence. The fraudulent scheme did not begin with the arbitration. It did not begin with the Slater Letter. It began when Red Bull made the decision to terminate Plaintiff's employment and then engaged Castaneda in May 2022 to create a pretextual justification for that decision—before any litigation was threatened, before any administrative proceeding was filed, before any cease-and-desist letter was sent, and before Plaintiff had retained counsel. The engagement was signed on May 19, 2022—five days before any complaint Red Bull has identified was allegedly received. An investigation commissioned before the complaints that supposedly prompted it is not a response to employee misconduct; it is a business decision to manufacture a justification for termination. The scheme continued through the Slater Letter (Red Bull's official response to Plaintiff's cease-and-desist, allegedly drafted, approved, reviewed, or transmitted through Red Bull's in-house le-

gal function involving Defendant Kim Brooks), where Red Bull described the investigation as "neutral," and through a separate administrative proceeding before the IDES, where Plaintiff alleges Red Bull used the investigation as the misconduct basis to contest Plaintiff's entitlement to benefits. The arbitration was supposed to be the forum in which Plaintiff could finally test the legitimacy of Red Bull's stated reason for his termination. Instead, the fraud corrupted that process from within, preventing the arbitration from serving its function as a truth-seeking mechanism. The fraud is not a discovery dispute incidental to the arbitration. It is a pattern of deception spanning multiple forums, originating in a decision made before any litigation was contemplated, and it has systematically denied Plaintiff his right under McDonnell Douglas to test the justification for his termination. That is an independent wrong, complete in itself, and it falls outside the scope of any reasonable litigation privilege. Additionally, the Illinois litigation privilege does not bar this action for multiple independent reasons:

(a) The scheme began in May 2022 before any litigation was threatened, before Plaintiff had retained counsel, and before any administrative charge or cease-and-desist letter existed. At that point, the alleged conduct was not communication preliminary to a proposed proceeding, but pre-litigation conduct used to manufacture a termination justification. The engagement of Castaneda on May 19, 2022—five days before any complaint Red Bull has identified was allegedly received—underscores that the investigation was a business initiative, not a response to any legal threat.

(b) At the time Castaneda was engaged on May 19, 2022, Plaintiff had no legal representation and had made no threat of litigation. Plaintiff did not retain counsel until July 6, 2022—seven weeks after the engagement. Red Bull could not have been antici-

pating litigation by an unrepresented employee against whom no charge, complaint, or demand had been made. If Defendants now claim they anticipated litigation at that time, that assertion would directly contradict the contemporaneous record and would itself be an admission that the investigation was pretextual.

(c) This JAMS employment arbitration is a private contractual forum, not a judicial proceeding. In Order No. 7, the Arbitrator denied Respondent's own motion to disqualify Plaintiff's non-lawyer representative and expressly recognized that JAMS Employment Rule 12(a) permits representation by "counsel or any other person"—an exception to the formal litigation rule. The Arbitrator emphasized that JAMS employment arbitration permits relaxed formalities, including relaxed evidentiary rules, witnesses who may or may not testify under oath, confidential proceedings, and procedures that vary from formal litigation. Relying on Illinois appellate authority, the Arbitrator quoted the principle that "arbitration is not a judicial proceeding but, rather, an alternative to such a proceeding." Having asked the Arbitrator to import formal litigation restrictions into this private arbitration and having lost that argument, Red Bull cannot now ignore the arbitration's relaxed, non-judicial structure when invoking litigation privilege. At minimum, whether this specific JAMS arbitration should be treated as a quasi-judicial proceeding for privilege purposes—given the relaxed formalities, the non-lawyer representation, and the Arbitrator's own characterization—should not be resolved against Plaintiff at the pleading stage.

(d) Under the Erie doctrine, a federal court applying Illinois law should not extend state law beyond the boundaries established by the Illinois Supreme Court. Because the Illinois Supreme Court has not held that the litigation privilege applies to private employ-

ment arbitration under circumstances comparable to those present here, this Court should decline to extend the privilege at the pleading stage.

(e) Plaintiff further alleges that applying the Illinois litigation privilege to bar these claims at the pleading stage would impair the federal employment-law framework governing Plaintiff's pending discrimination and retaliation claims. Under McDonnell Douglas, once an employer states a legitimate, non-discriminatory reason for termination, the employee must have a meaningful opportunity to show that the stated reason is pretextual. Red Bull identified the Castaneda investigation as its stated reason, used that investigation as a sword in multiple forums, and then invoked privilege to shield the very evidence needed to test that reason. Plaintiff alleges that applying the litigation privilege to bar independent fraud claims arising from conduct designed to obstruct that testing process would frustrate the truth-seeking function of the federal employment-law framework. At minimum, whether Illinois privilege doctrine can be applied to bar these independent fraud claims—which seek damages distinct from any employment remedy and arise from conduct that allegedly undermined Plaintiff's ability to test Red Bull's stated reason—should not be resolved against Plaintiff on a motion to dismiss.

### The Fraudulent Acts

24. The fraudulent scheme—which originated with the decision to terminate Plaintiff and the engagement of Castaneda in May 2022—consists of at least five distinct, independently provable acts. Each act was a component of a single, coordinated scheme, and each constituted a false representation to the arbitral tribunal.

25. **Fraudulent Act One: Submission of a Misleading Document.** Red Bull submitted the engagement letter to the Tribunal and represented it as the contract that authorized the neutral investigation into Charles Leclerc. The engagement letter references a "privileged investigation"—the opposite of the neutral investigation described in the July 22, 2022 Slater Letter. It does not mention Leclerc at all. It does not describe an investigation of Leclerc. The engagement letter was dated May 18, 2022, and fully executed on May 19, 2022—five days before any complaint Red Bull has identified was allegedly received by Red Bull's HR department. Red Bull nevertheless submitted it to the Tribunal as evidence of a legitimate, complaint-driven investigation.

26. **Fraudulent Act Two: The False Statement About Retrievability.** At the May 12, 2026 hearing, Red Bull's counsel told the arbitrator that Red Bull was "not even in possession of the Adobe records" and that the records were likely with the outside law firm. Plaintiff contends this statement was false, based on the facts set forth in this Complaint—including Red Bull's own production of the Adobe Acrobat Sign Final Audit Report for this exact transaction.

27. **Fraudulent Act Three: Submission of a Non-Genuine Document While the Genuine Package Was in Their Possession.** Red Bull submitted a static PDF and represented it as the genuine Castaneda Engagement Agreement. It was not. Plaintiff alleges that the genuine Adobe Sign certified package, or the complete Adobe transaction record from which authenticity can be confirmed, was in Red Bull's possession, custody, control, or immediate retrieval capability, or could be obtained from Adobe using the Transaction ID. Red Bull submitted a different, inferior document. Plaintiff alleges this was a false representa-

tion. Adobe Inc., a neutral third party, can confirm or refute the authenticity of the document definitively. Red Bull has refused to consent to a subpoena to Adobe.

28. **Fraudulent Act Four: The Sword-and-Shield Contradiction.** Red Bull described the investigation as "neutral" in the Slater Letter and used it as the misconduct basis in the IDES proceeding, while describing it as "privileged" in the arbitration to hide the underlying materials. These inconsistent descriptions demonstrate a deliberate scheme to shift explanations depending on the forum—using the investigation as a sword when it benefits Red Bull, and wielding privilege as a shield when Plaintiff seeks to test the basis of the termination.

