FILED
10/25/2026
THOMAS G BRUTON
CLERK, U.S. DISTRICT COURT
BC

Case No: 1:26-CV-07715

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES LECLERC,<br><br>Plaintiff,<br><br>v.<br><br>RED BULL NORTH AMERICA, INC.; OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.; KIM BROOKS; and JUAN C. CASTAÑEDA,<br><br>Defendants. | ) | Case No. 1:26-cv-07715<br><br>Judge Sharon Johnson Coleman<br><br>Magistrate Judge Karyn L. Bass Ehler |

**DECLARATION OF ROBERT ESSERTIER IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

I, Robert Essertier, declare pursuant to 28 U.S.C. § 1746:

**I. My role and personal knowledge**

1. I am Charles Leclerc's non-lawyer representative in his separate employment arbitration against Red Bull North America, Inc., JAMS Ref. No. 5340001145, before Arbitrator John C. Griffin. Since July 2024, I have helped prepare submissions, maintained regular contact with Charles, and attended every arbitration session. I undertook this role after Charles, whom I have known for years, told me that he could not afford an attorney and had been unable to find one willing to take his case.

2. I submit this declaration in support of Charles's opposition to Defendants' motions to dismiss. It describes my own submissions, document examinations, questions, objections, conferences, follow-up correspondence, and observations of Charles's distress. I could testify competently to those matters. When describing a document or another person's statement, I identify the source.

3. I previously served as mayor of Hermosa Beach, California. My municipal work included responsibility for the City's contract with an oil company for an oil-drilling and recovery project. That work gave me practical experience examining contractual terms and obligations. I also founded a software company, directed its software design, and managed approximately thirty software engineers. I hold degrees in mathematics and physics from the University of California, Santa Barbara. My contract and technical experience informed my examination of the engagement agreement and electronic records and the questions I pursued in this arbitration.

**II. The waiver request I submitted and the records I examined**

4. I signed and submitted the May 21, 2025 reply seeking the investigation materials on Charles's behalf. It expressly argued that Red Bull had already waived privilege by affirmatively using the investigation and asked Griffin to recognize and apply that waiver. My submission addressed uses already made of the investigation, rather than only what Red Bull might offer at a future hearing.

5. I examined the purported Castañeda engagement agreement and Adobe Acrobat Sign Final Audit Report produced on September 9, 2025. The report records that Castañeda created the document on May 19, 2022; that it was emailed to Brooks at her Red Bull address for signature; that she viewed the email and electronically signed the document; and that the agreement was completed that day. It records signature and completion at 7:09:43 p.m. GMT and identifies a Transaction ID. These entries document an actual completed transaction and Brooks's access to the document, in addition to identifying the participants.

6. Based on the recorded creation, email transmission, viewing, signature, and completion events, my technical understanding of Adobe Sign's completed-agreement process, and

Adobe's published documentation, I concluded that Adobe emailed completed signed copies, certified with Adobe's tamper-evident seal, to Castañeda and to Brooks at her Red Bull address. Adobe describes automatic distribution of completed, certified copies to all parties. Its June 2020 solution brief, published before this transaction, likewise states that securely signed documents are sent to all parties and describes storage with the audit trail. (Adobe Acrobat Sign Documentation Exhibit, pp. 2, 11.) I identify Castañeda, Brooks, and Adobe as concrete sources through which to seek those records. The later custody, retrieval, transfer, and retention history remains undisclosed to me. I sought the complete source transaction to compare it with the production and trace the production's source file. I have not received that transaction nor performed the comparison.[1]

**III. The authentication exchange at the May 12 hearing**

7. I participated in the May 12, 2026 videoconference hearing. The certified transcript identifies my statements as "MR. ESSERTIER." After Griffin directed Red Bull to obtain a knowledgeable person's certification of the produced agreement, I asked: "To make sure I understand, are you saying you are not requiring Red Bull to authenticate through Adobe?" Griffin answered: "Yes, that is what I'm saying." (Transcript, 4:4–8, 5:8–12.)

1 Adobe, Electronic signature legality, "Demonstrate proof of signing"; Adobe Sign for Life Sciences Solution Brief (June 2020), p. 2. Reproduced in Adobe Acrobat Sign Documentation Exhibit (compiled October 7, 2026), pp. 2, 11. The exhibit also includes Adobe's distribution-setting and download documentation.

8. When I again asked about authentication through Adobe, Griffin overruled the request and said: "Adobe doesn't know whether it's authenticated. They know that it was signed, but the authentication is more genuine the way I'm ordering it." (Transcript, 6:8–20.)

