FILED
10/25/2026
THOMAS G BRUTON
CLERK, U.S. DISTRICT COURT
BC

Case No: 1:26-CV-07715

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES LECLERC,<br><br>Plaintiff,<br><br>v.<br><br>RED BULL NORTH AMERICA, INC.; OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.; KIM BROOKS; and JUAN C. CASTAÑEDA,<br><br>Defendants. | ) | Case No. 1:26-cv-07715<br><br>Judge Sharon Johnson Coleman<br><br>Magistrate Judge Karyn L. Bass Ehler |

**DECLARATION OF CHARLES LECLERC IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

I, Charles Leclerc, declare pursuant to 28 U.S.C. § 1746:

1. I am the Plaintiff in this action and could testify competently to the events within my personal knowledge described below. When describing a document or another person's statement, I identify the source; I do not claim personal knowledge of the underlying events merely because that source describes them.

2. I submit this declaration in support of my opposition to Defendants' motions to dismiss and in response to the declarations of Kim Brooks and Juan C. Castañeda. I identify documents I sent, received, filed, or reviewed by title, date, and, where useful, page. The accompanying exhibit index identifies the selected documents submitted with this declaration.

**I. The separate arbitration and federal action**

3. I filed my arbitration demand against Red Bull North America, Inc. on July 14, 2024. That employment proceeding, JAMS Ref. No. 5340001145, includes my Title VII religious-

discrimination and retaliation claims, ADA claims, and other employment and termination claims. It proceeds under the Mutual Arbitration Agreement ("MAA").

4. My federal Complaint, ECF 11, asserts fraud and concealment, civil conspiracy, and intentional infliction of emotional distress against Red Bull, Ogletree Deakins, Brooks, and Castañeda, with negligent spoliation pleaded alternatively against Red Bull, Brooks, and Castañeda. It alleges a scheme beginning before arbitration and continuing across proceedings, including representations and concealment concerning the investigation and its records. Back pay, front pay, reinstatement, and other termination-based relief remain in the employment arbitration. (Complaint ¶¶ 3–5, 110–135.)

5. At the September 8, 2026 status hearing, my confirmation that a matter was before JAMS referred to the employment arbitration. I did not concede that the four-defendant tort action in ECF 11 was already before JAMS or was the same matter. The corrected minute entry, ECF 56, filed September 9 and correcting ECF 55, identifies Red Bull and me as the arbitration parties and records that arbitration is mandatory and remains in discovery.

6. My position in the September 4, 2026 Joint Status Report likewise distinguished this alleged independent scheme from the employment dispute and termination remedies in JAMS. The report separately presents Defendants' characterization. Section V states that there was no agreement to arbitrate Plaintiff's Complaint at that time. (ECF 54, pp. 1–3, 5.)

**II. Employment and events before the purported engagement**

7. Red Bull employed me as a Regional Account Manager from January 25, 2021 until July 11, 2022. I lived in Chicago and worked mostly remotely from Illinois as a field sales employee. Nearly all ordinary interactions with coworkers and management occurred by email, Microsoft Teams, telephone, or text rather than face-to-face.

8. On February 23, 2022, I formally requested exemption from Red Bull's COVID-19 vaccination and weekly-testing requirements as a religious accommodation. My request explained my Christian belief that my body is a temple of the Holy Spirit and my duty to honor God with it. I explained that I could not in good conscience accept a medical intervention whose risks to my body, as I understood them, outweighed its benefits. My objection to the nasal-swab test concerned the ethylene oxide – a class 1 carcinogen – used to sterilize the swab and the conflict I believed that presented with those religious duties. (Religious Accommodation Form Questions, answers 4–7.)

8(a). My request explained why I sought a complete exemption, rather than another condition on keeping my job. It challenged the asserted need for testing me under the policy and set out the reasons I believed exemption would permit me to perform my work without compromising my religion. I continued to believe the exemption I requested was justified. (Religious Accommodation Form Questions, answers 5–7.)

