FILED
10/25/2026
THOMAS G BRUTON
CLERK, U.S. DISTRICT COURT
BC

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CHARLES LECLERC,
Plaintiff,

v.

RED BULL NORTH AMERICA, INC.;
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.;
KIM BROOKS, individually; and
JUAN C. CASTANEDA, individually,
Defendants.

Case No. 1:26-cv-07715

Case No: 1:26-CV-07715

Judge Sharon Johnson Coleman

# EXHIBIT A

## July 22, 2022 Slater Letter

Complete four-page letter; enclosure omitted.

### Included materials

Slater letter, original pp. 1-4

Source pagination is preserved. Any references to source PDF pages identify physical page positions in the original file.

ERVIN COHEN & JESSUP LLP

9401 Wilshire Blvd., 9th Floor
Beverly Hills, CA 90212-2974
jslater@ecjlaw.com
PH: 310 281.6330
File 17902.2

July 22 2022

**VIA E-MAIL**

Paul M. Davis, Esq.
Paul M. Davis & Associates, P.C.
9355 John W. Elliot Dr., #25454
Frisco, TX 75033
*E-Mail: paul@fireduptxlawyer.com*

Re: **Cease and Desist Letter Regarding Charles Leclerc**

Dear Mr. Davis:

Thank you for your letter dated July 7, 2022 (the "Letter"). Red Bull North America. Inc. ("RBNA") considers matters of this nature to be very important. Accordingly, the issues raised in the Letter have been thoroughly examined. In order for us to properly address the issues, it is important for the parties to work from the same set of facts, particularly as they pertain to RBNA's business practices.

## I. Relevant Factual Background

Beginning in December 2021, RBNA implemented a COVID-19 Vaccination/Testing Policy (the "Policy") for all employees. (See Enclosure 1.) The Policy never mandated vaccinations; rather, it permitted employees to either provide proof of vaccination or submit evidence of weekly COVID-19 testing. After the Policy was implemented, Mr. Leclerc completed three COVID-19 tests for his employment without complaint. Thereafter, he made a request to RBNA's Benefits department for a religious exemption to the Policy. RBNA did not question the sincerity of Mr. Leclerc's religious belief and engaged in the interactive process to determine an appropriate accommodation. RBNA accommodated Mr. Leclerc by allowing him to submit to an alternative testing system that did not conflict with his religious beliefs. The accommodation letter from the Benefits department concluded, "if you require any changes to the above accommodation (including extending the accommodation period) we will need to further engage in the interactive process." Mr. Leclerc did not request any further accommodations, and RBNA thereafter supplied Mr. Leclerc with the requested testing kits on a weekly basis.

Entirely separate from Mr. Leclerc's accommodation requests, and as you noted in the Letter, Mr. Leclerc was the subject of several complaints regarding his interpersonal behavior with his co-workers over the past several months. During these instances, Mr. Leclerc's co-workers asked Mr. Leclerc to refrain from continuing his offensive conduct. Rather than self-correct, Mr. Leclerc became defensive and combative. Accordingly, Mr. Leclerc's co-workers reached a breaking point and, on or about May 24, 2022, lodged a series of complaints to RBNA's Talent department (HR) about Mr. Leclerc making racist, sexist, and insensitive comments and jokes.

Given the nature and number of the complaints, RBNA engaged Juan C. Castaneda, Esq. of Castaneda & Heidelman LLP to conduct a neutral investigation. Mr. Castaneda interviewed a multitude of witnesses who independently corroborated the complaints raised. Mr. Leclerc was also interviewed and admitted to many of these same events. More importantly, it was clear from the offensive instances as described by the participants and the investigator's interview with Mr. Leclerc, that Mr. Leclerc had no remorse for his offensive behavior nor any intention to correct his behavior despite being repeatedly asked to do so. This ongoing behavior underscored his insensitivity to his colleagues and contributed to a negative and hostile working environment and team dynamic, which are of paramount importance to RBNA's company culture.

Following the results of the month-long investigation, RBNA made the decision to terminate Mr. Leclerc's employment, effective July 11, 2022.

## II. Mr. Leclerc's Termination was Based on Offensive Behavior that Violated Company Policy

The Employee Handbook explicitly provides that the following behavior is prohibited:

- Verbal conduct such as epithets, derogatory, discriminatory or offensive jokes or comments, slurs, or unwanted sexual advances, invitations or comments (whether in person, through written, electronic, or telephonic communications – including social media – or otherwise).

