FILED
10/25/2026
THOMAS G BRUTON
CLERK, U.S. DISTRICT COURT
BC

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CHARLES LECLERC,
Plaintiff,

Case No. 1:26-cv-07715

Case No: 1:26-CV-07715

Judge Sharon Johnson Coleman

v.

RED BULL NORTH AMERICA, INC.;
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.;
KIM BROOKS, individually; and
JUAN C. CASTANEDA, individually,
Defendants.

# EXHIBIT E

## May 12, 2026 Hearing Transcript

Complete transcript, appearances, and reporter certification (original pp. 1-49). The separate word index is omitted.

### Included materials

Hearing transcript and certification, original pp. 1-49

Source pagination is preserved. Any references to source PDF pages identify physical page positions in the original file.

IN RE: )
)
THE MATTER OF )
)
CHARLES LECLERC, )
)
Petitioner, )
)
and )
)
RED BULL NORTH AMERICA, INC., )
)
Respondent. )

RECORD OF PROCEEDINGS

The following proceedings were taken by Nick W. DiGiovanni, C.S.R., before the Honorable John Griffin, via Zoom videoconferencing, commencing at 2:00 p.m. on the 12th day of May, of the year 2026.

There were present during the taking of these proceedings the following counsel:

OGLETREE DEAKINS NASH SMOAK STEWART PC
Jeffrey L. Rudd
Amy Cortez
35 W. Wacker Dr.
Chicago IL 60601
jeffrey.rudd@ogletreedeakins.com

On behalf of the Respondent.

# I N D E X

PAGE

Record of Proceedings 4

JUDGE GRIFFIN: The Castaneda agreement, that has been produced. I know there's an argument that it isn't complete.

Mr. Rudd, I'd like you to have someone with knowledge to certify that that is a true, accurate and complete copy of the agreement.

MR. RUDD: Okay. We can do that.

JUDGE GRIFFIN: That's my ruling on that.

MR. ESSERTIER: Can I interject here? What if we want...

JUDGE GRIFFIN: Not if it's going to be stuff that we've already covered. If it's stuff you've covered in your pleadings, I've read them multiple times. We need to keep moving.

MR. ESSERTIER: Okay. The question is on what you've ordered. Are you ordering authentication?

JUDGE GRIFFIN: Yes. That's what I just said.

MR. LECLERC: No. He said certification, Robert.

MR. ESSERTIER: You said certification.

MR. LECLERC: Judge Griffin, why not authenticate through Adobe Sign?

It is the only way that we will know for sure whether or not the contract that was submitted is genuine. It is the only way.

JUDGE GRIFFIN: This is my ruling. This is my ruling. That's -- typically the way it's done is you have someone certify the authentication of the document, completeness and authenticity.

MR. ESSERTIER: To make sure I understand, are you saying you are not requiring Red Bull to authenticate through Adobe?

JUDGE GRIFFIN: Yes, that is what I'm saying.

MR. ESSERTIER: Okay.

JUDGE GRIFFIN: Okay. And then what else did we have to -- oh, the documents that -- the other documents that you had talked to, the respondent has raised attorney-client privilege.

Now, I only saw in all of this stuff I have -- and maybe I didn't get it all -- but that the privilege log has eight items on it. Is there more of a privilege log?

MR. RUDD: No. That's the entirety of the privilege log, and we also submitted the documents for your in-camera review.

JUDGE GRIFFIN: I haven't seen them.

MS. CORTEZ: I can just quickly clarify.
In our response we agreed to an in-camera review; and we've noted that, once the arbitrator reaches out, we're happy to facilitate it. Whatever would be most easy for you, Judge.

JUDGE GRIFFIN: Okay. I don't remember seeing that.

MR. ESSERTIER: Judge Griffin, we would argue that, without authentication, the privilege is not valid. Before we can get in to what that represents, we have to have the contract authenticated.
Why would not going through Adobe be the way we would do that? There's no other way to authenticate.

JUDGE GRIFFIN: Okay. That's overruled.
Adobe doesn't know whether it's authenticated. They know that it was signed, but the authentication is more genuine the way I'm ordering it. So...

MR. LECLERC: That's technologically impossible because what Adobe does is it will take a package and it encrypts it so that it cannot be modified at any point in time by any party.

The vulnerability with your ruling, sir, is that it lets the respondent retroactively modify maybe an agreement that was submitted to us that may have been altered or incomplete. This is why it is so crucial that we have authentication via Adobe sign.

JUDGE GRIFFIN: Mr. Rudd, do you want to do that?

MR. LECLERC: For some reason you're refusing...

JUDGE GRIFFIN: Did you say okay?

MR. RUDD: No.

Your Honor, first of all, as you originally ruled, we can just have a business record -- a custodian certify to the authenticity of the document.

