FILED
10/25/2026
THOMAS G BRUTON
CLERK, U.S. DISTRICT COURT
BC

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CHARLES LECLERC,
Plaintiff,

v.

RED BULL NORTH AMERICA, INC.;
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.;
KIM BROOKS, individually; and
JUAN C. CASTANEDA, individually,
Defendants.

Case No. 1:26-cv-07715

Case No: 1:26-CV-07715

Judge Sharon Johnson Coleman

# EXHIBIT K

## July 7, 2022 Cease-and-Desist Letter

Complete five-page letter; enclosures omitted. The March 30, 2022 enclosure is supplied in Exhibit I.

### Included materials

Cease-and-desist letter, original pp. 1-5

Source pagination is preserved. Any references to source PDF pages identify physical page positions in the original file.

# Paul M. Davis & Associates

Paul M. Davis
Paul M. Davis & Associates, P.C.
9355 John W. Elliott Dr., #25454
Frisco, TX 75033
469-850-2930
paul@fireduptxlawyer.com

July 7, 2022

Red Bull North America, Inc.
C/O Kim Brooks
Senior Legal Counsel
Litigation and Employment US
1630 Stewart Street
Santa Monica, CA 90404

Re: Cease and desist letter regarding Charles Leclerc

*Sent via US certified mail and via email to* Kim.Brooks@redbull.com

Dear Kim:

I have been retained as counsel for Red Bull employee, Charles Leclerc, in the matter of Red Bull's apparent retaliation against him for engaging in protected activity under Title VII, for discriminating against him and creating a hostile workplace and treating those outside his protected class more favorably, and for discrimination in regarding him as disabled under the ADA because of his refusal to get the COVID-19 vaccine. This letter is a demand to Red Bull to immediately cease and desist all unlawful treatment of my client.

**Factual Background**

Starting in or around March of 2021, Mr. Leclerc's immediate supervisor, Eric Jacobson, began asking Mr. Leclerc if he was vaccinated against COVID-19. Several of Mr. Leclerc's coworkers also began asking him the same thing. Mr. Leclerc made it clear that he would not be getting the COVID-19 vaccine, and this was well-known to his team. On December 31, 2021, despite having positive performance numbers, Mr. Jacobson's performance review of Mr. Leclerc contained unsubstantiated critical comments on highly subjective categories of performance, indicating a bias against Mr. Leclerc (see attached review).

In December of 2021, Red Bull announced a COVID-19 vaccine mandate requiring all employees to be vaccinated by December 21, 2021. Mr. Leclerc indicated to HR that he would be seeking a religious exemption (RE), and submitted his RE toward the end of February. HR

granted his RE on March 30, 2021 (see attached approval document). On March 11, 2022, roughly 3 weeks after Mr. Leclerc submitted his RE, Mr. Jacobson placed Mr. Leclerc on what is effectively a performance improvement plan (PIP) with burdensome and unreasonable requirements that are not placed on Mr. Leclerc's peers outside his protected classes (see emails attached).

Then, on or about July 1, 2022, Mr. Leclerc had a videoconference with an individual named Juan Casteneda with Castaneda Heidelman, hired by Red Bull to conduct an internal investigation into Mr. Leclerc. Mr. Casteneda informed Mr. Leclerc that Red Bull was conducting an internal investigation based on allegations of racist, slanderous, and unethical behavior and because his team felt "uncomfortable" working with him. The questions Mr. Casteneda asked of Mr. Leclerc, however, were in regards to incidents that no reasonable person would believe are racist, slanderous, or unethical or that were simply based on false information. The list of allegations included the following:

1. Mr. Leclerc "spoke poorly of Italian people" by saying "Italian Americans who do not speak Italian are not genuinely Italian compared to those living in Italy."
2. Mr. Leclerc made a fake COVID vaccination card.
3. Mr. Leclerc once referred to a Japanese sports car as a "rice rocket."
4. Mr. Leclerc once said he "likes skinny women in stilettos" at a golf event.
5. Mr. Leclerc once mispronounced the words "quesadilla" and "tortilla" by saying "keh-sah-dill-ah" and "tort-ill-ah."
6. Mr. Leclerc bragged about exploiting his expense account, spending more money on meals than reasonable.
7. Mr. Leclerc once said that $75 for personal travel meals is not sufficient for expenses.