29. **Fraudulent Act Five: Continuing Concealment and Failure to Correct.** Despite being confronted with facts demonstrating falsity, Defendants have never retracted the false statement, have never produced the genuine Adobe Sign certified package, and have never explained how they can possess the audit report but not the package it came from. The concealment is ongoing, and it is a deliberate continuation of the original fraudulent scheme.

30. **Additional Matter Warranting Discovery: The Confidentiality Order Signature Anomaly.** The factual observations supporting this additional request for discovery are set forth in Paragraph 77 below. Plaintiff does not plead the signature anomaly as an independent fraud claim and does not rely on it as necessary to state any count. Plaintiff seeks discovery regarding the provenance of the signature file to the extent relevant to procedural irregularity, preservation, FAA § 3 default, and unclean hands.

## II. THE PARTIES

31. Plaintiff Charles Leclerc is a citizen of Illinois, an individual residing at 400 W. Ontario St., #603, Chicago, Illinois 60654. He is a former employee of Defendant Red Bull North America, Inc. and is the claimant in the underlying JAMS arbitration.

32. Defendant Red Bull North America, Inc. ("Red Bull") is, on information and belief, a corporation whose state of incorporation is California and whose principal place of business is in Santa Monica, California. Red Bull is, on information and belief, not a citizen of Illinois. Red Bull employed Plaintiff from approximately January 25, 2021 until his termination on July 11, 2022. Red Bull is vicariously liable for the acts of its counsel and agents committed within the scope of their authority, and is directly liable for its own participation in the fraudulent scheme.

33. Defendant Ogletree, Deakins, Nash, Smoak & Stewart, P.C. ("Ogletree Deakins") is, on information and belief, a professional corporation organized under the laws of South Carolina, with its principal office and principal place of business in Greenville, South Carolina. Ogletree Deakins is, on information and belief, not a citizen of Illinois. It maintains an office in Chicago, Illinois. Ogletree Deakins represented Red Bull in the underlying JAMS arbitration. It is vicariously liable for the tortious acts of its partners and associates committed within the scope of their authority, employment, or agency, and is directly liable for its own negligent supervision and sanctioning of the fraudulent strategy.

34. Defendant Kim Brooks is the former Senior Legal Counsel of Red Bull North America, Inc., a position she held from March 2021 to October 2025. She is currently an Employment Counsel (Contractor) for Red Bull, a position she has held since March 2026. Brooks

is a citizen of California. Based on her role as Red Bull's Senior Legal Counsel, her involvement in the Castaneda engagement, and her apparent role as Red Bull's legal point of contact, Plaintiff alleges on information and belief that Brooks was the architect of the litigation strategy that led to the submission of the non-genuine static PDF, that she drafted or approved the July 22, 2022 Slater letter, that she directed the unemployment benefits challenges, that she retained Ogletree Deakins, and that she produced or directed the production of the static PDF to Ogletree. Plaintiff alleges that Brooks is a person with knowledge within the meaning of the Arbitrator's certification order and cannot truthfully certify the static PDF without comparing it to the genuine Adobe Sign certified package, the complete Adobe transaction record, or other reliable Adobe source materials sufficient to confirm authenticity, accuracy, and completeness. She is sued individually.

35. Defendant Juan C. Castaneda is an attorney and partner at Castaneda & Heidelman LLP. He is a citizen of California. Plaintiff alleges on information and belief that Castaneda was retained by Red Bull in May 2022—before any litigation was threatened, before any administrative proceeding was filed, and before Plaintiff's employment was terminated—to create a pretextual justification for a termination decision Red Bull had already made. He is the owner or administrator of the Adobe Sign account through which the Engagement Agreement was executed. He drafted the agreement, signed it, and transmitted it to Brooks via Adobe Sign. As the creator of the Adobe Sign transaction, Castaneda had access to, or was in a position to retrieve or request, the Adobe Sign transaction record and related completion materials. Under his own firm's stated policy, he retains files while the matter is active, and the arbitration is still active. Plaintiff alleges on information and belief that, in connection with the engagement, Adobe Sign transaction, and related records, Castaneda

acted in his capacity as a partner of Castaneda & Heidelman LLP and in the ordinary course of the firm's legal-services business. He is sued individually for his alleged participation in the fraudulent scheme and, in the alternative, for negligent spoliation of evidence if he failed to preserve, deleted, or permitted the loss of the genuine package.

## III. JURISDICTION AND VENUE

36. This Court has subject matter jurisdiction under 28 U.S.C. § 1332. Plaintiff is a citizen of Illinois. Defendants are, on information and belief, citizens of California and South Carolina, and no Defendant is, on information and belief, a citizen of Illinois. The amount in controversy exceeds $75,000, exclusive of interest and costs.

37. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. The underlying JAMS arbitration is seated in Chicago, Illinois, within the Northern District of Illinois. The non-genuine static PDF was submitted to the arbitral tribunal sitting in this District. The May 12, 2026 false statement was made at a hearing conducted via Zoom and attended by parties and counsel in this District. The fraud was directed at an arbitral tribunal sitting in this District.

## IV. FACTUAL BACKGROUND

### A. Plaintiff Leclerc's Employment and the Origin of the Fraudulent Scheme

38. Plaintiff Charles Leclerc was employed by Red Bull North America, Inc. as a Regional Account Manager from approximately January 25, 2021 until his termination on July 11, 2022.

39. In December 2021, Red Bull announced a COVID-19 mandate requiring either vaccination or testing, and began enforcing it on or about January 10, 2022. Plaintiff requested a religious accommodation.

40. On February 23, 2022, Plaintiff submitted his formal religious accommodation request. On February 25, 2022, Red Bull's Benefits department acknowledged receipt and informed Plaintiff that a determination was expected "the week of February 28, 2022." Red Bull also informed Plaintiff that throughout this process, Plaintiff was not allowed to conduct any in-person activity, including his work and internal company functions. Red Bull did not meet the February 28, 2022 timeline. It took more than three additional weeks—until March 18, 2022—for Red Bull to act.

41. On March 18, 2022, Red Bull denied Plaintiff's religious accommodation request without legal justification or basis, and placed the burden on him to propose an alternative: "If you would like for us to consider other types of tests that you do not object to, please let us know, as that may be something we can accommodate." Red Bull did not suggest any alternatives itself.

42. On March 25, 2022, Red Bull threatened to terminate Plaintiff's employment on April 4, 2022 if he did not comply with its mandate. That same day, facing imminent termination, Plaintiff proposed a spit test as an alternative to the nasal swab consisting of ethylene oxide—a class 1 carcinogenic. On March 30, 2022, Red Bull approved the spit test. The accommodation was reached only because Plaintiff proposed it himself, under threat of termination, after an unjustified denial with no legal basis that took weeks longer than Red Bull had represented.

43. **The Fraudulent Scheme Begins.** The accommodation of Plaintiff's religious objection did not resolve the matter for Red Bull. Plaintiff had resisted the company's COVID-19 mandate, and the close temporal proximity between his accommodation request and the sudden emergence of alleged complaints—combined with the complete absence of any contemporaneous documentation of those complaints—supports the inference that Red Bull had decided to terminate his employment and needed a pretextual justification. It is at this point, in May 2022 or before, that Plaintiff alleges the fraudulent scheme began.