9. I heard Charles immediately respond: "That's technologically impossible because what Adobe does is it will take a package and it encrypts it so that it cannot be modified at any point in time by any party." He continued: "The vulnerability with your ruling, sir, is that it lets the respondent retroactively modify maybe an agreement that was submitted to us that may have been altered or incomplete. This is why it is so crucial that we have authentication via Adobe sign." (Transcript, 6:21–7:6.)

10. My request sought the source record underlying the production. I wanted to compare the produced agreement with the complete Adobe transaction and examine the accompanying electronic information. A later statement that the produced copy was authentic and complete would not itself provide those materials or allow me to perform that comparison.

11. After Charles's objection, Griffin asked Jeffrey Rudd of Ogletree: "Mr. Rudd, do you want to do that?" Rudd declined and said Red Bull was "not even in possession of the Adobe records." I immediately asked: "Are you saying that you have no access to it?" He answered that the agreement had been sent to Red Bull for signature and that, "[i]n all likelihood," the records were with the outside law firm. Griffin then moved on. (Transcript, 7:7–8:8.)

12. My question distinguished current possession from the ability to obtain records through the creator, recipient, and transaction provider identified in the Audit Report. Rudd's possession statement did not address those retrieval routes. In that exchange, he identified no attempt to retrieve the records from Castañeda, his firm, Brooks, or Adobe, and did not explain how the Audit Report already produced had been obtained.

**IV. My other questions and objections at the hearing**

13. Rudd asserted we had not met and conferred before or after filing the discovery motion. I responded: "Mr. Rudd, I did meet and confer with Amy." I was referring to Amy Cortez of Ogletree. Cortez later confirmed speaking with me before the February order, but said we had not met since that order. (Transcript, 11:8–14, 12:6–7, 15:4–13.)

14. When Griffin said Red Bull could not present evidence it had not produced, I objected: "And neither can we. That's the problem. We are not getting the evidence that we need to present at the hearings." Griffin answered, "Okay." (Transcript, 14:9–21.)

15. My objection reflected the work I was trying to perform as Charles's representative. I needed the contemporaneous complaints, witness statements, interview notes, and Brooks summary to establish the sequence of complaints and interviews; compare what witnesses actually said with the later termination account; identify recorded corroboration or contradictions; and trace what information reached the decisionmakers. The completed engagement and accompanying source records would permit comparison of Castañeda's actual mandate, timing, and agreed work with Red Bull's account. Those tasks bear on the asserted pretext for firing Charles after he sought religious accommodation. Excluding documents from Red Bull's presentation did not supply them to us or allow me to perform those tasks.

16. I explained that our lengthy discovery submission set out the specific deficiencies, what we sought, and why we needed it. I later asked Rudd whether his position was that all interrogatories and document requests had been satisfied. He said the responses were "perfectly appropriate." I then asked, "And complete?" He answered: "Yes. We raise valid objections and provide valid answers." I reiterated that our submission detailed what we believed had not been provided. (Transcript, 16:8–14, 23:7–23.)

17. I also asked Griffin about distinguishing work product from attorney communications. He answered, "Those are both privileged." I then asked, "Shouldn't they be separated in the log and described?" My question sought identification of the basis for withholding particular materials, so that the claimed protection could be assessed for the notes, summary, and communications actually requested. (Transcript, 25:10–15.)

18. I also heard the discussion of affirmative-use waiver at that hearing. My May 21 submission had argued that Red Bull's prior uses had already waived privilege. Griffin supplied no explanation rejecting that argument and did not apply the waiver we asked him to recognize. Across the sessions I attended and orders I received, he has never supplied a ruling or analysis resolving that argument. (Transcript, 25:16–28:24.)

**V. The further proceedings and follow-ups I pursued**

19. When Rudd said he would be out of the country through May 22, I asked why I could not meet and confer with Amy again. He said it would be helpful for both of them to participate. I later asked, "So when's the soonest you can do that?" He answered: "After Memorial Day. Probably first week of June." (Transcript, 32:11–22, 34:20–23.)

20. On May 14, 2026, Charles and I signed the request for leave to compel production of the genuine Adobe Sign certified package or, alternatively, subpoena Adobe or Castañeda. I was copied on the May 15 scheduling correspondence and the May 19 opposition and reply. I continued seeking a decision through the correspondence described below. (May 2026 email exchange, pp. 1–4.)

21. I participated in the June 5, 2026 meet-and-confer with Ogletree. Respondent's counsel declined substantive discussion, saying they needed to regroup internally and would contact

OpenSign™ DocumentId: W9tAjbFmU2


us the following week. By June 22, I had received no such follow-up. I reported this to Case Manager Natasha Erese on June 22.