8(b). Red Bull's February 25, 2022 acknowledgment said my request would receive individual review and that I should expect information about next steps during the week of February 28. While it reviewed the request, Red Bull barred me from in-person work and events and directed me to arrange remote participation. (Religious Accommodation Communications, p. 1.)

8(c). The March 18, 2022 denial said Red Bull did not believe my religious beliefs conflicted with all options under its vaccination-or-testing policy. It did not address my explanation of the religious conflict concerning ethylene oxide in the nasal-swab test. It did not identify a particular acceptable alternative test for me. Instead, it invited me to identify an

alternative for Red Bull to consider and required compliance by April 1. (Religious Accommodation Communications, p. 2.)

8(d). On March 25, 2022, before I proposed saliva testing, Red Bull expressly required testing through Color because I had not provided an alternative. It stated that Color must receive my test by April 1 and that, if I was unwilling to comply, Red Bull would terminate my employment effective April 4, paying my salary through that termination date. This was a direct threat to my employment while the specifically disputed Color test remained the required method. (Religious Accommodation Communications, p. 3.)

8(e). I raised alternative testing that day to keep my job under duress. Red Bull had not identified an acceptable test for me. I researched the options myself because I feared losing my job and income under the stated deadline.

8(f). I continue to believe that my request justified exemption from testing and that requiring me to find another test was in violation of my federal civil rights. I proposed the alternative under duress to keep my job after Red Bull threatened to terminate me.

8(g). On March 30, 2022, Red Bull approved weekly testing with the kit I had proposed, listing DxTerity and Vitagene options, reimbursement of the cost, and a first-results deadline of April 8. The letter called this a temporary accommodation. That approval followed my proposal and the earlier termination threat. (Religious Accommodation Communications, p. 4.)

9. Before May 19, 2022, I had asserted my religious-accommodation rights in my request and communications with Red Bull. I had not retained counsel, sent a cease-and-desist letter or an attorney's demand, filed an administrative charge, commenced a proceeding, or threatened

litigation against Red Bull. My accommodation request and assertion of statutory rights preceded those later steps.

10. Before July 1, 2022, no Red Bull manager, Human Resources or Legal representative, or other decision-maker had told me of misconduct complaints against me, a belief that I had engaged in misconduct, or an investigation of me for policy violations. I had received no communication of any kind, warning, or discipline for the accusations Castañeda later presented in his surprise interview of me.

**III. The interview and July 2022 correspondence**

11. On July 1, 2022, Castañeda interviewed me by videoconference at my Chicago home without advance notice of the meeting's purpose. I expressly told him I was in Chicago.

12. Castañeda first presented the specific accusations during that interview, the only investigatory activity directed at me of which I was contemporaneously made aware. I was shown no complaint, witness statement, interview note, finding, report, or other supporting evidence.

13. At Castañeda's invitation, I emailed him at 8:02 p.m. Central Time that evening about the feedback he had given me. I called that feedback "new and surprising," explained that I had not sensed those feelings in coworker interactions, and asked him to relay my question about what it would take to improve or salvage my working relationships with the team. I described Red Bull as an exceptional company, felt privileged to work there, wanted things to work out, and was willing to grow with the organization. He did not respond; neither did anyone else.

14. I first retained counsel on July 6, 2022. My agreement with Paul M. Davis & Associates is dated July 6 and displays my electronic signature on that date.

15. On July 7, 2022, my attorney sent a cease-and-desist letter directly to Brooks, identified as Red Bull's Senior Legal Counsel for Litigation and Employment. It disputed Castañeda's

accusations, described the investigation as retaliatory and pretextual, and threatened an EEOC charge followed by litigation or arbitration if Red Bull took adverse action. It attached the March 30 accommodation letter addressed to my Chicago residence.

16. The July 7 letter reflected my understanding from Castañeda that Red Bull had retained him to investigate accusations about me. I had never seen his purported engagement agreement and did not know its date, terms, or whether it identified me or such an assignment.