Similarly, the Employee Handbook provides the following section on the "Observance of High Standards":

> Employees must constantly demonstrate high standards of business conduct and professionalism in their relationships with coworkers, customers, suppliers, and members of the public. We expect our employees to treat customers, suppliers,

coworkers, and members of the public courteously and with respect and understanding at all times.

It is uncontestable that several of Mr. Leclerc's co-workers complained, in succession, about Mr. Leclerc's violation of these specific policies. Notably, and contrary to the speculation in your Letter, Mr. Jacobson was not one of the complaining persons. When presented with these complaints, RBNA was obligated to investigate. The results of the investigation not only corroborated that Mr. Leclerc had indeed made racist and sexist comments, often coming in the form of derogatory or offensive jokes but, more importantly, he expressed no remorse or willingness to self-correct, despite being repeatedly asked to do so. As set forth in the handbook's "Observance of High Standards" section and prohibition against "discriminatory and offensive" conduct, such behavior will not be tolerated and Mr. Leclerc's employment was terminated on this basis.

RBNA's Talent department made the initial decision to terminate Mr. Leclerc on or about Friday, July 1, 2022. Pursuant to RBNA's policies and practices, all relevant decisionmakers were contacted for their input and agreed with the termination decision by the morning of July 7, 2022, hours before RBNA received your Letter. When RBNA received your Letter, it paused the termination process in order to review and evaluate the Letter's contents. Once RBNA determined that the factual positions taken in the Letter were incorrect, RBNA moved forward with Mr. Leclerc's termination as previously planned.

## III. Mr. Leclerc's Unvaccinated Status, Religious Accommodation, and Performance Review Were Not Related to His Termination

It is perplexing that Mr. Leclerc believes that RBNA was hostile to his unvaccinated status. At every point, RBNA worked with Mr. Leclerc to resolve any issues he had with the Policy. When Mr. Leclerc requested a religious exemption, RBNA neither contested the request nor required him to present supplementary proof. After accepting the accommodation request, RBNA provided a list of alternative COVID-19 testing kits that would not conflict with Mr. Leclerc's religious beliefs. Then, after Mr. Leclerc informed RBNA of an acceptable testing kit, the company provided the kits to him. No line of causation can be drawn from the religious exemption or accommodations provided to Mr. Leclerc's termination; the former simply had nothing to do with the latter.

Separately, as tangential support for the contention that RBNA retaliated and/or discriminated against Mr. Leclerc based on his unvaccinated status, the Letter contends that Mr. Leclerc's 2021 year-end performance review was a de facto performance improvement plan ("PIP"). No reasonable fact-finder could come to this conclusion.

ERVIN COHEN & JESSUP LLP

Foremost, there is not a single mention of Mr. Leclerc's vaccination status in the review. Nor is there a determination or insinuation that Mr. Leclerc was deprived of opportunities or penalized for missed opportunities based on his unvaccinated status. Rather, the year-end performance review was just that; a review of Mr. Leclerc's performance in 2021. The review is even-handed in praising areas in which Mr. Leclerc performed well, and recommending improvement in those areas in which Mr. Leclerc was less than stellar. There is no indication that a failure by Mr. Leclerc to improve in those areas would be met with discipline or termination. Put bluntly, RBNA did not consider Mr. Leclerc to have performance issues with respect to his immediate job duties, and the performance review serves to underscore this fact.

As you may know, performance reviews are a common practice and are used by employers to evaluate their employees in a neutral and objective manner. Indeed, the goal of RBNA's performance review process has always been to promote the work of its employees so that they can perform at their best for the company. Mr. Leclerc's evaluation was designed in this manner and served this purpose. It is indisputable that the evaluation relied on hard performance metrics such as (1) increasing dollar and unit shares; (2) increasing "Multipack Features/Ads"; and (3) increasing product placement and exposure. As part of performing well on these metrics, the goal was to provide direction to Mr. Leclerc as to how to improve for the coming year. Accordingly, Mr. Jacobson outlined those areas in which, if Mr. Leclerc improved, he could continue to grow his sales figures.

Nothing in the performance evaluation can be construed as being influenced by Mr. Leclerc's unvaccinated status. Moreover, the basis for Mr. Leclerc's termination had nothing to do with his 2021 sales performance.

**IV. <u>Conclusion</u>**

We trust that a careful review of the facts provided will substantially alter your perception of Mr. Leclerc's purported concerns. If you believe that a further discussion of this matter is warranted, please contact the undersigned.

Very truly yours,

Jared W. Slater
Encl.
cc: Kelly O. Scott