And, additionally, we're not even in possession of the Adobe records because it was signed by our in-house counsel at the request of the outside attorney. It was a letter that was sent from the outside attorney to our in-house counsel that she then Docusigned. So...

MR. ESSERTIER: Are you saying that you have no access to it?

MR. RUDD: I'm saying that, the way it was structured, it's an agreement that was sent to us that we signed.

In all likelihood, any Docusign records in the possession of the outside law firm.

JUDGE GRIFFIN: Okay. We're going to move on. That's my ruling, and it clearly complies with all evidential means.

Okay. And you're going to send me the privilege log?

MR. RUDD: Yeah. We'll send the privilege log and we'll send you the underlying documents for in-camera review.

JUDGE GRIFFIN: Okay.

MR. LECLERC: So, secondly, there's also been matters that have been ignored from our filings. Like we're just assuming that there's privilege, and I'd like to understand how that's possible for several reasons.

First of all, the respondent explicity stated in its response -- July 22, 2022 in its response to my cease and desist letter that they hired Castaneda as an outside counsel -- no, not as an outside counsel -- as a neutral investigator, as

a neutral fact finder for this investigation.

So if we're just talking about facts that are directly at issue -- because what's at issue is this investigation which supposedly justified my termination, then why doesn't the sword-and-shield waiver kick in?

Because we talked about this. We brought it up in all four briefings since this arbitration started around this critical discovery issue, and it's been deliberately ignored by both you, Judge Griffin, and, you know, respondent's counsel.

So how are we supposed to be able to undergo the McDonnell-Douglas framework in these unlawful terminations that happen if we can't test the legitimacy of the reason why I was terminated?

Like why -- you know, we have to be able to get a hold of this evidence. We're in discovery now for over a year and a half. This has never been presented to us.

And on top of that, now we're supposed to assume that all this was done legitimately and legally authorized to do so when there's no authenticated contract on the plate?

Because the only way to truly authenticate is if you get the package directly from Adobe Sign. Is doesn't have to be in any attorney law firm's like handling. The handling is with the custodian itself. That's why it's trusted. That's why it's neutral, and that's why it's authenticated.

It seems like we're doing a lot to bypass this all in favor of respondent. And this is extremely concerning, and this is why we have refused to meet orally with you unless it's recorded via stenography.

JUDGE GRIFFIN: Correct, and we're doing that.

And the privilege log and the -- that's when I'll determine whether it's subject to the privilege, and I get to do that through the in-camera inspection.

MR. ESSERTIER: So -- excuse me. Is a neutral investigation considered a business process or is this something that would be subject to privilege in your opinion?

JUDGE GRIFFIN: I'll rule on that at the appropriate time.

Okay. Where -- so that's two of

the motions?

MR. RUDD: Yes.

JUDGE GRIFFIN: Okay. So now we're going to go in to the interrogatories?

MR. RUDD: That would be the 73-page motion to compel.

JUDGE GRIFFIN: Yes.

MR. RUDD: I would say, Your Honor, there was -- our position is this. He didn't meet and confer with us before filing it, which is improper in discovery.

He didn't meet and confer with us after he filed it and pursuant to the Court's directive -- or the arbitrator's directive.

We don't think it's -- and it was 73 pages long, single spaced, in violation of the JAMS rules that there should not be lengthy discovery motions.

We do not think it's appropriate to go through an entire 73-page single-spaced motion to address each of the issues he's raised where he failed to meet and confer both before and after and where he filed an excessively lengthy motion.

We don't think that's

appropriate. It would be rewarding conduct that is inconsistent with the rules and with the arbitrator's rulings, and we think it should be deemed that written discovery is closed and we need to move on to depositions.

MR. ESSERTIER: Mr. Rudd, I did meet and confer with Amy.

MR. LECLERC: And also this is our second time requesting to compel because -- the record is very clear.

You have consistently not respected the orders that were placed by the arbitrator, JAMS rules and you're consistenly exceeding deadlines.

And then, lastly, all of your discovery submissions like are completely deficient. You haven't done what we've asked you to do to get the evidence that we need so that we can materially have a fair process here.

Like if we can't -- if we can't obtain the material evidence to present our case, then we can't determine in a fair way whether or not what happened was indeed a legal conduct from respondent, and this is...

JUDGE GRIFFIN: Okay. Where are we with the meet and confer though?

They're saying they did with Attorney Cortez, I guess.

MR. LECLERC: Yeah, we did. We had it on the record. We can show all the e-mails. We met and conferred with Attorney Cortez after the first time we made a motion to compel.

Robert met with her, and that came to no fruition of any kind. There was all these promises that things were going to get produced like in the next couple weeks, and then it took like several months for anything to happen.

So it was useless. And we're not going to waste our time doing these meet and confers because all these meets and confers are a negative prejudice to us and they're rewarding respondent for wasting everybody's time in this arbitration when there's...