In addition, Red Bull has escalated Mr. Leclerc's de facto PIP as he is now supposed to start reporting to an individual, named Mark Rappaport, who reports directly to the Red Bull CEO, starting this Friday, July 8.

**Legal Analysis**

It strongly appears from these facts that Red Bull, Mr. Jacobson, and Mr. Leclerc's coworkers are treating him differently than his peers outside his protected classes because of his unvaccinated status and that Red Bull is retaliating against him and creating a hostile workplace for him because he refused to be vaccinated and then engaged in the protected activity of requesting an accommodation under Title VII. Red Bull appears to be going out of its way to build a pretextual case to rid itself of Mr. Leclerc because of his unvaccinated status in an attempt to avoid liability under Title VII and the ADA. Sadly, this pattern of facts has become commonplace among American corporations who want to get rid of their unvaccinated employees. This thinly veiled retaliation and discrimination is unlawful and must stop immediately.

Whereas Mr. Leclerc's supervisor and his team have been aware of Mr. Leclerc's unvaccinated status since at latest, March of 2021, Mr. Jacobson's decision to begin building a

pretextual case against Mr. Leclerc in the December 31, 2021 performance evaluation and the team's apparent comments to HR that they are "uncomfortable" working with Mr. Leclerc suggest that these individuals regard Mr. Leclerc as being disabled due to his unvaccinated status. The Code of Federal Regulation specifically includes "regarded as" having an impairment in the definition of "disability" for purposes of the ADA. 29 C.F.R. 1630.2(l). The Supreme Court opined on the inclusion of the "regarded as" disabled, stating, "Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 284 (1987).

The timing of Mr. Jacobson's decision to place Mr. Leclerc on a de facto PIP shortly after Mr. Leclerc submitted his RE, while not implementing the same protocols for his other teammates, is strong evidence of retaliation for engaging in the protected activity of applying for an RE. The sudden third-party internal investigation over ridiculous allegations that took place long before the investigation but are only just now being investigated, wreaks of retaliation. *See, e.g. Picard v. Louisiana ex rel. Dep't of Justice*, 931 F. Supp. 2d 731, 738 (M.D. La. 2013) ("Temporal proximity between an employer's knowledge of protected activity and an adverse employment action is sufficient evidence of causality to establish a prima facie case of retaliation if the temporal proximity is 'very close.'") (collecting cases).

"Retaliation claims under both Title VII and the FMLA are analyzed under the *McDonnell Douglas* burden-shifting framework." *Wheat v. Florida Par. Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016). The employee need only establish that: "(1) he engaged in protected activity; (2) the employer took a materially adverse action against him; and (3) a causal link exists between his protected activity and the adverse action. *Wheat v. Florida Par. Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016). The burden then shifts to the employer to "offer a non-discriminatory reason for the adverse action." *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir. 2021).

While a PIP and an investigation are not themselves "adverse employment actions," these events typically indicate that an employer is building a case against an employee to terminate them. Moreover, these types of actions create a highly stressful work environment for the employee that may rise to the level of a claim for hostile workplace harassment under Title VII or the ADA. *See, e.g.*, *Steiner v. Showboat Operating Co.*, 25 F.3d 1459 65 FEP 85, 61 (9th Cir. 1994) (hostile environment harassment occurs "if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position.").

There is no legitimate, non-discriminatory reason for Mr. Jacobson to have placed Mr. Leclerc on the de facto PIP while not doing the same to his peers outside his protected classes of being regarded as disabled under the ADA and his religion. It would be one thing if Mr. Leclerc's hard performance numbers were objectively suffering compared to his peers, but that is not the case. Instead, Mr. Jacobson relies on soft, subjective aspects of Mr. Leclerc's performance, which is typical in cases of pretext for retaliation. There is certainly no legitimate,

non-discriminatory reason that Mr. Leclerc's weekly reporting requirements should have to be escalated to an individual who reports directly to the CEO.

The internal investigation is probably the clearest indicator that Red Bull is building a pretextual case against Mr. Leclerc in an attempt to legally justify a discriminatory and retaliatory termination. The allegations are ridiculous and did not even occur in temporal proximity to the investigation.