44. To create that pretext, Red Bull engaged Defendant Juan C. Castaneda, Esq. of Castaneda & Heidelman LLP. The engagement, dated May 19, 2022, stated: *"The purpose of this letter is to confirm our engagement by Red Bull North America, Inc. ('Client'), to represent the Client in connection with a privileged investigation ('Matter'). We appreciate your confidence and thank you for selecting us as investigation counsel."* It does not mention Plaintiff. It does not agree to perform investigation services; it agrees only to provide legal services in connection with some investigation. It does not specify what work was to be performed, what level of investigation was required, or what would constitute completion. The engagement letter's studied vagueness—it does not mention Leclerc, does not agree to perform investigation services, and does not specify any work to be performed—supports the inference that the engagement was designed to create the appearance of a legitimate investigation while preserving the ability to shield whatever materials were generated behind a claim of privilege.

45. At the time Castaneda was engaged, there was no litigation. No internal complaints to Red Bull's HR from Plaintiff. No administrative proceeding had been filed. No cease-and-desist letter had been sent. Plaintiff had no legal representation and had not retained counsel (rep-

resentation was not formalized until July 6, 2022). Plaintiff was still an active employee. The engagement was not a response to any legal threat. Plaintiff alleges that it was an affirmative step taken to manufacture a justification for a termination decision that had already been made. This is the origin of the fraudulent scheme.

46. On or about May 24, 2022—less than two months after Plaintiff was forced to propose his own accommodation under threat of termination—Red Bull's Talent department allegedly received complaints about Plaintiff's interpersonal behavior. No HR records, no warnings from management, no documentation of any kind have ever been produced to substantiate these alleged complaints. The close temporal proximity to Plaintiff's accommodation request, combined with the complete absence of contemporaneous documentation, strongly suggests the complaints were either fabricated or seized upon as the pretext the fraudulent scheme required.

47. The sequence is facially irreconcilable with a genuine, complaint-driven investigation. Red Bull's own Slater Letter states that complaints were first lodged with HR "on or about May 24, 2022" and that Castaneda was engaged "given the nature and number of the complaints." Yet the Castaneda engagement letter is dated May 18, 2022, and was fully executed by both signatories on May 19, 2022—five days before any complaint Red Bull has identified was allegedly received. A neutral investigation follows complaints. A pretextual investigation is commissioned before them. The engagement of Castaneda before any identified complaint had allegedly been received is powerful evidence that the investigation was not a response to misconduct, but a pre-emptive step taken to manufacture a justification for a termination decision that had already been made. The Slater Letter's statement that Castaneda was engaged because of the complaints is demonstrably false.

48. On July 1, 2022, Plaintiff was summoned to a surprise videoconference with Defendant Castaneda. Plaintiff was not told the purpose of the meeting in advance. Castaneda informed Plaintiff for the first time that Red Bull was conducting an internal investigation based on allegations that Plaintiff's team felt "uncomfortable" working with him and that he had engaged in racist, slanderous, and unethical behavior. The questions Castaneda posed concerned incidents that no reasonable person would believe constituted racist, slanderous, or unethical conduct, or were based on plainly false information. Based on the facts alleged—including that the only investigatory activity of which Plaintiff has ever been made aware is this single conversation, that the engagement letter specified no investigatory work to be performed, that the Slater Letter's description of a "multitude of witnesses" has never been substantiated by any documentation produced in discovery, and that Plaintiff has never been shown any evidence that any other investigation occurred—Plaintiff alleges that the investigation was a sham from the start, a pretextual exercise designed to generate a paper trail that could be used to justify termination.

49. Plaintiff's attorney formally entered into a representation agreement with Plaintiff on July 6, 2022. On July 7, 2022, Plaintiff submitted a cease-and-desist letter to Red Bull prepared by that attorney. Plaintiff did not have signed representation or ongoing legal counsel at any time before July 6, 2022. On July 11, 2022, Plaintiff was terminated for allegedly having violated company policy without any specificity.

50. On July 15, 2022, Red Bull's counsel formally communicated to Leclerc's counsel that they needed time to respond to the cease-and-desist.

**B. The July 22, 2022 Slater Letter**

51. On July 22, 2022, Jared W. Slater, counsel for Red Bull, responded to Plaintiff's cease-and-desist by letter (the "Slater Letter"). The Slater Letter stated, in relevant part:

"Given the nature and number of the complaints, RBNA engaged Juan C. Castaneda, Esq. of Castaneda & Heidelman LLP to conduct a neutral investigation. Mr. Castaneda interviewed a multitude of witnesses who independently corroborated the complaints raised. … Following the results of the month-long investigation, RBNA made the decision to terminate Mr. Leclerc's employment, effective July 11, 2022." (emphasis added).

52. Based on her role as Red Bull's Senior Legal Counsel, her involvement in the Castaneda engagement, and her apparent role as Red Bull's legal point of contact, Plaintiff alleges on information and belief that the Slater Letter was drafted, approved, or reviewed by Defendant Kim Brooks. The Slater Letter disclosed Red Bull's official position: that Plaintiff was terminated because of a "neutral investigation" and its results—supplementing justification for the alleged bare policy violation stated on July 11 while still absent of any facts, context, or explanation to support it, and a description fundamentally inconsistent with the "privileged investigation" referenced in the Castaneda engagement letter.

53. On July 28, 2022, Plaintiff filed a charge of discrimination with the EEOC and the Illinois Department of Human Rights.

**C. The IDES Proceeding and Red Bull's Use of the Castaneda Investigation**

54. Following his July 11, 2022 termination by Red Bull, Plaintiff applied for unemployment insurance benefits through the Illinois Department of Employment Security ("IDES"). Red Bull was Plaintiff's only employer in Illinois during the relevant 18-month employ-

ment-history period. Plaintiff later received IDES benefit payments, as reflected in independent bank records for his sole bank account. Those records show deposits from IDES and do not reflect any repayment, clawback, withdrawal, offset, or reversal to IDES from that account.

55. Plaintiff's claim became the subject of a formal administrative proceeding before an IDES administrative law judge/referee. Under the public IDES process, an ALJ/referee proceeding is not the ordinary uncontested payment process; it occurs when a claim is appealed or disputed, and the claimant and employer may present their positions and evidence. Plaintiff personally participated in that proceeding.

56. Plaintiff does not rely on any IDES finding, determination, decision, ruling, order, transcript, agency file, or confidential IDES record to prove the existence, outcome, or basis of the IDES proceeding. Plaintiff relies on independent non-IDES evidence, including his employment history, his personal knowledge, his bank records, Red Bull's own non-IDES arbitration filings, and public IDES process rules.

57. Red Bull later acknowledged Plaintiff's IDES proceeding in a non-IDES arbitration filing dated May 16, 2025. In that filing, Red Bull discussed the existence of an IDES ALJ/referee decision and made arguments concerning whether "Respondent"—defined in the filing as Red Bull—submitted documents to IDES. Red Bull's own filing therefore independently links Red Bull to the IDES proceeding.