22. In that email, I requested a ruling on the May 14 leave request and action on Rudd's possession statement. I identified the prior production of the Audit Report and sought source production or a written explanation for declining relief. Erese acknowledged receipt, said she would forward the email to Griffin, and promised further information or direction when received. Her acknowledgment contained no ruling.

23. After Greenberg Traurig replaced Ogletree, I participated in a July 10, 2026 meet-and-confer with David Stein and Addison Schlatter. My July 14 email reported their planned discovery amendments by August 7 and renewed my requests for a ruling on the May 14 request and action on the source records and Rudd's statement.

24. I have received no ruling granting or denying the May 14 request, no correction or withdrawal of the possession statement, and neither certification contemplated by Order No. 23, § 4 or Amended Order No. 35, § 4. These follow-up efforts have also supplied neither the complete source transaction nor Castañeda's interview notes, Brooks's summary, or the underlying complaints and witness records I sought to examine.

**VI. My examination of order files and related inquiries**

25. Separately, I examined electronic files issued as Griffin's orders. I observed a recurring signature image on multiple orders and a different signature image and format on the unilaterally executed confidentiality order. Those observations prompted my questions about how orders were authorized and posted. I did not observe who applied the images or whether their use was authorized.

26. On June 24, 2026, I asked Erese about preparing, signing, posting, and authenticating Griffin's orders. She replied on June 25 by referring me to JAMS Employment Rule 8. My July 14 email renewed specific questions about who could affix a signature, post in her name, or edit an order, and whether Griffin reviewed edits. I have received no substantive answer to those procedure-specific questions beyond the Rule 8 reference.

**VII. The discovery impasse and the distress I have witnessed**

27. Although conferences, orders, and correspondence have occurred, the arbitration remains in discovery more than two years after it began, without a merits evidentiary hearing or final award resolving Charles's employment claims. Red Bull continues to withhold the investigation materials described above. The certification directions and our repeated follow-ups have secured neither the certifications nor the records needed for the comparisons described in paragraph 15. We also have received no substantive ruling addressing our argument that Red Bull's prior affirmative uses had already waived privilege. I have received no order imposing sanctions for the continuing nonproduction.

28. As matters stand, proceeding to a merits hearing would require me to help Charles present his federal discrimination and retaliation claims without the contemporaneous investigation evidence needed for the examination described in paragraph 15. The religious-accommodation letters document the earlier request, denial, termination threat, and later approval. They do not disclose what the later investigation actually established or what decisionmakers relied on when firing him. Excluding withheld documents from Red Bull's presentation would not supply that evidence for Charles's case. My continued requests seek to obtain it before his claims are adjudicated; proceeding without it would forgo the opportunity to examine and use it in presenting those claims.

29. Throughout my regular contact with Charles since July 2024, I have personally witnessed his continuing emotional distress over the prolonged inability to obtain that evidence and advance his claims to a merits determination. I have observed that distress persist as the repeated requests, hearings, and follow-up efforts described above have left the discovery impasse unresolved. These observations concern my own interactions with Charles while helping him pursue the arbitration since July 2024.

29(a). I have personally observed Charles's substantial work reviewing and comparing the investigation account, the engagement and Audit Report, and the later source and completeness representations. We worked together on requests, submissions, conference preparation, and follow-ups. Those inquiries required additional work without supplying the records needed for the comparisons described in paragraph 15.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 22, 2026.

Robert Essertier

______________________________

10/22/2026

Robert Essertier

OpenSign
Seal the Deal, Openly

# Certificate of Completion

## Summary

Document Id : W9tAibFmU2

Document Name : Essertier Declaration for Federal Court

Document hash (sha256) : d9f9b4772f58f025cd61de4bd02f962ef36fe48dde4e152a40892f94a5208b35

Organization : Not Applicable

Created on : 10/22/2026, 15:50:21 GMT -05:00

Completed on : 10/22/2026, 17:51:17 GMT -05:00

Signers : 1

## Document originator

Name : Charles Leclerc

Email : charles_leclerc@outlook.com

IP address : 67.89.229.82

## 1. Signer

Name : Robert Essertier

Email : essertier@verticalpowersystems.com

Viewed on : 10/22/2026, 17:48:55 GMT -05:00

Signed on : 10/22/2026, 17:51:17 GMT -05:00

IP address : 2607:fb92:3181:1c3b:bbc8:db75:bc35:66fa

Signature :