17. On July 11, 2022, Red Bull terminated me for allegedly violating company policy without identifying the specific conduct it determined warranted termination.

18. Red Bull's counsel answered the cease-and-desist letter on July 22, 2022 in the "Slater Letter." It stated that complaints arrived "on or about May 24, 2022"; that, "[g]iven the nature and number of the complaints," Red Bull retained Castañeda for a "neutral investigation"; that "a multitude of witnesses" independently corroborated the complaints; and that Red Bull terminated me following the investigation's results.

19. The Slater Letter stated that Red Bull's Talent department made the initial termination decision "on or about Friday, July 1, 2022," the day of my interview. The relevant decisionmakers had agreed by the morning of July 7, before receiving my attorney's letter, according to Slater.

20. Neither the termination communication on July 11, 2022 via video conference on Microsoft Teams nor the Slater Letter dated July 22, 2022 identified which accusation Red Bull adopted as a termination ground. More than four years later, Red Bull still has not identified those specific acts to me. I distinguish Castañeda's accusations from Red Bull identifying which acts it determined I committed and relied upon to terminate me.

**IV. My reliance and pursuit of relief**

21. I disputed the accusations and believed Red Bull's conduct was retaliatory and pretextual. I nevertheless understood Castañeda to be reporting actual coworker feedback and responded to it in my July 1 email. The Slater Letter later represented that complaints prompted his retention and investigation results supplied Red Bull's termination rationale. I understood those accounts to describe actual events: complaints prompted his retention, witnesses were interviewed, and investigation findings supplied the stated termination rationale. I relied on Castañeda's factual account in responding and on Slater's account in pursuing the supporting evidence, while disputing the accusations.

22. After termination, I applied for Illinois unemployment benefits. Red Bull was my only employer during the relevant Illinois employment period. I personally participated in the formal IDES dispute over my claim. My independent bank records show continued IDES deposits and no repayment, clawback, withdrawal, or reversal to IDES from that account.

23. Red Bull's May 16, 2025 JAMS filing acknowledged the IDES proceeding and stated that the investigation "was the basis for Respondent's decision to terminate Claimant." It also stated that termination was "solely based on its findings that he engaged in misconduct." (May 16 response, pp. 4, 6.) Red Bull's September 1, 2026 First Amended Supplemental Interrogatory Answers state that it opposed my unemployment application "on the belief that Claimant engaged in misconduct." (Answer 10(a)–(b), pp. 9–10.) Red Bull has identified no other factual basis to me. Reading those non-IDES statements together with my employment history, I understand that investigation to be the misconduct basis for contesting my benefits. The account in this paragraph rests on those independent non-IDES sources. I separately seek Court-authorized access to and use of the IDES evidence described below.

23(a). My firsthand account of the warnings and communications I received appears in paragraphs 10–12 and 20. If available and authorized for discovery and use, I expect the IDES recording, any existing transcript, and relevant records to corroborate Red Bull's reliance on the investigation and my account of the lack of any prior HR or management warnings or communications identifying the alleged misconduct. I seek those materials for that verification.

23(b). On October 21, 2026, I emailed IDES requesting the complete hearing recording and any existing transcript, including continued or additional sessions. I requested those hearing records as a party to the proceeding, and retention schedules and policies under FOIA. I also requested confirmation of whether the records remain available and preservation of retained recordings and transcripts.

23(c). I do not possess the hearing recording or a transcript. The requested records would permit verification of Red Bull's statements and identification of any investigation materials it disclosed or invoked in opposing my benefits. Those details bear on whether Red Bull used the investigation while withholding its underlying materials as privileged.

24. On July 28, 2022, I filed a charge of discrimination with the EEOC and the Illinois Department of Human Rights. The EEOC issued my Right to Sue letter on April 23, 2024.