JUDGE GRIFFIN: They're required. They're required.

Ms. Cortez...

MR. LECLERC: Any contemporaneous evidence of any kind for what respondent alleges is their

reason, their rationale for termination.

We have gotten zero evidence. There's nothing that exists. We've asked for it. They're unable to provide it. And then their goal is to make us concede, and then we're going to move on with the evidential process but just because they don't want to give us anything because they -- either they don't have it or because it's not...

JUDGE GRIFFIN: Let met just say -- let me just say that nothing will be produced at the hearing -- nothing will be produced at the hearing that was not produced in discovery. That's the way it is.

So if they don't have anything and they're not giving you anything, they can't present anything at the hearing.

Ms. Cortez...

MR. ESSERTIER: And neither can we. That's the problem. We are not getting the evidence that we need to present at the hearings.

JUDGE GRIFFIN: Okay.

MS. CORTEZ: Judge...

MR. LECLERC: In your prior orders you confirmed in writing as a fact finder -- you said

that there are materials that exist to this investigation. You confirmed this.

JUDGE GRIFFIN: Ms. Cortez.

MS. CORTEZ: Yes. For clarity, your order number 34 which was entered in late February -- I believe 23rd -- directed the parties to meet and confer. We have not met and conferred since that order.

I had spoken with Mr. Essertier prior to that. However, your order that was entered in February directed us to meet and confer albeit again perhaps to further try and resolve our issues. We have not met since then.

JUDGE GRIFFIN: Okay. Let me ask a couple questions and -- the -- the production that's been made, now I haven't seen that.

And, Mr. Leclerc, your position is that it's inadequate, is that correct?

MR. LECLERC: That is correct.

And actually the vast majority of the production is not even anything we ever asked for. It actually also includes, it appears, another case with another claimant against Red bull.

So we're getting information that

didn't even have to do with our own case as well, and it was all packaged in the form of a giant dump. There was nothing organized. There was nothing that said, hey, this...

JUDGE GRIFFIN: Yeah. You said -- you said that in your paperwork. I saw that. There's no page numbers or whatever they call them, yeah.

MR. ESSERTIER: The reason it's 74 pages is because we laid out exactly the deficiencies, exactly what we want and why we need it.

JUDGE GRIFFIN: Well, I've read them all.

MR. ESSERTIER: Good.

JUDGE GRIFFIN: I have notes on them all. I'm prepared basically to rule on them all.

But if -- if -- I want to make sure both sides are prepared.

MR. RUDD: We had no indication...

JUDGE GRIFFIN: I want to keep moving this along though.

MR. RUDD: I know.

JUDGE GRIFFIN: I hear the complaint that it's taking too long, and there's some validity to that.

In any case, what were you going

to say, Mr. Rudd?

MR. RUDD: We received no indication that the intent of today's hearing was to go through the entirety of their 73-page motion. If that's what Your Honor intends to do, I think we need to reschedule a hearing for a later date so that we can prepare to do that.

But that's -- we haven't received any indication that that was going to happen at today's hearing.

JUDGE GRIFFIN: Okay.

MR. LECLERC: Could I ask -- or say something before you step in here, John.

So we submitted this motion like, what, end of December, maybe first week of January, like after New Years Day, something like that.

You had the opportunity to respond. I think you submitted like a three-page response basically just trying to take, hey, I'm not going to deal with this. That's kind of what I got out of it.

Why didn't you then do your due diligence of going through every single one of the interrogatories and RFPs and explaining why you

sincerely believe that you did comply with the obligation?

MR. RUDD: Because you filed a 73-page single-space brief which is entirely improper; and you were directed to meet and confer after that, and you haven't done so.

MR. LECLERC: Well...

MR. RUDD: Excuse me, sir. Excuse me, sir.

MR. REPORTER: Hey, I can't take interruptions...

(Discussion kept off the record.)

MR. RUDD: That is your position. If that's what Your Honor intends for us to do today, then we need to have a hearing at a later date to do that.

MR. LECLERC: May I make a suggestion?

JUDGE GRIFFIN: Go ahead.

MR. LECLERC: This is what we originallly wanted, right. There was a scheduling for the briefs originallly once we submitted the motion. First we had to ask permission. So we did that too.

But, you know, instead of just reorganizing another hearing and going through these

one by one, what I think would be most organized and most time efficient for all parties is if you actually go back and do your job and, you know, respond to these one by one properly and make your case so that then Judge Griffin can finally have your clear responses versus ours initially, and then he can make a, you know, decision because he's the arbitrator.

And, you know, he'll make a proper decision instead of just kind of bickering back and forth for each interrogatory and each RFP. I think that would be a lot more efficient.

And then we'll finally move on in discovery, and we'll pretty much be done at that point.