Racism is defined as (1) "the belief that race accounts for differences in human character or ability and that a particular race is superior to others, (2) discrimination or prejudice based on race, (3) the belief that each race has distinct and intrinsic attributes, (4) the belief that one race is superior to all others, (5) prejudice or discrimination based upon race, (6) discriminatory or abusive behavior toward members of another race, (7) the prejudice that members of one race are intrinsically superior to members of other races." *Racism*, *The American Heritage Dictionary of the English Language*, 5th Edition.

Making a statement that Italians who speak Italian are more genuinely Italian than those who do not is not a racist statement. It merely indicates Mr. Leclerc's opinion speaking the language of one's native culture is a sign of embracing one's cultural heritage. Such statement does not express any view that Italians are somehow intrinsically inferior or should be treated differently than any other race.

Calling a Japanese-made sports car, a "rice rocket," also does not meet the definition of racism. "Rice rocket" is such a commonly used term within the motorsports community that it is officially defined in the American Heritage dictionary as: "(1) a fast, light motorcycles imported from Japan, (2) a car, usually an Asian import, that has been modified or speed or customized for a flashy appearance." *Rice rocket*, *The American Heritage Dictionary of the English Language*, 5th Edition. Associating a vehicle with a popular food from its manufacturing country of origin is not racist by any stretch of the definition. It is similar to the popular term calling the series of Western movies made in Italy, "Spaghetti Westerns." No reasonable person would be offended by such a term.

Saying that mispronouncing quesadilla and tortilla is racist is simply laughable. First, quesadillas were invented in Texas as Tex-Mex, and are thus, not even a traditional food associated with any race. It is an American dish that is usually served at Tex-Mex chain restaurants owned by large corporations. In any case, Mr. Leclerc was using the pronunciation from the movie "Napoleon Dynamite," in which two white characters are actually made to appear stupid and ignorant for not knowing the proper pronunciation for quesadilla. In quoting this scene, Mr. Leclerc applied the same humor to "tortilla." Again, not racist. Here is a link to view the scene on YouTube: https://www.youtube.com/watch?v=NZJrGuC92U8

I fail to see how expressing that one thinks skinny women in stilettos are attractive is a comment that merits any kind of discipline or investigation unless the comment was an unwelcomed sexual advance to a specific female in the workplace. In this case, it was not.

Someone else made the comment in a group conversation and Mr. Leclerc indicated that he is attracted to women who are physically fit in response to the comment. This is a non-event.

It is obviously false that Mr. Leclerc used a fake vaccination card. If this were true, he would not have needed to apply for an RE from the vaccine mandate. In any case, there is no actual evidence to support this accusation, and Mr. Leclerc categorically denies this accusation. Mr. Leclerc also did not brag about abusing his expense account nor did he abuse it. This is merely an unsubstantiated false accusation against him by his teammates who want him gone because of his refusal to be vaccinated.

Finally, it is false that Mr. Leclerc abused his expense account or bragged about doing so. This allegation is completely fabricated to harass him, and there is no corroborating evidence. Mr. Leclerc did criticize Red Bull's daily allocation for travel meals, saying it was insufficient. As you know, doing so is actually a protected activity under the National Labor Relations Act. Red Bull could be held liable if it retaliates against Mr. Lecerc for making such a comment to his coworkers to the extent he was soliciting support for his opinion, which he was.

**Cease and Desist**

The forgoing analysis demonstrates that Red Bull is in precarious legal territory regarding its behavior toward Mr. Leclerc. Likely, this behavior is merely the actions of a few and is not a reflection on the company as a whole. Accordingly, I trust that you will remedy this situation by instructing all involved to cease harassing and retaliating against Mr. Leclerc because of his perceived disability and his sincerely held religious belief that prevents him from being vaccinated. The ridiculous "witch hunt" investigation must stop and Mr. Leclerc must be taken off his de factor PIP and treated the same as his peers outside his protected class. Moreover, any adverse employment action against him will be met with an immediate charge of discrimination to the EEOC and will be followed up with litigation or arbitration as may be appropriate.

Again, I trust that you will take the necessary remedial action to correct this unfortunate situation. Please confirm within 10 days of this letter that Red Bull will cease the apparent discriminatory and retaliatory treatment of Mr. Leclerc. Thank you for your attention to this matter.

Best regards,

Paul Davis

Enclosure
CC: Charles Leclerc
Anjelica Garcia via email to anjelica.garcia@redbull.com
Andra Brigmohan via email to andra.brigmohan@redbull.com
Human Resources via email to talent.operations@us.redbull.com