58. Based on the foregoing independent evidence, Plaintiff alleges that Red Bull participated as the employer in the IDES proceeding and contested Plaintiff's entitlement to benefits. That conclusion follows from the known facts: Plaintiff applied for benefits after Red Bull

terminated him; Red Bull was his only Illinois employer; his claim entered an ALJ/referee appeal or dispute proceeding; and Red Bull's own arbitration filing acknowledges that proceeding.

59. Red Bull's stated basis for Plaintiff's termination was the Castaneda investigation. Its July 22, 2022 Slater Letter stated that Plaintiff was terminated following an investigation into alleged misconduct. Its May 16, 2025 arbitration filing confirmed the same rationale, stating that the investigation "found that Claimant engaged in conduct that was violative of Respondent's policies" and "was the basis for Respondent's decision to terminate Claimant." Red Bull has identified no other basis for termination.

60. From these non-IDES facts, Plaintiff alleges that Red Bull used the Castaneda investigation as the misconduct basis for contesting Plaintiff's entitlement to IDES benefits. That conclusion follows from the sequence: Red Bull terminated Plaintiff based on the investigation; Plaintiff sought benefits; his claim entered an ALJ/referee dispute proceeding; Red Bull was the only employer connected to the claim; Red Bull acknowledged the proceeding in its own filing; and Red Bull's only stated basis for termination was the investigation. Under the public IDES process and Illinois unemployment law, when an employer contests benefits after a discharge for alleged misconduct, the employer's position turns on the asserted reason for discharge.

61. Plaintiff further alleges that the practical outcome of Red Bull's challenges were favorable to him. The public IDES process permits overpayment recovery or offset if a claimant is paid benefits and later found ineligible. Plaintiff's bank records show continued IDES deposits and no repayment, clawback, withdrawal, offset, or reversal to IDES from his sole bank account. These non-IDES financial facts support the inference that Red Bull's chal-

lenges did not result in a denial or termination of Plaintiff's benefits, or in a repayment obligation through that account.

62. In its May 16, 2025 arbitration filing, Red Bull admitted that investigation materials existed: Castaneda interviewed seven witnesses, took notes, gave a verbal report, and Brooks prepared a summary. Red Bull nevertheless asserted attorney-client privilege and work-product protection over those materials. Plaintiff alleges that Red Bull thereby used the investigation as a sword to justify termination and contest benefits, while shielding the underlying materials from scrutiny.

63. Plaintiff will rely on independent, non-IDES evidence to prove the existence, nature, and asserted role of the investigation materials, including Red Bull's arbitration admissions, Order No. 16, privilege logs, in-camera directives, and Defendants' own non-IDES records. Plaintiff expressly disclaims reliance on any IDES finding, determination, decision, ruling, order, transcript, agency file, or confidential IDES record as binding, conclusive, or admissible proof of the truth of any matter.

## D. The Sword-and-Shield Contradiction

64. Under sword-and-shield principles, a party cannot use an investigation offensively to justify its actions while simultaneously concealing the evidence necessary to test that justification; doing so supports waiver or limitation of privilege to the extent fairness requires.

65. Red Bull used the alleged investigation as a sword to justify Plaintiff's termination—first in the Slater Letter, which described the investigation as "neutral," and second in the IDES proceeding, where Plaintiff alleges Red Bull contested his entitlement to benefits using the investigation as the misconduct basis. Plaintiff further alleges that the practical outcome of

Red Bull's challenges were favorable to him, as reflected by continued IDES deposits and no repayment, clawback, offset, withdrawal, or reversal shown in Plaintiff's independent bank records. Red Bull simultaneously used the claim of privilege as a shield to prevent Plaintiff from accessing the very evidence that would either corroborate or refute its stated rationale.

66. The Slater Letter describes the investigation as "neutral." A neutral fact-finding investigation conducted for business purposes typically does not generate attorney-client privilege over the facts gathered. If the investigation was truly neutral, as Red Bull represented, the materials should be discoverable.

67. The Purported Agreement describes the engagement as a representation in "connection with a privileged investigation." It purports to cloak an entire investigation in attorney-client privilege and work product protection, rendering everything undiscoverable.

68. These two descriptions are inconsistent. They demonstrate a deliberate scheme to shift explanations depending on the forum—using the investigation as a sword when it benefits Red Bull, and wielding privilege as a shield when Plaintiff seeks to test the basis of the termination. The scheme's origin at the engagement stage—before any proceeding was pending—underscores that it is not shielded by any litigation privilege. The arbitration was not the source of the fraud. It was the forum in which the fraud was finally exposed.

69. **The McDonnell Douglas Framework and the Right to Test the Stated Reason.** Under the McDonnell Douglas burden-shifting framework that governs Plaintiff Leclerc's discrimination and retaliation claims, once an employee establishes a prima facie case, the employer must articulate a legitimate, non-discriminatory reason for termination. The em-

ployee must then be given a fair opportunity to prove that the stated reason is pretextual. Red Bull identified the results of the Castaneda investigation as its stated justification for terminating Leclerc in its formal response to his cease-and-desist letter (the Slater Letter). By simultaneously using that investigation as a sword—calling it "neutral" in the Slater Letter and using it as the misconduct basis in the IDES proceeding—while shielding its contents behind a claim of privilege in the arbitration via an unauthentic purported engagement agreement with Castaneda, Red Bull prevented Leclerc from exercising his right to test the legitimacy of that reason.

70. Plaintiff alleges, based on the facts set forth above—including the absence of any documented investigation, the contradiction between the engagement letter and the Slater Letter, and the temporal proximity between Plaintiff's accommodation request and the alleged complaints—that the stated reason itself was the product of the fraudulent scheme, and that Red Bull engaged Castaneda not to conduct a genuine investigation but to create a pretextual justification for a termination decision that had already been made. The investigation materials—the genuine engagement agreement, the interview notes, the findings, the communications to the decision makers etc.—were always intended to be concealed, because they would have revealed the pretext. Without them, McDonnell Douglas is reduced to an empty formality: the employer formally articulates a reason, and the employee is denied the tools to challenge it. The fraud on the tribunal—submitting a document that is not even what it purports to be, submitting a non-genuine engagement document, falsely claiming the genuine Adobe package was irretrievable, and concealing the authentic records—was the mechanism by which this obstruction was accomplished. The fraud was not a peripheral discovery dispute. It was a targeted effort to ensure that Leclerc could never test

whether the investigation was genuine or pretextual, and it is actively preventing him from doing so. The McDonnell Douglas framework guarantees a meaningful opportunity to prove pretext. The Defendants' fraud denied him that opportunity. That is a substantive wrong, independent of the arbitration's outcome, and it caused Leclerc to litigate for years in a corrupted process where the central evidence was systematically hidden.

### E. The Mutual Arbitration Agreement and Initiation of Arbitration

71. Plaintiff and Red Bull are parties to a Mutual Arbitration Agreement ("MAA") that requires arbitration of employment-related disputes before JAMS, under the JAMS Employment Arbitration Rules and Procedures.

72. The MAA provides, in relevant part:

• Section 5: "The parties to the arbitration shall be entitled to conduct reasonable discovery."

• Section 6: "The arbitrator may award any form of remedy or relief … that would otherwise be available to an individual claimant in court of competent jurisdiction."