25. Red Bull's investigation account shaped my decision to initiate arbitration, my claims, and my pursuit of the underlying engagement agreement, complaints, communications, witness materials, notes, findings, and summary. I pursued those materials to test Red Bull's stated reason in my Title VII and ADA claims. Item 21 of my Consolidated Amended Demand recorded that reliance before the September 2025 engagement production. (Demand, reproduced at ECF 43-2, p. 12.)

26. When I filed my original demand, I had not received the purported engagement agreement. I did not know its recorded completion preceded the complaint date in the Slater Letter or that it did not name me or state that Castañeda was retained to investigate me. Those facts were also unknown to me at the interview, cease-and-desist letter, termination, benefits dispute, and receipt of the Right to Sue letter.

**V. Investigation representations and requests for supporting records**

27. On February 7, 2025, I served discovery seeking the materials underlying Red Bull's termination explanation: engagement agreement, investigation materials, communications, notes, summaries, complaints, findings, and other records, not merely a formal report. By March 21, I had also produced the Slater Letter to Red Bull through Ogletree. Order No. 9, dated March 25, 2025 (after the March 21 deadline), extended Red Bull's deadline to respond to its discovery obligations to March 28, 2025. Red Bull is still delinquent on its Discovery obligations to this day.

28. My May 1, 2025 motion to compel expressly argued that Red Bull had already waived privilege by affirmatively using the investigation and asked Griffin to recognize and apply that waiver under sword-and-shield principles. It explained my reliance on that account in preparing and filing my demand. Ogletree attorneys Jeffrey Rudd and Amy Cortez participated in the May 7 conference on the motion.

29. Red Bull's May 16, 2025 response stated that Castañeda interviewed seven witnesses, took notes, and gave a verbal report; Brooks prepared a summary; and the investigation found policy violations and was the sole basis for termination. It denied that a formal written report existed while asserting privilege over the other materials. I renewed my argument that those affirmative uses had already waived privilege in my May 21 reply, August 27, 2025 reply

concerning reconsideration of Order No. 13, and January 21, 2026 consolidated reply. (May 16 response, pp. 2–4, 6.)

30. In Order No. 13, dated June 2, 2025, Arbitrator John C. Griffin declined to compel a report Red Bull said did not exist and denied an adverse inference because privilege had been properly raised. He addressed Red Bull's assertion of privilege while ignoring my argument that its prior affirmative uses had already waived that privilege.

31. Order No. 16, dated September 12, 2025, acknowledged that the interview notes and Brooks's summary existed and required a privilege log and in-camera submission if privilege was claimed. Red Bull later served a log identifying investigation materials, including Castañeda's notes and a Brooks memorandum. This order also did not address my argument that Red Bull's prior affirmative uses had already waived privilege. (Order No. 16, § 4.)

32. At the May 12, 2026 hearing, I directly asked Griffin why sword-and-shield waiver did not apply, reminding him of my repeated written requests and need to test the termination rationale. A certified stenographer recorded the hearing; I had insisted on that record to preserve my questions and his responses. When I repeated the question, Griffin acknowledged reading my cited material and answered: "I wouldn't be inclined to think that that will be relevant." He gave no explanation. (May 12 transcript, 8:15–10:13, 25:16–26:6.)

33. Griffin said Red Bull would have to produce the materials if it used them. I immediately identified its prior uses in the cease-and-desist response and benefits dispute, reminding him that I had already presented them. He did not address my position that those uses had already waived the privilege Red Bull continued to assert. (May 12 transcript, 26:7–27:4.)

34. During that hearing, Griffin said: "So if they don't have anything and they're not giving you anything, they can't present anything at the hearing." My representative responded: "And

neither can we. That's the problem. We are not getting the evidence that we need to present at the hearings." Griffin later repeated that Red Bull could present only what it had produced and could not introduce something at the last minute. (May 12 transcript, 14:9–21, 38:13–18.)

35. Rudd argued that witnesses could testify to events without producing the contemporaneous materials used as the basis for termination. I explained that later testimony would not provide the same information from the same source as the contemporaneous materials on which Red Bull said it solely based termination. I told Griffin that excluding those materials could work to Red Bull's advantage if it substituted witness testimony, while preventing me from testing its actual rationale and establishing pretext. I asked him to consider that problem in deciding privilege. He gave no substantive response. (May 12 transcript, 27:5–28:14, 40:14–43:24.)