MR. RUDD: Yeah. Responding to a 73-page single-spaced brief is not efficient in any fashion whatsoever. And you were directed to meet and confer thereafter probably for the specific purpose of narrowing the issues for Judge Griffin to resolve.

But if Judge Griffin wants us to go through all 73 pages and the issues raised in that, we can do so; but we're going to have to do so

at a later date.

MR. LECLERC: Jeffrey, you are misrepresenting the timeline. The meet and confer order, as Amy just stated, was in February which was after I submitted this motion that you said is 73 pages.

Now I understand that it's not ideal and it's a lot or work. And I went through a lot of work too when I went through your 1500 pages of discovery dump that was not indexed or labeled in any way.

But you know what? That's how it works. You know, when I submitted my discovery obligations to you, I did everything in good faith; and I organized everything, and I legitimately said whether or not I answered what you asked and, if I didn't, why I don't think I feel like I have to.

I think I was very clear. I think you got some A-grade work from me here, and on your end I didn't get anything really that is of good faith at all.

I took many hours to dig through everything that you sent in your big dump, and I evaluated -- which is then where this motion came in

and why it was, you know, written so diligently -- one by one to determine whether or not what you submitted actually includes any of that.

And pretty much for every single thing that we've asked for you did not provide that. And if you provided a response, it was just some kind of overbroad objection which does not justify anything.

So if you're going to keep using that same response then for those in particular, then we can go back and have another hearing and then John Griffin ask decide from there.

But, any way, you know, whether it's 73 pages, that's not against the JAMS rules. It had to be 73 pages because this is a very big case.  There's 20 claims, and a there's lot of materials that we need to prove our case.

And we have in particular been focusing diligently on the most important one, which is the termination rationale, and any contemporaneous evidence of any kind that exists to support it; and to date we haven't seen anything from you that supports that.  It looks like it really doesn't exist.

But there are also other claims that have to do with whether or not Red Bull followed the informed consent processes of informing employees whether or not these were experimental, whether or not people did have a choice or not.

Like there are a lot of things that we'll get to later, but first we got to get through this termination rationale because we're going to have to prove that really that's not the real reason why I was fired.

The real reason why I was fired was for maybe something else, and that something else -- I already made my prima facie case for that, right, for the McDonnell-Douglas framework.

Now it's your turn to prove whether or not your rationale actually has any evidence to support it, and you haven't been able to provide any of the evidence that we've ask for that would support it.

This is where we're at today.

MR. RUDD: Okay. I respectfully disagree with your categorization of our discovery responses. We were fully compliant with our discovery responses and raised valid objections.

But if Your Honor wishes to have a hearing in which we go through all of his objections to our responses spelled out in 73 single-spaced pages, we'll do so if Your Honor wishes us to do so; but it should be at a later date so that we can prepare for that extensive hearing.

MR. ESSERTIER: And, Mr. Rudd, is it your position that you have satisfied all of the interrogatories and documents?

MR. RUDD: Yeah, it's our position that our responses were perfectly appropriate.

MR. ESSERTIER: And complete?

MR. RUDD: Yes. We raise valid objections and provide valid answers.

Parties can disagree over these these things in discovery, and Judge Griffin can decide whether he thinks additional discovery is required or not, but we don't believe our responses were improper in any fashion.

MR. ESSERTIER: Well the 73 pages were basically a detailed explanation of what we feel you failed to provide.

MR. RUDD: We understand.

JUDGE GRIFFIN: Okay. The comments I had

throughout are, if there's a privilege being raised, Mr. Rudd, we need a privilege log. And there's a lot of them that you are raising privilege, and all I've seen is the privilege log which had eight items.

So that -- that's one of my comments throughout --

MR. RUDD: Okay.

JUDGE GRIFFIN: -- Is that you need -- if you're saying it's privileged, you need a privilege log.

MR. RUDD: Okay. And that's true of all internal communications from in-house counsel to business people covering all of our ESI?

JUDGE GRIFFIN: The privilege log?

MR. RUDD: Yes.

JUDGE GRIFFIN: Well, I don't know about whether it's necessary to have an in-camera inspection, but the -- I'm trying to find the privilege log you have. It's just one page for eight of them, and it just has a paragraph -- a column with what's in there.

And, yeah, it should -- if we're raising it as a privilege, we should have a log.

MR. RUDD: We'll see if there's additional items that were pulled from our ESI searches that were identified as privileged, and we will add that to the privilege log if it's required.

JUDGE GRIFFIN: If that's the basis for you not -- you know, for you not complying with it, then -- then that's what we need. If there's another basis or something -- but then I -- there was something else that was in here...

MR. ESSERTIER: What about distinguishing the work product from the attorney -- attorney conversations?

JUDGE GRIFFIN: Those are both privileged.

MR. ESSERTIER: Shouldn't they be separated in the log and described?