• Section 7: "The decision … shall contain the essential findings of fact and conclusions of law on which the decision is based."

• Section 8: "Company agrees to pay all of the fees and costs that are unique to arbitration."

73. The JAMS Employment Minimum Standards, incorporated into the proceeding, further require:

• Standard No. 4: "an exchange of core information prior to the arbitration."

• Standard No. 5: the right to "present proof, through testimony and documentary evidence, and cross-examine witnesses."

• Standard No. 6: "All other costs must be borne by the company."

74. On July 28, 2022, Plaintiff filed a Charge of Discrimination with the EEOC and the Illinois Department of Human Rights. After administrative delays, Plaintiff received a Right to Sue letter on April 23, 2024.

75. The Consolidated Amended Demand for Arbitration was filed on November 5, 2024, per the Arbitrator's request. The supplementation of the Illinois Human Rights Act (775 ILCS 5/) was submitted on November 12, 2024, and approved orally without objection from Respondent. The arbitration has been active since approximately July 14, 2024.

76. The arbitration was assigned to Arbitrator John C. Griffin (Ret.) of JAMS. In Order No. 7, citing JAMS Employment Rule 12(a) and Illinois authority distinguishing arbitration from judicial proceedings, the Arbitrator permitted Plaintiff's non-lawyer representative to appear and advocate on Plaintiff's behalf. Defendant Ogletree Deakins appeared on behalf of Red Bull.

77. In the arbitration, a confidentiality order was entered. The order was conceived, drafted, and submitted by Red Bull's counsel, with no input from the Arbitrator. The MAA contains no confidentiality provision binding the parties. Although JAMS Rule 26 permits an arbitrator to issue orders protecting proprietary information, trade secrets, or other sensitive information, the default JAMS confidentiality obligation applies to JAMS and the Arbitrator, not to the litigants themselves. Plaintiff alleges that the order imposed party-level confidentiality obligations beyond those contained in the MAA or required by the default JAMS

rule. The Arbitrator has never personally signed any order in this proceeding; the Case Manager ordinarily applies a standard PNG signature file. The confidentiality order, however, bore a different signature file that had never been used before or since—one that did not match the Arbitrator's handwriting and was not the standard file applied by the Case Manager. Plaintiff alleges, on information and belief, that Red Bull's counsel caused the order to be submitted to JAMS with a signature already affixed, without the Arbitrator's knowledge or authorization.

### F. The Submission of the Non-Genuine Static PDF

78. In February 2025, Plaintiff served Requests for Production of Documents on Red Bull, including a request for all materials related to the Castaneda investigation and the engagement agreement between Red Bull and Castaneda.

79. Red Bull failed to comply with the discovery deadline. Therefore, on May 1, 2025, Plaintiff moved to compel production. The Arbitrator has never sanctioned Red Bull or enforced his orders onto Red Bull to this day despite their contempt of them.

80. In response, Red Bull claimed that "no report exists" from the Castaneda relationship, yet simultaneously asserted privilege over the investigation materials—a logically contradictory position.

81. On September 4, 2025, Plaintiff filed a Motion to Compel Production of the Castaneda Engagement Agreement Contract.

82. On or about September 9, 2025, Red Bull, through Ogletree Deakins and, on information and belief, Defendant Brooks, produced a document it claimed was the genuine Castaneda Engagement Agreement (the "Purported Agreement"). The Purported Agreement was a

static PDF with a metadata receipt page appended. It was not a genuine Adobe Sign certified package. It lacked an embedded digital certificate, a tamper-evident cryptographic seal, complete signer identity verification, and the ability to be independently verified as authentic and unaltered.

83. Plaintiff alleges that the genuine Adobe Sign certified package, or the complete Adobe transaction record from which authenticity can be confirmed, was in Red Bull's possession, custody, control, or immediate retrieval capability, or could be obtained from Adobe using the Transaction ID. Red Bull submitted a different, inferior document. Plaintiff alleges this was a false representation. Adobe Inc., a neutral third party, can confirm or refute the authenticity of the document definitively. Red Bull has refused to consent to a subpoena to Adobe.

84. Moreover, the Purported Agreement describes a representation in "connection with a privileged investigation," directly contradicting the "neutral investigation" described in the Slater Letter. Plaintiff alleges on information and belief that both documents were drafted, approved, reviewed, or transmitted through the same in-house legal function involving Defendant Kim Brooks.

85. Plaintiff immediately challenged the authenticity of the Purported Agreement, identifying the absence of the digital certificate and the contradiction with the Slater Letter. This challenge was made in writing and on the record. Plaintiff demanded authentication via direct transmission of the genuine Adobe Sign certified package from Adobe Inc.

86. Defendant Brooks left Red Bull in October 2025—approximately one month after the Purported Agreement was submitted and challenged. She spent four months at Stripe, Inc. in a lower-level role, before returning to Red Bull in March 2026 as a contractor.

### G. The Arbitrator's Denial of Authentication

87. Plaintiff's motion to compel authentication via Adobe Sign was fully briefed. The Arbitrator did not rule on it for over six months.

88. Before the authentication dispute, the Arbitrator had issued inconsistent procedural rulings concerning Plaintiff's ability to use material evidence. In Order No. 13, the Arbitrator sua sponte invoked 820 ILCS 405/1900(B)—a state evidentiary bar that no party had raised or briefed—to exclude material evidence. Plaintiff alleges that this ruling conflicted with the Arbitrator's earlier statement in Order No. 7 that "arbitration is not a judicial proceeding but, rather, an alternative to such a proceeding, given that judicial fact-finding, court proceedings, evidentiary rules, and other characteristics of the judicial process do not apply in the arbitration context."

89. After Plaintiff moved for reconsideration, the Arbitrator stated in Order No. 16 that § 1900(B) "does not apply at this time." Plaintiff alleges that these unreconciled procedural rulings are relevant to whether the arbitration has afforded the procedural protections promised by the MAA and JAMS rules, whether Red Bull may invoke FAA § 3 to obtain a stay, and whether limited discovery is warranted before any stay or arbitration-enforcement issue is decided.

90. At the May 12, 2026 hearing, the Arbitrator denied Plaintiff's request for authentication via Adobe Sign. Instead, the Arbitrator ordered Red Bull to provide a "certification" from

"someone with knowledge" that the Purported Agreement is "a true, accurate and complete copy of the agreement."

91. The Arbitrator's oral ruling, captured in the certified transcript at pages 4–5, was as follows:

ARBITRATOR GRIFFIN: "The Castaneda agreement, that has been produced. I know there's an argument that it isn't complete. Mr. Rudd, I'd like you to have someone with knowledge to certify that that is a true, accurate and complete copy of the agreement."

MR. RUDD: "Okay. We can do that."

ARBITRATOR GRIFFIN: "That's my ruling on that."

MR. ESSERTIER: "To make sure I understand, are you saying you are not requiring Red Bull to authenticate through Adobe?"

ARBITRATOR GRIFFIN: "Yes, that is what I'm saying."

92. The ruling was memorialized in Amended Order No. 35, which states: "Respondent shall provide a written certification that the Agreement previously produced is authentic, accurate, and complete. Claimant's request for authentication via direct transmission from Adobe Sign, including metadata and digital certificate transmitted directly to the parties, is denied. Claimant objected to this ruling."