36. When Rudd claimed the materials had already been ruled privileged, I stated that Griffin was still determining whether privilege applied. Griffin answered, "That's correct." My position throughout was that Red Bull's identified affirmative uses had already waived privilege. I asked Griffin to recognize and apply that waiver. He has never supplied an oral or written ruling or analysis resolving that argument. His references to future in-camera inspection did not address the effect of those prior uses, even if the documents originally qualified as privileged. (May 12 transcript, 10:14–23, 28:15–24.)

37. Rudd initially said the in-camera documents had already been submitted. Griffin answered, "I haven't seen them," and Cortez clarified that counsel had agreed to facilitate review when Griffin requested it which he already did in prior orders if Red Bull were to assert privilege – which they did. Rudd then promised submission and repeated that promise near the hearing's end. To my knowledge, Red Bull still has never submitted those materials for in-camera review. (May 12 transcript, 5:21–6:7, 8:9–14, 41:14–18.)

38. I needed the contemporaneous investigation records to prepare and prove my discrimination and retaliation claims, regardless of whether Red Bull planned to offer them. Excluding documents from Red Bull's presentation did not supply the records to me or allow me to examine what its decisionmakers actually received and relied on. After the exchanges described above, I still lacked those records and a substantive resolution of my repeatedly presented prior-use waiver argument. My requests sought the evidence needed to test Red Bull's termination account.

38(a). I also sought institutional review. My representative submitted a formal challenge to Griffin's continued service on June 10, 2025, identifying among other irregularities and violations his failure to address my prior-use waiver argument. The JAMS National Arbitration Committee (NAC) denied the challenge in its June 24 letter. I submitted a request for clarification that day. The NAC's July 9 letter denied clarification, stated that its denial of the challenge was final, and said that issues with the substance of rulings could be raised with the arbitrator before an award. Those steps produced neither the investigation records nor a ruling resolving my prior-use waiver argument.

38(b). On January 2, 2026, I filed an Emergency Motion to Enforce Compliance with Order No. 16, for Sanctions, and to Memorialize Contempt of the Tribunal. I asked Griffin to require production of the investigation materials or a detailed privilege log and in-camera submission, and to impose sanctions for continued noncompliance.

**VI. The September 2025 engagement production**

39. On September 9, 2025, Red Bull through Ogletree produced a static PDF represented as the Castañeda engagement documentation and an Adobe Acrobat Sign Final Audit Report. These

are the materials produced to me, not an independently verified copy of the original Adobe transaction.

40. The purported agreement, dated May 18, 2022, states that Castañeda's firm was retained to provide representation "in connection with a privileged investigation." It does not name me, identify the investigation's subject, state that he was retained to investigate me, or specify the investigative work.

41. The Audit Report records that Castañeda created the document on May 19, 2022; that it was emailed to Brooks at her Red Bull address for signature; that she viewed the email and electronically signed the document; and that the agreement was completed that day. It identifies a unique Transaction ID and records Brooks's signature and completion at 7:09:43 p.m. GMT. Those recorded transmission, viewing, signing, and completion events occurred five days before the "on or about May 24, 2022" complaints that the Slater Letter described as prompting retention.

42. I first learned that chronology and the agreement's failure to identify me or an assignment to investigate me from the September 2025 production. By then, I had supplied Ogletree with the Slater Letter and my May 1 motion explaining my reliance on Red Bull's account.

43. I promptly challenged authenticity, completeness, and provenance and requested comparison with the underlying Adobe transaction. The Audit Report recorded an actual completed transaction and Brooks's receipt of and access to the document for signing. What remained unavailable to me was the completed source transaction for comparison, the production's source file, and the subsequent custody and retrieval history.