MR. LECLERC: How can something be privileged though if it's directly at issue and used as both a sword and a shield? Like it seems like that's not legal.

JUDGE GRIFFIN: Yeah, it is.

MR. LECLERC: Okay. So the sword-and-shield doctrine does not apply in this arbitration then.

JUDGE GRIFFIN: I'm sorry?

MR. LECLERC: So does the sword-and-shield

doctrine not apply in this arbitration?

JUDGE GRIFFIN: The sword-and-shield -- and I remember reading it on a number of cases that you cite -- I mean a number of things that you cite, but it -- I wouldn't be inclined to think that that will be relevant.

MR. LECLERC: Well how could that not be relevant? I mean, very clearly the sword-and-shield doctrine is a legal principle holding that a party cannot use privileged information or a legal defense offensively as a sword to influence a decision maker while someone seems to be using that same privilege defensively to hide related unfavorable evidence from the opposing party?

JUDGE GRIFFIN: If they use it, yes, they have to produced it.

MR. LECLERC: And they have used it. They've used it twice.

They've used it in their response to my cease and desist letter from their counsel that they hired, and they used it offensively in a quasi judicial setting to try to deprive me from my unemployment benefits.

We submitted all that

documentation to you earlier already. So it directly applies. You can't change your footing. You know, like you've already committed to that, dude.

MR. RUDD: Respectfully, if information is available from other non-privileged sources, then it can be obtained through those sources and you don't have to get in to the privileged materials.

We're talking about interviews of witnesses. Witnesses can testify to events. We don't need to get the attorney notes of their prior interviews with people.

MR. LECLERC: Yes, we do, and I'll tell you exactly why. Because the termination decision was based entirely on the results of that investigation and those attorney notes and their impression. Because we're talking about four different levels of hearsay that were then transmitted to the Red Bull senior leadership to then make that decision.

So they are directly relevant. And then reconstructed, repracticed witness testimony later on is not going to be of -- the same information of the same source. So it's directly relevant.

I was terminated because of the result of this investigation. That has been clearly stated by Red Bull. You are just judicially estopped in that position to do so.

You can't change your stance. You can't fabricate things, and that's why it's directly relevant.

MR. RUDD: We respectfully disagree; but if you want to address this issue in briefing, we'll be glad to do so.

MR. LECLERC: Well we already have in many briefings, and it's been consistently ignored by both you and Arbitrator Griffin. We don't understand whY.

MR. RUDD: These things have been ruled as privileged already.

MR. LECLERC: Those are two different things, Judge -- not judge, but Jeff.

I believe John has not ruled these as privileged yet. I think he's trying to determine whether or not privilege even applies.

I have not seen an order that says that yet, Mr. Rudd.

JUDGE GRIFFIN: That's correct.

MR. LECLERC: Thank you.

JUDGE GRIFFIN: Okay. Well -- so what we're going to do is -- I think you should meet and confer, and I'm going to order you to meet and confer.

That's -- that's right in the JAMS rules. It's fundamental in every level of court.

And then you may be able to resolve some things, and you may be able to minimize some things.

And then, Mr. Rudd, you'll have to respond to. And if there's things that you can produce or things you can answer, there's -- there's all kinds of things that -- like I say, I have notes and what I would -- just to take some of the repetition out of it, Mr. Rudd, if you'd describe -- if you'd define the health mandate.

Because every answer says there is no health mandate, and I -- I think it says here in a number of places that it has to do with the COVID -- the COVID restrictions.

So let's get that out of here. Let's get that off the table first of all. When

you're meeting and conferring, confirm what we're talking about as far as the health mandate; and then we can get that out of there.

I think we all know what it was; and as a matter of fact, in your answers you say that assuming that that's what it is. And so...

MR. LECLERC: Yeah, that's been made very clear since we even filed the consolidate demand for arbitration. So there's really no ambiguity there.

But I -- I just want to say one little example here. Like, for example, if we're looking at interrogatory number five, we had asked respondents what were the scientific or medical credentials of the person who wrote the informed consent document distributed to the employees, if any.

Because my -- you know, in my personal experience we didn't see any of that.

Anyhow, they responded with this. They injected that the interrogatory was vague, ambiguous, unduly burdensome, oppressive, harassing and seeking information not in its custody or control.

JUDGE GRIFFIN: No. Let me interrupt you for

one second, sir.

MR. LECLERC: There's a lot of responses that resemble this throughout the entire, you know, discovery submission of respondent.

Why not just say, no, we didn't have any informed consent document or anything -- like, see, that's really all that we were looking for, just the truth, you know, not some kind of weird way to say like we're not going to tell you what we really should tell you, you know.

MR. RUDD: Well, just to be clear...