93. The Arbitrator did not set a deadline for compliance. The order remains outstanding, and Respondent has not produced the required certification.

**H. The May 12, 2026 False Statement**

94. At the May 12, 2026 hearing, Red Bull's counsel made the following statement, captured in the certified transcript at pages 7–8:

MR. RUDD: "And, additionally, we're not even in possession of the Adobe records because it was signed by our in-house counsel at the request of the outside attorney. It was a letter that was sent from the outside attorney to our in-house counsel that she then Docusigned."

MR. ESSERTIER: "Are you saying that you have no access to it?"

MR. RUDD: "I'm saying that, the way it was structured, it's an agreement that was sent to us that we signed. In all likelihood, any Docusign records in the possession of the outside law firm."

95. Plaintiff contends the statement was false in multiple respects: it claimed Red Bull was "not even in possession of the Adobe records"—a claim difficult to reconcile with Red Bull's own production of the Adobe Acrobat Sign Final Audit Report for this transaction—and it claimed the records were "in all likelihood" with the outside law firm, when in fact the audit report confirms that Red Bull's own Senior Legal Counsel, Kim Brooks, was a direct participant in the Adobe Sign transaction, receiving, viewing, and e-signing the document through that platform.

**I. The Facts Demonstrating Falsity**

96. Plaintiff identified the following facts demonstrating that the statement was false, placed on the record in his May 19, 2026 Reply:

(a) The Audit Report: Red Bull itself produced the Adobe Acrobat Sign Final Audit Report for the Castaneda Engagement Agreement. The report identifies the transaction by a unique Transaction ID, confirms the platform was Adobe Acrobat Sign, identifies Juan C. Castaneda as the creator, shows the document was emailed to Kim Brooks for signature, shows Brooks viewed and e-signed the document, and records the agreement's completion on May 19, 2022. Red Bull's possession and production of this Adobe transaction record strongly supports the inference that Defendants had access to the Adobe Sign transaction record or obtained Adobe transaction materials from someone who did.

(b) The Adobe Sign Process: Adobe Sign records are capable of showing who created, sent, received, viewed, signed, downloaded, or accessed an agreement and its related audit materials. Because the audit report identifies the exact transaction, creator, signer, email-view event, e-signature event, completion event, and Transaction ID, Adobe can confirm whether the complete signed agreement package, certificate, audit trail, delivery records, access logs, and download history were transmitted to, received by, downloaded by, or accessible to Red Bull, Brooks, Castaneda, or the Adobe Sign account holder.

(c) Federal Retention Obligations: Federal regulations require employers to preserve all personnel records relevant to a charge of discrimination until final disposition. 29 CFR § 1602.14. This arbitration is part of that disposition. The certified package is directly relevant and was legally required to be preserved.

(d) Retrieval Capability: The Transaction ID gives Adobe a specific transaction record to locate. Plaintiff alleges that Red Bull, Brooks, Castaneda, the Adobe Sign account

holder, or Adobe itself had possession, custody, control, or retrieval capability over the complete transaction record, including the signed agreement, audit history, certificate information, delivery history, access history, and download history. Adobe can confirm or refute that access and retrieval history definitively.

(e) The Document Retention Provisions: The Engagement Agreement itself contains two critical provisions. Section 8 obligates Red Bull to preserve all records related to the matter. Section 9 states Defendant Castaneda's policy: "It is our policy and practice to destroy our files seven (7) years after the file is first closed. Files are generally closed at the conclusion of an investigation, lawsuit or completion of a transaction." The arbitration remains ongoing. The file has never been closed. Both Red Bull and Castaneda are contractually obligated to retain the genuine package.

97. In the same Reply, Plaintiff stated: "A material false statement to a tribunal—provable from the record already before it—is fraud on the tribunal. The facts support this conclusion."

98. Ogletree Deakins and Red Bull have not retracted the statement. They have not produced the genuine certified package. They have not explained how they can possess the audit report but not the package it came from. They have remained silent.

## J. The Certification Order Creates Three Possible Outcomes

99. The certification order, which the Defendants likely believed would resolve the authenticity dispute in their favor, instead became a mechanism that exposes the fraudulent scheme. The Arbitrator's certification order requires "someone with knowledge" to certify the Purported Agreement is authentic, accurate, and complete. Plaintiff alleges that Brooks and

Castaneda are the principal persons with knowledge because the audit report identifies Castaneda as creator and Brooks as the recipient/signer of the Adobe Sign transaction.

100. A certification from anyone without personal knowledge would be insufficient. A certification based solely on unaided human memory, without comparison to the genuine Adobe Sign certified package, the complete Adobe transaction record, or other reliable Adobe source materials, would be unreliable and insufficient to resolve the authenticity dispute because the disputed issue concerns the contents, completeness, and provenance of an electronic record.

101. Plaintiff alleges that Brooks or Castaneda cannot truthfully certify the Purported Agreement without comparing it against the genuine Adobe Sign certified package, the complete Adobe transaction record, or other reliable Adobe source materials sufficient to confirm authenticity, accuracy, and completeness.

102. The certification order creates three possible outcomes, each bearing on authenticity and access to the genuine Adobe Sign package: (i) certification after comparison to the genuine package; (ii) certification without comparison; or (iii) refusal to certify. Each outcome is relevant to whether Defendants had access to the genuine package and whether the static PDF can be authenticated.

103. Plaintiff alleges that compliance requires either access to the genuine package or reliance on insufficient memory.

**K. The Continuing Concealment**

104. On May 14, 2026, Plaintiff filed a Request for Leave to File Motion to Compel Production of the Genuine Adobe Sign Certified Package or, in the Alternative, to Subpoena Adobe Inc. or Juan C. Castaneda.

105. Respondent opposed on procedural grounds, did not produce the certified package, and did not address the substance of the fraud allegation. The Request remains pending.

106. The certified transcript of the May 12 hearing confirms the false statement, the authentication denial, the sword-and-shield rejection, and Plaintiff's preserved objections.

107. The genuine Adobe Sign certified package remains concealed. The Purported Agreement—a static PDF lacking any digital certificate or tamper-evident seal—remains the only document Defendants have submitted.

108. To date, despite ongoing discovery obligations under the MAA, JAMS rules, and the Arbitrator's orders, Red Bull has produced no contemporaneous HR complaint records, witness statements, investigation notes, written report, or other investigation materials substantiating its stated reason for Plaintiff's termination. Red Bull's continued failure to produce such materials, while asserting privilege over the investigation materials it admits exist, has left Red Bull in sole possession and control of whatever materials exist. That continued concealment creates an ongoing risk that any evidence later produced may be post-hoc reconstruction rather than contemporaneous documentation. Plaintiff alleges that this continuing failure to produce contemporaneous evidence, while simultaneously using the investigation as the basis for termination and benefits opposition, is part of the ongoing

fraudulent concealment and further supports Plaintiff's allegation that Red Bull is in default of its obligations under the MAA.