44. The purported agreement's § 8 instructs Red Bull, for a litigation-related matter, to suspend any retention policy that risks destroying, deleting, or altering potentially discoverable

information and to preserve that information in its existing form. Section 9 states the firm's policy of destroying files seven years after first closure. I do not know when it closed any particular file or what it retained.

**VII. Completeness representations and certification orders**

45. On October 1, 2025, Ogletree described the production as a "complete and authenticated copy" and the only document setting forth the engagement terms. I continued to dispute completeness and seek independent source verification. Ogletree repeated the "complete and authenticated copy" representation on November 6.

46. Order No. 23, dated October 14, 2025, recites Red Bull's representations that the engagement letter alone set forth the terms and that it possessed no further documentation of them. Section 4 states: "At this point, the Respondent has complied with the discovery request. Respondent shall file a certification of this fact now or when all other discovery is completed." I have not received that certification.

47. At the recorded May 12, 2026 hearing, Griffin directed Rudd to obtain a certification from "someone with knowledge" that the produced agreement was a true, accurate, and complete copy. Rudd answered, "Okay. We can do that." I wanted Red Bull to substantiate its completeness and authenticity representations. The certification direction addressed that request, although Griffin expressly declined to require the separate Adobe authenticated transmission I also sought for comparison. (May 12 transcript, 4:4–8, 5:8–11.)

48. After that initial certification ruling, Griffin asked whether Red Bull would proceed with Adobe authentication. Rudd declined, stating Red Bull was "not even in possession of the Adobe records." When my representative asked about access, Rudd said that, "[i]n all likelihood," they were with the outside law firm. (May 12 transcript, 7:7–8:8.)

49. Amended Order No. 35, dated May 14, 2026, § 4 states: “Respondent shall provide a written certification that the Agreement previously produced is authentic, accurate, and complete.” It denies direct Adobe transmission, records my objection, and specifies no certification deadline. As of today, I have not received the certification.

50. Section 5 directed the parties to meet and confer after May 22, 2026 about outstanding discovery, then file modified discovery and responses and notify the Case Manager of the status when completed.

51. On May 14, 2026, I requested leave to move to compel the genuine Adobe Sign certified package from Red Bull or, alternatively, subpoena Adobe or Castañeda for it. I sought to compare the production with the identified source transaction. On May 15, JAMS conveyed Griffin’s direction permitting a Red Bull response by May 19.

52. On May 19, Cortez, who attended the May 12 hearing, opposed my request. She stated that Red Bull had produced “the entirety” of the agreement, “including the Adobe metadata thereof,” and that the issue “has been resolved on multiple occasions and must be closed.” Approximately thirty-two minutes later, I responded, identifying the May 12 possession statement and the Adobe materials already produced. I have received no correction or withdrawal of those statements.

**VIII. Subsequent efforts and the present record**

53. My representative’s June 22, 2026 email requested a ruling on the May 14 request and reported that the June 5 meet-and-confer ended without substantive discussion because Ogletree said it needed to regroup internally. The Case Manager acknowledged receipt and said she would forward it to Griffin and provide direction. After Greenberg Traurig replaced

Ogletree, his July 14 email reported a July 10 meet-and-confer with Greenberg, planned discovery amendments by August 7, and the continued absence of a ruling.

54. As of today, I have received no ruling granting or denying the May 14 request for leave. I have received neither the certification contemplated by Order No. 23, § 4 nor the certification required by Amended Order No. 35, § 4. Following the July 14 correspondence described above, I have received no further action or direction from JAMS. Red Bull provided amended discovery responses following the discussions described in paragraph 53, but they supplied nothing materially different from the responses previously provided to me. They supplied neither the complete Adobe source transaction nor the underlying investigation materials identified below.

55. More than twenty months after my February 2025 requests, Red Bull has not produced to me contemporaneous HR complaint records, emails, Teams messages, texts, witness statements, Castañeda's interview notes, Brooks's summary, factual findings, or a written report substantiating the alleged misconduct. This includes support for the Slater Letter's account of the May 24 complaints and corroborating witnesses.