JUDGE GRIFFIN: Mr. Rudd, let me just say, for example, in interrogatory number five, your relief sought, identify by name, title, et cetera,, produce any records. I think you should.

MR. RUDD: Okay.

JUDGE GRIFFIN: That's just -- you know, it's not like I'm -- every one of these, here's what it says, answer, here's what it says, you're making an argument here that isn't appropriate, here's what it says, well, what's the relevance, here's what it says, argument, lie, answer, answer, why, answered -- you know, so I have gone through them all, and it's not like I'm saying they're -- none of

them are -- or they're all going on direction or the other direction.

But I think you can -- you can minimize this. And if -- I appreciate -- well, I want to make sure everybody -- I do want to move forward with this. This is going slower than I'd like.

So when would you like to -- when would you like to meet again with me after you meet and confer with each other?

MR. RUDD: Well, Your Honor, what I will say is this, I'm actually leaving the country tomorrow and will be out through May 22nd. I'd like to do a meet and confer upon my return.

And then after the meet and confer we can file a response covering any issues that we can't resolve.

MR. ESSERTIER: Mr. Rudd, is there a reason why I couldn't meet and confer with Amy again?

MR. RUDD: Well I think it would be helpful for both Amy and I to be on the meet and confer.

MR. ESSERTIER: Okay.

MR. LECLERC: That's fine.

Suggestion. Before we meet and

confer, would you be able to take a stab at, you know, responding to all the deficiencies that we identified in our submission?

I think that will make the consideration more constructive, and then we just say, hey, do we agree on this, yes or no; and then for the ones we don't agree with, then we'll push it back to Judge Griffin. Then he'll decide as he pleases, and then we'll move on from there.

MR. RUDD: If we can get you something in writing, we can. But in my experience it's best just to talk over the gone go, through each issue on one by one; and then afterwards we can reduce to writing where we disagree and where we agree, and we can go from there.

MR. LECLERC: There's so many deficiencies that we identified though. I think it would just be best for -- you know, you sit down, you make your case as to what we identified; and then, you know, if you're set on a specific position, then so be it.

Then I will be able to then review this carefully on my own with my time. I think it will be a lot more streamlined than just kind of, you know, openly bickering, brainstorming,

so to speak, between the two of us here, you know, in a meet and confer.

And I'm open to having the meet and confer, but I'd like to have it after you submit something in writing. You know, you can just e-mail it to us, or you can put it in the JAMS portal if you wanted to be more formal.

But just so that we clearly understand your position on every deficiency that we identify here -- you know, because again, you know, I'm not an attorney myself. So I'm really doing my best here to, you know make sure that I understand everything that -- you know, that you're positioning yourself to be. So...

MR. RUDD: I think it would be unduly expensive for us to respond to a 73-page deficiency brief, and it will be much more efficient and cost efficient to just have a phone call; and then we can document where we agree and disagree.

MR. ESSERTIER: So when's the soonest you can do that?

MR. RUDD: After Memorial Day. Probably first week of June.

MR. LECLERC: At the speed we're moving here,

you know, even if we're going to talk from like one interrogatory at a time, honestly I can't help but feel that it's going to be a much more slow and a much more expensive process for you and respondent here.

It's just -- you know, think of all the hours you would spend, you know, meeting and conferring to go through each and every single one of these deficiencies.

The best way is please submit the response that you should have submitted the first time instead of that three-page thing that just dismissed everything. You know, make a good-faith effort to reply to everything.

Then we will meet and confer with you in good faith, and I'm sure we'll still have disagreements. And then after that we'll just say whether we still disagree, and they'll push it back to Judge Griffin and he'll decide, you know, from that point what to do, whether he wants to have another hearing to contest things.

But hopefully by that point -- my goal is to make so things so clear that, you know, we have your position, my position, we give it to

Arbitrator Griffin; and then he, you know, can take his time and,you know, make his decision and explain why his decision is so.

I think that would just be really the most clear way for really everybody and for the record and, you know, it would just be the fastest way and the most streamlined way.

MR. RUDD: Well, the standard practice is that we would met and confer as we should have done after order number 34 was entered; and we will only highlight for Judge Griffin the issues that we can't reach agreement on, and we'll submit that as our response.

But at this point in time I think we need to have a call when I return where we can go through all the issues, and then we can submit in writing from Judge Griffin to rule upon.

JUDGE GRIFFIN: And That is the typical way it's done.

Now the other thing is that a number of your answers, Mr. Rudd, say that you're in the process of producing things. And so I would like to -- like to know the status of that.

MR. RUDD: Yeah. We completed our

production. We did written our responses and completed our ESI and produced about 1700 pages in documents.

JUDGE GRIFFIN: Okay. And is there any way to identify what those documents are responsive to?

MR. RUDD: If Your Honor wants us to do that, we can do that; but that's generally not required under JAMS' rules.