### L. Pattern Evidence—Similar Tactic on Another Former Employee

109. Plaintiff initially learned of Zachary Wassmund's existence because Red Bull inadvertently produced documents identifying Wassmund and reflecting the denial of his medical accommodation request as part of the unorganized, unindexed document dump in this arbitration. Leclerc then contacted Wassmund directly. Wassmund informed Plaintiff that, in his separate JAMS arbitration, Red Bull—represented by Greenberg Traurig, the same firm that now represents Red Bull in Leclerc's arbitration as of June 22, 2026, effectively replacing Ogletree Deakins—allegedly employed a similar tactic: submitting a static PDF that was not the genuine certified package, and claiming that the genuine package could not be retrieved. The similar tactic, allegedly used against multiple former employees, is consistent with the allegation that the fraudulent conduct in this case was not an isolated mistake but a deliberate, repeated strategy.

### M. The Confidentiality Order Signature Anomaly

(The factual observations supporting the additional request for discovery are set forth in Paragraph 77 above.)

## V. CAUSES OF ACTION

### COUNT I – FRAUDULENT CONCEALMENT / COMMON LAW FRAUD

### (Against All Defendants)

110. Plaintiff realleges and incorporates by reference all preceding paragraphs.

111. The fraudulent scheme alleged in this Complaint did not begin with the submission of a non-genuine document to the Tribunal. It began in May 2022, after Red Bull denied Plaintiff's religious accommodation and threatened termination, when Red Bull decided to terminate Plaintiff's employment and engaged Defendant Castaneda to create a pretextual justification for that decision, following Plaintiff's resistance to Red Bull's COVID-19 mandate. Plaintiff alleges that the engagement was the first false step. Every act that followed—the Slater Letter's description of a "neutral investigation," Red Bull's use of the investigation as the misconduct basis to contest Plaintiff's unemployment benefits in the IDES proceeding, a challenge Plaintiff alleges did not result in the denial or termination of benefits as reflected by independent bank records, the submission of the engagement letter to the Tribunal as if it authorized an investigation of Leclerc when it did not, the false statement about the retrievability of the genuine Adobe package, and the continuing concealment—was a continuation of that original fraudulent decision. That chronology is confirmed by Red Bull's own Slater Letter, which stated that complaints were first lodged with HR "on or about May 24, 2022," although the Castaneda engagement had already been fully executed on May 19, 2022. The scheme's origin in a business decision made before any litigation was threatened is the foundation of the fraud. The acts directed at the Tribunal were its instruments.

112. Defendants knowingly submitted a non-genuine document to the arbitral tribunal, representing it as the genuine Castaneda Engagement Agreement when it was not. Specifically:

• Plaintiff alleges on information and belief that Defendant Brooks, on behalf of Red Bull, produced, directed, approved, or participated in the production of the non-genuine static PDF to Defendant Ogletree Deakins.

• Ogletree Deakins, on behalf of Red Bull, represented to the Tribunal that the static PDF was the genuine agreement.

113. Defendants knowingly, or at minimum recklessly, made a false statement to the arbitral tribunal—that they could not retrieve the genuine Adobe Sign certified package—when that statement was false. Specifically Ogletree Deakins on behalf of Red Bull, through its partner and associates, made the false statement at the May 12, 2026 hearing and reaffirmed the false narrative via email.

114. Having affirmatively represented the static PDF as authentic and represented that the genuine Adobe records were not in Red Bull's possession or access, Red Bull and Ogletree Deakins had a duty not to omit facts necessary to make those representations non-misleading.

115. Regardless of whether the submitted alleged contract agrees with what Adobe holds, the document presented to the Tribunal as evidence of a privileged investigation performed by Castaneda regarding Leclerc is no such document. The Purported Agreement does not agree to perform investigation services; it agrees only to provide legal services in connection with some investigation. It does not mention Leclerc. It does not specify any work to be performed, nor any details of legal services other than they were to be "privileged." As a privileged matter, it is distinct from the neutral investigation referred to by Slater. The document was submitted to deceive Claimant and the Tribunal into believing that Respondent had produced the contract that engaged Castaneda to perform an investigation on Leclerc. Without an agreement to perform an investigation, and without any mention of Leclerc, the submitted document is something very different from what Respondent represented it to be.

116. The fraudulent scheme began before any of these acts. It began when Red Bull decided to terminate Plaintiff's employment and engaged Castaneda to create a pretextual justification. The false representations made to the Tribunal were not isolated errors. They were the continuation of a scheme that originated in a business decision made before any litigation was threatened.

117. Defendants made these false representations with the intent to deceive the tribunal and to deprive Plaintiff of material evidence central to his case.

118. Plaintiff relied on Defendants' representations and omissions by continuing to litigate, expending time and resources, and being deprived of the opportunity to obtain and test the genuine package. Plaintiff was entitled to rely upon the truthfulness of statements made to the Tribunal by opposing counsel without first verifying them independently. The falsity of the statements was not known to Plaintiff at the time they were made and relied upon; it was discovered through Plaintiff's own investigation and confirmed by the facts set forth in this Complaint. In reliance on Defendants' representations and omissions, Plaintiff incurred transcript expenses, briefing expenses, representative time, and additional motion practice directed at obtaining authentication and correcting the record. Had Defendants disclosed that the Adobe package was available or retrievable, Plaintiff would have sought immediate production, third-party subpoena relief, sanctions, or other corrective relief earlier and on a materially different record.

119. The Tribunal was induced to deny authentication, decline to apply the sword-and-shield doctrine, and shield the genuine package from discovery based on Defendants' false representations. Had the Tribunal known the genuine package was available or retrievable, there is a reasonable probability it would have ruled differently on authentication and discovery.

120. As a direct and proximate result of the fraudulent scheme—beginning with the decision to terminate Plaintiff and engage Castaneda to create a pretextual justification, continuing through the IDES proceeding, and culminating in the corruption of the arbitration—Plaintiff suffered damages independent of the termination remedies pending in arbitration, including: the burden of defending against Red Bull's IDES challenges, which Plaintiff alleges was based on the same Castaneda investigation and did not result in denial or termination of benefits; additional arbitration costs, stenographer and transcript expenses, time and resources spent investigating and responding to the concealment, deprivation of a timely opportunity to test material evidence, reputational harm from the allegedly false accusations used in multiple forums, ever-perpetuating delays in the pursuit of justice and emotional distress caused by the alleged concealment and misrepresentations. The harm is continuous, and it began before any arbitration existed.

121. Defendants' conduct was willful, wanton, and malicious, entitling Plaintiff to punitive damages.

## COUNT II – CIVIL CONSPIRACY

**(Against All Defendants)**

122. Plaintiff realleges and incorporates by reference all preceding paragraphs.

123. Plaintiff alleges that Defendants Red Bull, Ogletree Deakins, Brooks, and Castaneda acted in concert as part of a deliberate fraudulent scheme—originating in the decision to terminate Plaintiff and the later engagement of Castaneda to create a pretext—to achieve the unlawful objective of concealing the genuine Castaneda Engagement Agreement and preventing Plaintiff from obtaining material evidence.

124. Each defendant committed overt acts:

• Plaintiff alleges on information and belief that Brooks produced, directed, approved, or participated in the production of the static PDF, the Slater Letter, and the IDES challenge.

• Ogletree Deakins made the false statement at the May 12 hearing, remained silent when confronted with facts demonstrating falsity, and Plaintiff alleges on information and belief that the firm sanctioned, supervised, or ratified the challenged strategy.