56. Procedural conferences, orders, and correspondence have occurred. No merits evidentiary hearing has resolved whether the termination explanation was pretextual, and no final award has resolved my employment claims.

57. Griffin's General Fee Schedule in the JAMS Commencement packet lists $750 per hour plus a case-management charge of 13% of professional fees. Chargeable time includes reading, research, conference calls, and drafting orders and awards. (Commencement packet, p. 7.)

58. I reviewed the "Case Deposit Summary," supplied as "JAMS Invoices.pdf." It lists thirteen "Retainer" entries as of today, including one zero-dollar entry. Amounts requested and marked

paid total $117,000: $92,000 under the Ogletree/Rudd billing contact and $25,000 under Greenberg/Stein. It does not itemize hours, tasks, or application of deposits, or identify these as my expenses.

**IX. The documented source trail and records still withheld**

59. The Audit Report identifies the completed Adobe transaction and records Castañeda's creation, transmission to Brooks, her viewing and signature, and completion. Those events provide a specific source and documented historical access for my requests. Red Bull and Ogletree produced the PDF and Audit Report but still have not supplied the complete source transaction needed to determine whether the production reproduces the complete executed agreement. I also lack the records identifying who obtained the September 9, 2025 production's source file, from whom, and in what form.

60. The recorded May 2022 events establish Castañeda's and Brooks's participation in and access to that transaction. I have not received the later retrieval, download, or transfer records showing who supplied the September 2025 production to Rudd or Ogletree, when, in what form, and with what accompanying files or communications. I also lack the records showing who held or accessed the complete source at the October 1 and November 6, 2025 representations or the May 12 and May 19, 2026 statements. Rudd's possession statement did not explain that history or the identified participants' ability to obtain the records. I have not received an account of who compared the production with which source materials, when, and with what result.

61. The source trail identifies Castañeda as creator, Brooks as the Red Bull recipient who viewed and signed, Castañeda's firm as the likely possessor Rudd identified, and Adobe as the transaction provider. Red Bull and Ogletree produced the agreement and Audit Report and

made the completeness and authentication representations. My requests seek the completed signed agreement and associated source records through those identified sources, together with the existing delivery, access, download, retrieval, transfer, and comparison records supporting their representations.

62. I am not privy to Defendants' internal communications or the full extent of Brooks's authority, discretion, or involvement in the investigation, Slater Letter, Illinois IDES activity, preservation decisions, instructions to counsel, or production strategy. My records do not reveal whether Brooks or Castañeda personally retained, downloaded, transferred, deleted, or directed others concerning the complete Adobe materials.

63. The accommodation correspondence already records Red Bull's March 25 testing and termination ultimatum. My requests also seek to determine whether the broader investigation occurred as Red Bull described it, including the claimed interviews, corroboration, and findings. The withheld investigation records concern the investigation's chronology and substance: when complaints first arose; what each witness actually said (or if there really were any); what corroboration, contradictions, or information favorable to me was recorded; what Castañeda reported; what Brooks summarized; and what information the termination decisionmakers actually received and relied upon. I need those contemporaneous materials to compare the stated investigation with the reasons Red Bull gave for firing me and to test whether that explanation concealed retaliation for seeking accommodation. The completed engagement and Adobe source records would help determine whether Red Bull ever commissioned a genuine investigation of me: when, why, and on what terms Castañeda was retained, and what he was actually assigned to do. They would also permit the source comparison and tracing needed to test the later completeness and possession representations.

I seek those records for my employment claims and to examine the alleged deception and concealment in my separate federal Complaint.

64. My requests concern the identified completed transaction and the records available through its participants and Adobe. I have not independently accessed their accounts or files. My lack of access does not establish that those records are unavailable to them. If any source records were lost, I do not know when or who was responsible. My nonproduction statements describe what I received; I do not claim personal knowledge of destruction, a loss date, or a content mismatch.