JUDGE GRIFFIN: No, it isn't required, but I'm just wondering if it would be more productive ultimately so that we know -- so we know -- oh, here it is. Here's your response -- yeah, on a number of them you say respondents conducting a search for non-privileged documents in its possession, custody or control. You say that in a number of them.

So I'd like to at least know which ones you produced something and which ones you don't have anything type thing.

MR. RUDD: Okay.

JUDGE GRIFFIN: Those are some of the questions that I had when I was going through this. One was to get the privilege log -- I mean, just throughout -- to get the privilege log up to date -- privilege logs -- and to find out the status of the

production.

But it sounds like you've made it.

MR. RUDD: Yeah.

JUDGE GRIFFIN: At least all you're going to make.

MR. RUDD: Yes.

JUDGE GRIFFIN: And as part of the meet and confer, Mr. Leclerc, if you have something that you -- in particular that you want to identify what it's responsive to, you can -- you can bring that up.

But anyway, like I keep saying, when you do the hearing on this, that's all they can present. That's all they can present is what they produced.

They can't bring something out at the last minute and use it.

And can I ask another question just to -- how many depositions do we think we're going to try -- you know, the rules say each take one.

MR. LECLERC: I think in the past we had aligned to just one. We plan on just deposing one

individual.

JUDGE GRIFFIN: Okay. Mr. Rudd?

MR. RUDD: We'd be inclined just to do one deposition as well.

JUDGE GRIFFIN: Okay. Well, hearing that, you know, once we get passed this written discovery, we can take a couple of deps and we'll be ready to go.

MR. LECLERC: Yeah. Just a couple things I wanted to say.

You know, one regarding the meet and confer, I do want to remind everybody that, you know, claimant has fully complied with discovery obligations back in late February of 2025. So it's been over a year that we fully complied.

This is not our first time meeting and like -- you know, compelling deficient discovery obligations on to respondent. We submitted our first request back in either April or May. So we did do that.

Then after that we did do a meet and confer as you had ordered. So we did do that in good faith, you know. Beto met with Amy, and they had a discussion.

Seemingly it went really well at the time, but then nothing came of it. It wasn't until months later after complaining more via e-mail or another motion -- I don't remember exactly -- to then get them to finally produce something because nothing was going to get produced.

So now we compelled again because what they produced was -- you know, what we allege and what we would like for you to look at and decide -- is deficient, and we don't have all the material evidence that we need -- or that we'd asked for and that we know exists to be able to present our case fairly.

So I know, for example, you said -- at least to my second point, so I know, for example, you said now that, oh, okay, well, whatever is not going to be shared with you during discovery, well, they can't present and rely on anyway.

Okay, that's fine. But for them, when it comes to these investigation materials which are so central, it's almost to their advantage not to rely on them for this particular arbitration.

Because what they would like to do instead is substitute that with merely

established witness testimony.

What we'd like to do instead is to directly reference the termination rationale that was used, and that is what we absolutely need under the McDonnell-Douglas framework to prove pretext.

We can't prove pretext if they can just shield themselves from presenting the actual evidence they leverage and then just shielding themselves with new witness-trained testimony.

This is where it's fundamentally unfair, and I'd like for you to consider this as well as your, you know, determining privilege here.

MR. RUDD: And I think -- just to keep us on track here. We're going to update our privilege log as needed. We'll submit any documents identified in the privilege log for in-camera inspection for Judge Griffin.

We'll have a meet and confer first week of June and see if we can resolve any issues. And for the issues we can't resolve, we'll go back to Judge Griffin and get resolution on those.

But I -- I think we've got a game

plan moving forward and know what we're going to do and probably don't need to argue much more.

MR. LECLERC: I hope so. Because, you know, I don't know how many more times we're going to be expected to meet and confer and to, you know, request compelling your discovery obligations.

So, you know -- and I'd like for, you know, Judge Griffin to come up with some kind of reasonable number now because like I don't know how many times we're going to keep punting the baby down the road so that, you know, we don't actually make a decision to move this case forward, you know.

And, honestly, if we don't get this absolutely critical evidence that's central to this case, particularly around the investigation -- and, unfortunately, it looks like we're not going to get the authenticated contract even though it's pivotal as well -- you know, we're not going to be able to present our case fairly and materially because that is absolutely why I was terminated. And then we can move on to COVID stuff which is the real reason.

Which also -- you know, we haven't gotten a lot of stuff regarding that too,

right. A lot of stuff has just been ignored, like, oh, we don't know what you're talking about, it might not even exist.

I'm just really concerned we're going to be in this arbitration and it's going to break down, that it's never going to move forward and -- you know, just because we're never able to obtain the material evidence that we are entitled to to present our case, unless we concede that entitlement and then move on. And then we're going to have -- and then we're not going to be able present -- you know, in the hearings we're not going to have everything we need to be able to make a case around pretext which is what this case is entirely about.