• Plaintiff alleges on information and belief that Castaneda, acting in his capacity as a partner of Castaneda & Heidelman LLP and in the ordinary course of the firm's legal-services business, drafted and executed the Engagement Agreement with the studied vagueness alleged herein—describing it as a "privileged investigation," omitting Leclerc's name, and agreeing only to "legal services in connection with" an unspecified investigation—and, as the creator of the Adobe Sign transaction, had access to, or was in a position to retrieve or request, the Adobe Sign transaction record and related completion materials, thereby creating the instrument used to cloak the pretextual termination in a false appearance of legitimacy and maintaining possession of material evidence that was never produced.

• Red Bull authorized, ratified, and benefited from the scheme.

125. The conspiracy caused Plaintiff the damages set forth herein.

**COUNT III – NEGLIGENT SPOLIATION OF EVIDENCE, PLEADED IN THE ALTERNATIVE**

**(Against Defendants Red Bull, Castaneda, and/or Brooks)**

126. Plaintiff realleges and incorporates by reference all preceding paragraphs.

127. Plaintiff has alleged that the genuine Adobe Sign certified package, or the complete Adobe transaction record from which authenticity can be confirmed, exists or remains retrievable through Defendants, the Adobe Sign account holder, or Adobe using the Transaction ID. In the alternative, if the package or complete transaction record is no longer retrievable, Plaintiff alleges that Defendants Red Bull, Castaneda, and/or Brooks negligently failed to preserve, deleted, destroyed, or permitted the loss of the relevant Adobe records after the duty to preserve arose.

128. The duty to preserve arose from the Engagement Agreement's retention provisions, federal regulations under 29 CFR § 1602.14, the filing of the EEOC charge, the filing of the arbitration demand, and Plaintiff's explicit challenge to the static PDF's authenticity in September 2025.

129. Any failure to preserve, deletion, destruction, or loss of the genuine Adobe Sign certified package or complete transaction record breached Defendants' preservation duties and foreseeably impaired Plaintiff's ability to prove the authenticity, accuracy, and completeness of the Purported Agreement.

130. If the genuine Adobe Sign certified package is no longer retrievable, Plaintiff has been deprived of the best evidence needed to test whether the static PDF is authentic, accurate,

and complete, and has incurred additional costs attempting to prove authenticity through inferior secondary evidence.

131. Defendants' conduct breached their preservation duties, entitling Plaintiff to damages and an adverse inference.

## COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## (Against All Defendants)

132. Plaintiff realleges and incorporates by reference all preceding paragraphs.

133. Defendants' fraudulent scheme was extreme and outrageous, and it caused Plaintiff severe emotional distress and concrete harm at every stage. The scheme began with the decision to terminate Plaintiff and engage Castaneda to create a pretextual justification—before any litigation was threatened, before Plaintiff had any counsel, and arising in the same chronology as Plaintiff's termination—and caused reputational harm from accusations of misconduct based on a sham investigation. It continued through the IDES proceeding, where Plaintiff was forced to defend against a benefits challenges based on the same pretextual investigation, challenges Plaintiff alleges that did not result in the denial or termination of benefits. The contest of benefits ultimately proceeded to a formal IDES ALJ/referee hearing, which under public IDES rules occurs when a party appeals or disputes an unemployment determination. Plaintiff alleges on information and belief that Red Bull's pursuit of the benefits challenges through that process was not economically rational when compared with the cost and burden of pursuing it, supporting the inference that Red Bull intended to impose financial pressure, deplete Plaintiff's resources, reinforce its misconduct narrative, and place Plaintiff at a severe disadvantage in pursuing his legal rights. The fi-

nancial pressure contributed to Plaintiff's inability to afford adequate legal representation and forced Plaintiff to proceed pro se, while placing Plaintiff in fear of financial ruin, including the potential loss of his home. Plaintiff alleges that Defendants knew this course of conduct would likely damage his reputation, exhaust his resources, impair his ability to obtain counsel and test Red Bull's accusations, and cause severe emotional distress. The scheme then corrupted the arbitration, where Defendants submitted a non-genuine document, made a knowing false statement about material evidence, concealed the genuine package, forced Plaintiff to litigate against a non-genuine document while the genuine article was hidden, and used the investigation as a sword while shielding its contents. The scheme persisted for years, spanning multiple forums, and Plaintiff suffered continuous severe emotional distress and related harm from its inception to the present day.

134. Defendants' conduct goes beyond the ordinary rough-and-tumble of litigation. It is intentional, systemic deception that no litigant should endure.

135. Plaintiff has suffered severe emotional distress, anxiety, humiliation, and mental anguish.

136. Defendants' conduct was willful, wanton, and malicious, entitling Plaintiff to punitive damages.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against all Defendants, jointly and severally, and grant the following relief:

### A. Compensatory Damages:

• All out-of-pocket costs, expenses, and consequential losses incurred as a result of Defendants' alleged fraud and concealment, including IDES-related costs, stenographer costs, transcript costs, filing costs, copying costs, third-party assistance costs actually incurred or owed, and the reasonable value of time and resources diverted to investigating, responding to, and seeking correction of Defendants' alleged misrepresentations, to the extent recoverable by law.

• Emotional distress damages for the continuous harm caused by the fraudulent scheme from its inception in May 2022 to the present, in an amount to be determined at trial.

• Consequential damages resulting from the prolonged litigation, the deprivation of material evidence, and the years of concealment.

### B. Punitive Damages:

• An award of punitive damages against each Defendant on the claims for which punitive damages are legally available, sufficient to punish willful, wanton, and malicious conduct and deter similar conduct in the future.

### C. Declaratory Relief:

• A judicial declaration that Defendants committed fraud by the acts alleged in this Complaint.

## D. Injunctive Relief:

• An order compelling Defendants to immediately produce the genuine Adobe Sign certified package for the Castaneda Engagement Agreement, including all metadata, digital certificates, audit trails, and the complete electronic document package.

• An order compelling Defendant Castaneda to preserve and produce all records related to the Adobe Sign transaction.

• An order permitting expedited third-party discovery, including a subpoena to Adobe Inc. for the complete Adobe Sign transaction record.

• In the alternative, an order permitting limited expedited discovery on arbitrability, FAA § 3 default, preservation, and access to the genuine Adobe Sign certified package before adjudication of any motion to stay or compel arbitration.

• An order compelling Defendants to produce all investigation materials related to the Castaneda investigation, including witness interview notes, summaries, the verbal report findings, Brooks's written summary, and any records of the complaints that allegedly prompted the investigation, which Plaintiff alleges are not shielded by any valid claim of privilege and are necessary to test Red Bull's stated reason for termination.

## E. Costs and Fees:

• Plaintiff's costs, expenses, and fees as permitted by law.

## F. Such other and further relief as the Court deems just and proper, including any relief necessary to prevent further prejudice from the alleged fraud.

## VII. JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all counts.

Dated: July 1, 2026

Respectfully submitted,

/s/ Charles Leclerc

Charles Leclerc

Plaintiff, Pro Se

400 W. Ontario St., #603

Chicago, IL 60654

Tel: (612) 600-4044

Email: charles_leclerc@outlook.com