**X. Actions taken and continuing effects**

65. I have devoted substantial time and effort to defending my Illinois unemployment entitlement, pursuing my claims, and obtaining the investigation, engagement, and source records described above. That work has included reviewing and comparing documents and representations, preparing and pursuing written requests and submissions with my representative, conferences, and follow-up efforts. Reconstructing the undisclosed engagement history and testing the source, completeness, and possession accounts required substantial additional personal work. I have also incurred out-of-pocket expenses in pursuing these matters. During self-representation, my principal additional burden has been my own time and effort, and interferences with my means of earning a living.

66. I disputed the accusations and believed Red Bull's conduct was retaliatory in 2022. But I did not know that the Audit Report would later record completion of Castañeda's engagement agreement on May 19, before the complaints the Slater Letter identified as prompting his retention. Before September 2025, Red Bull's account that those complaints prompted the investigation shaped how I developed my claims and sought records. Had that chronology

been disclosed in 2022, I would have raised that specific inconsistency then. The delayed disclosure required me to reconstruct the engagement timeline from the later-produced materials and compare it with the account on which I had developed my claims and requests. Timely disclosure would have supplied that history when I first pursued the investigation records and avoided that later reconstruction. The September 2025 production still did not give me the completed source agreement. I continued seeking that agreement and the records needed to test Defendants' later claims about what they held and whether production was complete. Despite that additional work, I still lack the completed Adobe source agreement and contemporaneous materials needed to test whether Red Bull ever commissioned a genuine investigation of me, what Castañeda was actually assigned to do, whether the investigation occurred as represented, and whether the produced PDF matches the completed agreement. Without those comparisons, I cannot test Red Bull's termination account against the contemporaneous records needed to prove pretext and vindicate my rights under Title VII and the ADA.

67. After Red Bull terminated me, I was unemployed for approximately a year. I also lacked health insurance for approximately a year while unemployed. Being uninsured added to the hardship and distress I experienced during that period. During that period, I spent prolonged periods isolated at home and relied on a food bank because I could not afford food and ordinary activities or much social contact. The financial pressure associated with these events depleted my resources, contributed to my inability to afford adequate legal representation, and forced me to proceed pro se. I feared financial ruin, including losing my home. My career has been seriously stifled, and I have not obtained a job that I consider as good as the position I held at Red Bull. The effects on my career have continued beyond the period of unemployment.

67(a). In October 2022, while seeking employment with Michelin, I spoke with its Talent Management Director for North America and its then Vice President of Sales. Each described me as "smart" but told me Michelin was dissuaded to hire me because it was closely partnered with Red Bull. The Vice President of Sales made his statement during my final in-person interview. Their statements advised me to be discouraged about my prospects of working for another large corporation.

68. I experienced severe anxiety, humiliation, and mental anguish from the accusations, inability to obtain and test the records, and financial pressure. During the earlier period when I was unemployed and isolated at home, I experienced thoughts of suicide. I believe those thoughts have passed, but I remain intensely frustrated and continue to experience emotional distress. Prioritizing and pursuing these matters has seriously harmed my relationships and my ability to move forward in my career. These effects accumulated through the investigation, termination, benefits dispute, and separate arbitration. The prolonged inability to obtain the records and advance my claims has continued to burden me.

**XI. The related source inquiry described in my Complaint**

69. As described in paragraph 109 of my Complaint, I learned of Zachary Wassmund from documents Red Bull inadvertently produced and contacted him directly. He told me that he was pursuing his own Red Bull dispute in JAMS, that Greenberg Traurig had supplied a static PDF instead of the Adobe-certified materials he sought, and that the firm had said the source materials could not be retrieved. I retain iMessages on my iPhone containing my exchange with him about those matters.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 25, 2026

Respectfully submitted,

/s/ Charles Leclerc

Charles Leclerc

Plaintiff, Pro Se

400 W. Ontario St., #603

Chicago, IL 60654

Tel: (612) 600-4044

Email: charles_leclerc@outlook.com