MR. RUDD: I understand your position, Mr. Leclerc.

I think we've got a path forward, and I don't think it benefits us to continuing -- continue arguing in front of Judge Griffin. I think we've -- we know what our next steps are going to be, and we'll follow them and then raise any issues that may still exist with Judge Griffin.

JUDGE GRIFFIN: Okay. Well, thank you.

And one -- if I could just add one more little thing.

MR. RUDD: Yes.

JUDGE GRIFFIN: Respondent's response to your first request for production doesn't respond to request 12, malicious prosecution.

Now I don't know if you did some place or -- or -- and I'm -- with all of this paperwork that I just have not put it together. But on page 68 of claimant's request to produce...

MR. LECLERC: Yep, I'm looking at it.

JUDGE GRIFFIN: Do you see what I'm saying?

MR. LECLERC: Yes. So what is your -- what's your question regarding this?

JUDGE GRIFFIN: You know, I don't -- I don't see the respondent's response to it.

MR. LECLERC: It says respondent's answer and we summarized it.

JUDGE GRIFFIN: I know, but I didn't see it anywhere. You know what I mean?

I'm looking at his -- their response that you summarize, but that -- there is none in this thing.

So maybe there was something some

place else that I missed. That's my point.

If somebody could help me out with that, I'd appreciate it. That's all.

MR. RUDD: We'll make sure that the full and complete responses are included if we have, you know, remaining issues that we need to raise with you.

JUDGE GRIFFIN: Okay. Well, so you're going to meet and confer right after Memorial Day -- or after Memorial Day and then -- well, we'll take it from there.

You'll get a hold of my case manager -- unless you want to set more sort of a date now.

MR. RUDD: I think it makes more sense for us to meet and confer first, and then we can set a date.

JUDGE GRIFFIN: That's fine. And get a hold of my case manager, and we'll get it done.

MR. RUDD: All right. Thank you, Your Honor.

JUDGE GRIFFIN: Thank you.

As part of your meeting and conferring, talk about the -- using JAMS to record it.

MR. RUDD: Yeah, we will do so.

JUDGE GRIFFIN: There's -- you know, because originally that was the claimant's request, was to use JAMS, and then the respondent turned it down.

And then we got in to this, and here's where we are.

But if you think about that -- and I'm sure mister -- Nick, I don't wanted to mis pronounce your last name -- will be perfect on this. But I've had a lot of tough experiences over the years with the court reporters' record having -- having issues.

The classic was I took a dep in a jail, and it had to do with alcohol and the guy said that the defendant said I was drunk. When I got the transcript it said he said he was drunk, meaning my client. That was the whole case, you know.

And fortunately the guy in jail -- who killed my client, by the way -- he fortunately changed it. I was surprised. He reserved signature.

But, anyway, whatever you guys think.

MR. ESSERTIER: I have a quick question to

Nick. And that is do you keep an audio copy also?

MR. REPORTER: I do not. I don't keep it. It's my work product and I get rid of it.

(Discussion kept off the record.)

MR. REPORTER: As to the record, does anybody -- do we need the record right away or just regular delivery, and who do I give it to?

MR. RUDD: Regular delivery is fine. And you can send it to me, and I can send it to Charles and Robert.

MR. LECLERC: Thank you.

And before we wrap things up, I just want to reaffirm our position on recordation. You know, we did initially propose to record Zoom calls. Respondent objected.

Then we went down the stenographic route. Then Judge Griffin kind of had, you know, this middleman approach, like, hey, I can record via JAMS. And then again respondent did object to that via e-mail as well.

But, you know, to reaffirm our position today, we do feel more comfortable and more

confident with a stenographic record moving forward for all oral hearings. Because, from the research we've done and understanding how recordation is interpreted in judicial review, that is basically like the golden rule, right.

That is basically what's going to be the most accepted widely to be considered in judicial review, and we do highly anticipate this case to eventually move on to judicial review. So we need a reviewable record desparately that's going to be incontestable.

So that is just our position just to wrap up this call, and I wanted to have that statement on the record.

MR. RUDD: Okay. We'll discuss when we meet and confer.

3:02 P.M. END TIME

STATE OF ILLINOIS)
) ss:
COUNTY OF C O O K)

The within and foregoing proceedings were taken before Nick W. DiGiovanni, C.S.R., via Zoom videoconferencing, on the 12th day of May, the year 2026.

The transcription of these proceedings have been done so through stenographic means and contains all that transpired at said proceedings.

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties. Witness my official signature in and for Cook County, Illinois on this 19th day of May, the year 2026.



NICK W. DIGIOVANNI, C.S.R.
License No. 084-003060
One North Franklin Street - Ste. 3000
Chicago, Illinois 60606
Telephone: 312.442.9087