FILED
11/15/2026
THOMAS G BRUTON
CLERK, U.S. DISTRICT COURT
BC

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Case No: 1:26-CV-07715

Charles Leclerc v. Red Bull North America, Inc., et al.
Case No. 1:26-cv-07715
Judge Sharon Johnson Coleman

# SUPPLEMENTAL EXHIBIT L

## September 1, 2026 First Amended Supplemental Answers to Interrogatories

16 source pages follow this identifying cover.

Complete 16-page document, including general objections, all answers, attorney signature, and certificate of service. Source page numbers are retained.

This cover is not part of the original document. References to pages of this exhibit exclude this cover.

**JAMS ARBITRATION**

| | |
|---|---|
| CHARLES LECLERC,<br><br>Claimant,<br><br>v.<br><br>RED BULL NORTH AMERICA, INC.<br><br>Respondent. | JAMS Ref. No. 5340001145<br><br>Arbitrator: Hon. Judge John C. Griffin (Ret.) |

**RESPONDENT'S FIRST AMENDED SUPPLEMENTAL ANSWERS TO CLAIMANT'S FIRST SET OF INTERROGATORIES TO RESPONDENT**

Respondent, RED BULL NORTH AMERICA, INC. ("Red Bull" or "RBNA" or "Respondent"), by its undersigned attorneys, hereby propounds its First Amended Supplemental Answers to Claimant, CHARLES LECLERC's ("Leclerc" or "Claimant"), First Set of Interrogatories, as follows:

***GENERAL OBJECTIONS***

A. Respondent objects to the interrogatories to the extent they purport to impose requirements exceeding those set forth by the JAMS Employment Arbitration Rules & Procedures.

B. Respondent objects to the interrogatories to the extent that they seek production or information protected from disclosure by attorney-client privilege, the attorney work-product doctrine, and/or under any other JAMS Employment Arbitration Rules & Procedures. Respondent will not produce such privileged information, and any inadvertent production thereof shall not be deemed a waiver of any privilege, immunity, prohibition or limitation with respect to such information, documents, or any work-product doctrine that may attach thereto. Nothing contained in these objections is intended as, or shall in any way be deemed, a waiver of any attorney-client privilege, attorney work-product doctrine, or any other applicable privilege, immunity, prohibition or limitation.

C. Respondent objects to the interrogatories to the extent that they seek information that is equally available to Claimant.

D. Respondent objects to the interrogatories to the extent they seek confidential, private, financial, commercial, competitive, or proprietary company information, information that may qualify for trade-secret protection, and/or information the disclosure of which could be harmful to Respondent or its current and/or former employees.

E. Respondent objects to the interrogatories to the extent that they are vague, ambiguous and/or unintelligible, requiring Respondent to speculate as to what information is being requested.

F. Respondent objects to the interrogatories to the extent they seek information that is not in its custody or control or attempt to extend the definition of "custody and control" beyond that required by law.

G. Respondent objects to the interrogatories in their entirety to the extent that they are unduly burdensome and oppressive, voluminous, irrelevant, overlapping, repetitious, and redundant.

H. Respondent objects to the interrogatories to the extent they are overly broad as to time and scope and, thus, are unduly burdensome, oppressive, and harassing.

I. Respondent objects to the interrogatories to the extent they call for information and/or documentation not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

J. By providing these answers, Respondent does not admit that such information is relevant or admissible in this or any other action. Respondent reserves all of its relevancy and admissibility objections at any hearing, trial, or other proceeding. Respondent also reserves the right to object to further inquiry into any subject matter.

K. Respondent will respond to these interrogatories based on its present knowledge, information, and belief. Respondent's answers are at all times subject to such additional or different information that discovery or further investigation may disclose. Respondent reserves the right to supplement or amend these objections, upon, among other things, discovery of additional facts and materials and other developments or proceedings in this matter. Respondent reserves the right to make use of, or introduce at any hearing or at trial, materials responsive to these interrogatories discovered subsequent to the date of the initial answer to these interrogatories.

L. Each of the foregoing General Objections shall be deemed incorporated into each and every answer to these interrogatories as if repeated in the text of the response. No specific answer hereafter is to be construed as a waiver of any of the foregoing General Objections.

## INTERROGATORIES

**Depositions/Witnesses**

1. Identify all individuals you intend to depose or call as witnesses in this matter, including fact witnesses and expert witnesses. For each individual, provide their full name, job title, employer (if applicable), role within Red Bull North America, Inc. (if applicable), and a summary of their expected testimony. If any expert witnesses are identified, also provide their credentials and a brief description of the subject matter on which they are expected to testify.

**ANSWER:** Without waiving the General Objections, Respondent states as follows:

- Respondent intends to depose Charles Leclerc, former Regional Account Manager at RBNA. Respondent believes Claimant has knowledge regarding his employment with Respondent and the allegations in his Demand. Claimant may also have knowledge regarding certain defenses propounded by Respondent.

- Respondent may call as witness Takesha Clark, Senior LOA & Benefits Specialist at RBNA. Respondent believes Clark may have information and knowledge regarding Claimant's accommodation request(s). Clark may also have certain information and knowledge related to, at least in part, the pleadings and/or defenses in this case, including, but not limited to, her communications with Claimant.

- Respondent may call as a witness Stephanie Carter, Talent Business Partner. Respondent believes Carter may have information and knowledge regarding Claimant's employment with Respondent, including but not limited to Claimant's co-workers' complaints against Claimant and the investigation into Claimant's conduct. Carter also may have certain knowledge related to, at least in part, the pleadings and/or defenses in this case, including, but not limited to, her communications with Claimant and the termination of Claimant's employment.

- Respondent may call as a witness Eric Jacobson, Senior Director of Safeway Albertsons at RBNA. Respondent believes Jacobson may have information and knowledge regarding Claimant's employment with Respondent, including but not limited to, Claimant's job duties and assignments, Claimant's job performance, and Claimant's co-workers' complaints against Claimant. Jacobson also may have certain knowledge related to, at least in part, the pleadings and/or defenses in this case, including, but not limited to, his communications with Claimant and the termination of Claimant's employment.

- Respondent may call as a witness Nour Abusaad, Director, Category for Category Circle K US. Respondent believes Abusaad may have information and knowledge regarding Claimant's employment with Respondent, including but not limited to, Claimant's job duties and assignments and Claimant's job performance. Abusaad also may have certain knowledge related to, at least in part, the pleadings and/or defenses in this case, including, but not limited to, his communications with Claimant.

- Respondent may call as a witness Nickole Herhold, Category Development Manager at RBNA. Respondent believes Herhold may have information and knowledge regarding Claimant's employment with Respondent, including but not limited to, Claimant's job duties and assignments and Claimant's job performance. Herhold also may have certain knowledge related to, at least in part, the pleadings and/or defenses in this case, including, but not limited to, her communications with Claimant.

- Respondent may call as a witness Mark Andrade, Sr. Key Account Manager for Large Format Safeway US. Respondent believes Andrade may have information and knowledge regarding Claimant's employment with Respondent, including but not limited to, Claimant's job duties and assignments and Claimant's job performance. Andrade also may

have certain knowledge related to, at least in part, the pleadings and/or defenses in this case, including, but not limited to, his communications with Claimant.

- Respondent may call as a witness Karishma Dayanand, Senior Director of Category Development at RBNA. Respondent believes Dayanand may have information and knowledge regarding Claimant's employment with Respondent, including but not limited to, Claimant's job duties and assignments and Claimant's job performance. Dayanand also may have certain knowledge related to, at least in part, the pleadings and/or defenses in this case, including, but not limited to, her communications with Claimant.

- Respondent may call as a witness Leslie Newlee, VP of Insights at RBNA. Respondent believes Newlee may have information and knowledge regarding Claimant's employment with Respondent, including but not limited to, Claimant's job duties and assignments and Claimant's job performance. Newlee also may have certain knowledge related to, at least in part, the pleadings and/or defenses in this case, including, but not limited to, her communications with Claimant.

Respondent reserves the right to supplement its Answer to this Interrogatory, as necessary.

**Religious Accommodation**

2. Describe Red Bull North America's process for handling religious accommodation requests related to health policies. Your response should include:

a. Whether a standard accommodation was offered and, if so, the details of that accommodation.
b. The name(s) and position(s) of individuals responsible for granting or denying such requests.
c. The typical timeframe for processing a religious accommodation request.
d. The steps involved in processing such requests.
e. The number of accommodation requests pending during the processing of Charles Leclerc's request.

**ANSWER:** Respondent objects to this Interrogatory as vague, ambiguous, overly broad, and not reasonably calculated to lead to the discovery of admissible evidence. Respondent further objects to the phrase "standard accommodation" as vague and ambiguous because it is undefined. Subject to and without waiving these objections and the General Objections, Respondent answers in part that:

(a) Respondent granted Claimant's religious accommodation request by allowing him to submit to an alternative testing system (saliva-based testing) that he alleged did not conflict with his religious beliefs;

(b) religious accommodation requests are processed by Sarah Richards, RBNA's Director of Benefits, and Takesha Clark, RBNA's Senior LOA & Benefits Specialist;

(c) the typical timeframe for processing religious accommodation requests varies depending on the accommodation requested; and

(d) During the time in which Claimant's accommodation request was being processed, only one other request for religious accommodation was pending.

**Treatment of Charles, Alleged Misconduct, and the Investigation**

3. Identify each person involved in deciding to terminate Charles Leclerc, including their name, title, and role in the decision-making process. Explain what factors were considered, including whether any prior complaints, disciplinary actions, or concerns were raised about him before his religious accommodation request.

**ANSWER:** Respondent objects to this Interrogatory as vague, ambiguous, overly broad, and unduly burdensome. Respondent further objects to Interrogatory No. 3 to the extent it seeks information that is subject to the attorney-client privilege, the attorney work-product doctrine, or both. Subject to and waiving these objections and the General Objections, Respondent states Stephanie Carter, Talent Business Partner for RBNA, Andra Brigmohan, former Senior Director of Talent for RBNA and Claimant's immediate supervisor, Eric Jacobsen, Senior Director of Safeway Albertsons were involved in the decision to terminate Claimant. RBNA's decision to terminate Claimant was based on investigation findings that Claimant engaged in conduct violative of RBNA's Policy against Harassment and Observance of High Standards. Respondent further states that before Claimant submitted his religious accommodation request, Claimant's co-workers reported Claimant's offensive conduct such as using sexist, racist, and derogatory language, to Claimant's supervisor, Eric Jacobson. On or about May 24, 2022, reports made against Claimant by Claimant's coworkers were escalated to Stephanie Carter, Talent Business Partner.

4. Describe in detail the circumstances surrounding the investigation and subsequent treatment of Charles Leclerc following his religious accommodation request in February 2022. Your response should include

a. The reasons Charles was treated differently from his peers after submitting his request.
b. Any specific incidents that triggered concerns about his behavior, including details of the parties involved, dates, locations, and any related documentation.
c. Whether Charles was ever informed by Red Bull of an ongoing investigation concerning him.
d. Whether Charles was explicitly informed that he would be the subject of the investigation prior to meeting with the investigator.
e. The date Red Bull received the investigator's final report.
f. The date Red Bull conferred on the report's contents to determine the outcome of the investigation and its impact on Charles' employment.
g. The factual basis from the investigation that was considered in making the decision to terminate Charles' employment, if any.

**ANSWER:** Respondent objects to this Interrogatory as vague, ambiguous, overly broad, unduly burdensome, oppressive, harassing, and argumentative. Respondent further objects to Interrogatory No. 4 to the extent it seeks information subject to the attorney-client privilege, the attorney work-product doctrine, or both. Subject to and without waiving these objections or the General Objections, Respondent states as follows:

(a) Claimant was not treated differently from his peers after submitting his request for a religious accommodation;

(b) Respondent had concerns about Claimant's behavior including Claimant's co-workers asking Claimant to refrain from engaging in offensive conduct such as using sexist, racist, and derogatory language;

(c) Claimant was informed of an ongoing investigation concerning him;

(d) Claimant was informed that he would be the subject of the investigation prior to meeting with the investigator;

(e) Respondent received the investigator's findings on or around July 1, 2022;

(f) Respondent conferred on the investigator's findings to determine the outcome of the investigation and its impact on Claimant's employment on or around July 1, 2022; and

(g) Respondent made its decision to terminate Claimant's employment based on the investigatory conclusions that Claimant engaged in offensive conduct such as using sexist, racist, derogatory language and rather than self-correct, Claimant became offensive and combative.

**Informed Consent**

5. What were the scientific or medical credentials of the person who wrote the informed consent document distributed to the employees (if any)?

**ANSWER:** Respondent objects to this Interrogatory as vague, ambiguous, unduly burdensome, oppressive, harassing, argumentative, and seeking information not in its custody or control. Subject to and without waiving these objections and the General Objections, Respondent states that no informed consent document was distributed by Respondent to Red Bull employees.

**Health Mandate**

6. Describe in detail the decision-making process behind the implementation of Red Bull North America's health mandate, including:

a. Who made the decision, when it was made, and where it was discussed.
b. Whether a formal order was issued by senior executives to management prior to execution, and if so, provide details on who issued it, when, and any corresponding

documentation.

c. Whether Red Bull currently has a health mandate in place. If not, specify when and why the policy changed, as well as who authorized the change.
d. The stated purpose of the mandate and whether this purpose was documented in writing.
e. If the purpose was to "make the workplace safer," identify the evidence used to support the conclusion that the mandate would achieve this objective.

**ANSWER:** Respondent objects to the phrase "health mandate" as vague and ambiguous, as Respondent never had a "health mandate." Assuming "health mandate" refers to Red Bull's COVID-19 policies and updates, Respondent further objects to this Interrogatory as, overly broad, unduly burdensome, voluminous, and irrelevant. Respondent further objects to Interrogatory No. 6 to the extent that it seeks information protected by the attorney-client privilege, attorney work product doctrine, or both. Subject to and without waiving these objections or the General Objections, Respondent answers in part that it implemented directives regarding COVID-19 based on guidance from the U.S. Centers for Disease Control and Prevention (CDC), the Occupational Safety and Health Administration (OSHA), and CrowdRx, and in compliance with federal and local requirements.

**Cease and Desist Letter and Formal Response**

7. Provide detailed information regarding Red Bull North America's receipt and response to the Cease-and-Desist letter, as well as the decision-making process surrounding Charles Leclerc's termination. Your response should include:

a. The exact date and time Red Bull received the Cease-and-Desist letter.
b. The date Ervin Cohen & Jessup LLP was contracted to respond to the Cease-and-Desist letter, along with a copy of the contract and any communications defining its intent.
c. The reason Ervin Cohen & Jessup LLP was chosen to handle the response.
d. The exact date and time the decision to terminate Charles Leclerc was made, the individual(s) responsible for the decision, and any contributors to the decision-making process.

**ANSWER:** Respondent objects to this Interrogatory as vague, ambiguous, overly broad, and unduly burdensome. Respondent further objects to Interrogatory No. 7 to the extent it seeks information protected by the attorney-client privilege, attorney work product doctrine, or both. Subject to and without waiving these objections or the General Objections, Respondent answers in part that:

(a) Respondent received the Cease-and-Desist letter on July 7, 2022; and

(d) Respondent further states that the Talent Department, together with Claimant's immediate supervisor, Eric Jacobson, Senior Director of Safeway Albertsons made the decision to terminate Claimant's employment on or about July 7, 2022, based on information from the

investigator's findings.

**Collusion**

8. Provide a detailed account of the decision-making process, enforcement, and external influences regarding Red Bull North America, Inc.'s health mandate, including:

a. The individuals or committees responsible for implementing and enforcing the mandate, their roles, and the dates of any related meetings.
b. The involvement of Red Bull's foreign parent company, including whether it directed, influenced, or required the mandate as part of its global policies. The individuals responsible for interpreting government regulations, how these regulations were communicated to employees, and whether Red Bull was aware that the mandate exceeded federal, state, or local requirements.
c. The process used to enforce compliance, including monitoring methods, employee adherence measures, and any threats of disciplinary action or termination.
d. Communications, policies, or directives outlining consequences for noncompliance.
e. Whether employees were coerced into compliance through disciplinary threats, and
whether Red Bull recognized the mandate's impact on interstate commerce, employee mobility, and labor practices.
f. Any similar policies or mandates enforced by Red Bull or its parent company, especially those involving coercion, misrepresentation, or investor influence.
g. Whether the mandate was part of a broader effort to meet investor or lender expectations, even if it meant exceeding legal requirements or coercing employees.

**ANSWER:** Respondent objects to the phrase "health mandate" as vague and ambiguous, as Respondent never had a "health mandate." Assuming "health mandate" refers to Red Bull's COVID-19 policies and updates, Respondent further objects to this Interrogatory as overly broad, unduly burdensome, voluminous, oppressive, harassing, argumentative, and not reasonably calculated to lead to the discovery of admissible evidence. Respondent further objects to Interrogatory No. 8 to the extent that it seeks information protected by the attorney-client privilege, attorney work product doctrine, or both. Subject to and without waiving these objections or the General Objections, Respondent answers in part that

(a) RBNA established a task force consisting of members from RBNA's Talent, Legal, and Operations departments. This task force was responsible for implementing and enforcing RBNA's COVID-19 policies and procedures;

(c) Respondent monitored employee compliance with its COVID-19 policies and procedures through its third-party approved vendors; and

(d) Respondent refers Claimant to its production of documents, which contains RBNA's COVID-19 policies, including compliance requirements and consequences.

**Financial and Investment Pressures**

9. Describe in detail the extent to which financial institutions, investors, or ESG-related considerations influenced Red Bull North America, Inc.'s decision to implement a Covid-19 vaccine or testing policy. Your response should include:

a. The identity of any investors, lenders, or financial institutions that expressed expectations or requirements regarding ESG compliance or health and safety measures, along with any relevant agreements or communications.
b. Whether Red Bull or its foreign parent company considered investor, lender, or financial pressures when implementing the mandate, including any discussions where ESG performance was tied to financing terms or capital access.
c. Any financial incentives, such as favorable loan terms, reduced interest rates, enhanced credit ratings, or ESG-focused investment opportunities, that were contingent upon adopting a Covid-19 policy.
d. Any negative financial consequences, such as increased borrowing costs, restricted capital access, divestment threats, or reputational risks, that influenced the decision to implement or maintain the mandate.
e. Whether the mandate was part of a broader ESG strategy aimed at satisfying investor, lender, or financial partner expectations, including steps taken to improve ESG ratings or attract socially responsible investment.
f. The extent to which legal risks, stakeholder expectations, or brand reputation considerations played a role in Red Bull's decision to implement, enforce, or later modify its Covid-19 policy.

**ANSWER:** Respondent objects to this Interrogatory as overly broad, conclusory in nature, oppressive, harassing, and argumentative. Respondent further objects to Interrogatory No. 9 to the extent that it seeks information protected by the attorney-client privilege, attorney work product doctrine, or both. Subject to and without waiving these objections or the General Objections, Respondent states that financial institutions, investors, or ESG-related considerations did not influence RBNA's decision to implement a Covid-19 vaccine or testing policy.

**Malicious Prosecution**

10. Describe Red Bull North America, Inc.'s actions and decision-making regarding post-employment benefits for Charles Leclerc, including:

a. Whether Red Bull took any action related to benefits after his separation and, if not, the reasons no further action was pursued.
b. Whether Red Bull alleged misconduct as a basis for preventing post-employment benefits and the internal rationale supporting this allegation.

c. Any internal discussions on whether to continue or discontinue further action regarding post-employment benefits, including decisions made and reasons identified.

**ANSWER:** Respondent objects to this Interrogatory as vague, ambiguous, and overly broad. Respondent further objects to Interrogatory No. 10 to the extent that it seeks information protected by the attorney-client privilege, attorney work product doctrine, or both. Without waiving these objections or the General Objections, Respondent answers in part that:

(a) Respondent opposed Claimant's application for unemployment benefits;

(b) Respondent opposed Claimant's application for unemployment on the belief that Claimant engaged in misconduct.

**Unauthorized Practice of Medicine**

11. Describe Red Bull North America, Inc.'s qualifications and authority in implementing its health mandate, including:

a. Whether any individuals at Red Bull had specialized training, required licensure, or an understanding of the risks the mandate posed to employees.
b. Whether Red Bull possessed the proper licensure and legal authority to impose the health mandate on its workforce.

**ANSWER:** Respondent objects to the phrase "health mandate" as vague and ambiguous, as Respondent never had a "health mandate." Assuming "health mandate" refers to Red Bull's COVID-19 policies and updates, Respondent further objects to this Interrogatory as overly broad, conclusory in nature, oppressive, harassing, and argumentative. Subject to and without waiving these objections and the General Objections, Respondent answers in part that

(a) No specialized training or licensure was required to develop and implement a COVID-19 policy; and

(b) As an employer, RBNA was authorized to implement health and safety protocols.

**Deceptive Medical Practices**

12. Describe the legal basis, sources, and employee disclosures related to Red Bull North America, Inc.'s health mandate, including: Red Bull North America, Inc.'s qualifications and authority in implementing its health mandate, including:

a. Any federal, state, or local laws that required Red Bull to implement a health mandate.
b. The sources Red Bull relied upon to assess the efficacy and safety of the mandated inoculations and tests.
c. The medical or scientific evidence Red Bull North America, Inc. relied upon to

justify requiring testing only for uninoculated employees while exempting inoculated
employees from the same requirement?

d. Whether employees were informed of potential health risks associated with participation in the health mandate, including experimental drugs (inoculations), testing swabs, and masks, and how this information was communicated.
e. Whether Red Bull informed employees that the mandated inoculations and tests were authorized only under emergency use, requiring informed consent, and that the
inoculations were not fully licensed vaccines.
f. Whether employees were made aware that the mandated inoculations and test kits were not FDA-approved.

**ANSWER:** Respondent objects to the phrase "health mandate" as vague and ambiguous, as Respondent never had a "health mandate." Assuming "health mandate" refers to Red Bull's COVID-19 policies and updates, Respondent further objects to this Interrogatory as overly broad, unduly burdensome, voluminous, oppressive, harassing, and argumentative. Respondent further objects to Interrogatory No. 12 to the extent that it seeks information protected by the attorney-client privilege, attorney work product doctrine, or both. Subject to and without waiving these objections or the General Objections, Respondent answers in part that it implemented directives regarding COVID-19 based on guidance from the CDC, OSHA, CrowdRx, and based on federal and local requirements.

**Coercion in Medical Practices**

13. Describe the options available to employees regarding compliance with Red Bull North America, Inc.'s health mandate, including:

a. Whether employees were permitted to opt out without the threat of termination, and if so, how Charles Leclerc could have done so.
b. Whether any FDA-approved products were offered to Charles that would satisfy the health mandate.

**ANSWER:** Respondent objects to the phrase "health mandate" as vague and ambiguous, as Respondent never had a "health mandate." Assuming "health mandate" refers to Red Bull's COVID-19 policies and updates, Respondent further objects to this Interrogatory as vague, ambiguous, overly broad, oppressive, harassing, and argumentative. Subject to and without waiving these objections or the General objections, Respondent states that:

(a) Employees were permitted to request accommodations to Respondent's COVID-19 policy, including that employees could request to submit to alternative weekly COVID-19 testing methods. Respondent considered and in some cases granted requested accommodations related to its COVID-19 policy. Respondent further states that Claimant requested as a religious accommodation an alternative weekly COVID-19 testing method, and Respondent granted this request; and

(b) Claimant requested as a religious accommodation an alternative weekly COVID-19 testing method. Specifically, Claimant requested to submit to weekly saliva-based COVID-19 testing. Respondent granted this request, which complied with its COVID-19 policy.

**Fraudulent Misrepresentation**

14. Did Red Bull North America, Inc. inform employees that the COVID-19 inoculations and tests were only authorized under Emergency Use Authorization (EUA), were not FDA-approved, and that there was no approved alternative accessible? If so, describe how and when this information was communicated. If not, explain why this information was not disclosed. Describe the evidence Red Bull North America, Inc. relied upon to justify its health mandate, including:

a. Any evidence Red Bull used to support that the mandate reduced transmission of any pathogen, and the details of that evidence.
b. Any evidence Red Bull used to support that the mandate prevented any disease, and the details of that evidence.
c. The evidence Red Bull relied upon to determine the accuracy and reliability of the test kits used in its mandate.

**ANSWER:** Respondent objects to this Interrogatory as vague, ambiguous, unduly burdensome, oppressive, harassing, argumentative, and seeking information not in its custody or control. Respondent further objects to the use of the phrase "COVID-19 inoculations" as vague and ambiguous because it is undefined. Subject to and without waiving these objections and the General Objections, Respondent states as follows:

Respondent did not provide employees with information regarding the Emergency Use Authorization or FDA-approval of COVID-19 tests and vaccines because Red Bull did not create and/or administer COVID-19 tests and vaccines. With respect to Interrogatory 14(a)-(b), Respondent states that it relied on federal, state, and local research and public health guidance in developing its COVID-19 policy.

**Privacy Violations - Intrusion Upon Seclusion**

15. Describe how Red Bull North America, Inc. managed the confidentiality of Charles Leclerc's health information related to the health mandate, including:

a. The individuals at Red Bull who had access to Charles' COVID inoculation status.
b. The individuals at Red Bull who had access to Charles' weekly testing results.
c. The specific measures taken to protect the confidentiality of inoculation and testing status from the rest of the Red Bull staff.

**ANSWER:** Respondent objects to the phrase "health mandate" as vague and ambiguous, as Respondent never had a "health mandate." Respondent further objects to this Interrogatory as vague, ambiguous, overly broad, and unduly burdensome to the extent it requires Respondent to search for and compile information unrelated to the claims and issues in this case. Subject to and without

waiving these objections and the General Objections, and assuming "health mandate" refers to Red Bull's COVID-19 policies and updates, Respondent states that:

(a) The only individual at RBNA who had access to Claimant's COVID-19 inoculation status was Benefits Director, Sara Richards. Specifically, via RBNA's third-party vendor for COVID vaccination certification, Color, Richards was able to see whether employees had submitted vaccination confirmation and/or their weekly testing results;

(b) Respondent further states that Claimant directly submitted his saliva-based COVID-19 testing results to Stephanie Carter, Talent Business Partner, and Takesha Clark, RBNA's Senior LOA & Benefits Specialist; and

(c) Respondent protected the confidentiality of inoculation and testing status from RBNA staff by engaging a third-party vendor, Color, for COVID-19 vaccine certification and weekly testing status monitoring. Respondent further states that only Sara Richards was authorized to access this information through Color.

**Breach of Fiduciary Duty**

16. Describe how Red Bull North America, Inc. managed and safeguarded Charles Leclerc's sensitive health information, including:

a. The methods used to handle, store, and protect his health data.
b. Any documented incidents of unauthorized access to or breaches of his health information.
c. The safeguards in place to prevent such breaches and how employees were informed of these protections.

**ANSWER:** Respondent objects to this Interrogatory as vague, ambiguous, and overly broad. Subject to and without waiving these objections and the General Objections, Respondent answers in part that there are no documented incidents of unauthorized access to or breaches of Claimant's health information.

17. Has Red Bull North America, Inc. ever conducted an internal audit, compliance review, or data security risk assessment regarding the handling of employee health data related to its COVID-19 policies? If so, provide details of the review, its findings, and any corrective actions taken.

**ANSWER:** Respondent objects to this Interrogatory as vague, ambiguous, overly broad, oppressive, harassing, and argumentative. Without waiving these objections or the General objections, Respondent states no.

**Concurrences**
***Instructions:***

- **Please answer with either a "YES" or "NO" (mandatory) for questions 19 – 25.**

**You may add more for context.**

18. Will Red Bull concur that there was never a law affecting Red Bull requiring Covid-19 inoculations or testing?

**ANSWER:** No.

19. Will Red Bull concur that it established a Covid-19 policy that demanded either inoculate or test weekly where non-compliance with this policy threatened termination from Red Bull?

**ANSWER:** No.

20. Will Red Bull concur that other than the Covid-19 mandate, there was no other mandate from Red Bull for health or wellness purposes during Charles' period of employment?

**ANSWER:** No.

21. Will Red Bull concur that it had no formal informed consent document offered, or provided, to employees which described risks, benefits, possible adverse reactions, or the option to not comply without consequences?

**ANSWER:** No.

22. Will Red Bull concur that employees were never told they had the option to not comply with the Covid-19 mandate and suffer no consequences from Red Bull?

**ANSWER:** No.

23. Will Red Bull concur that no notice, warning, or conversation with management occurred informing Charles that his behavior was allegedly offensive in any way?

**ANSWER**: No.

24. Will Red Bull concur that employees were not informed that available inoculations and test kits were not approved by the FDA, but only authorized under an Emergency Use Authorization

**ANSWER:** No.

**DATED:** September 1, 2026

Respectfully Submitted,

**GREENBERG TRAURIG, LLP**

*/s/ David J. Stein*

David J. Stein
Addison Schlatter
360 North Green Street, Suite 1300
Chicago, IL 60607
Tel: 312-456-1003
Fax: 312-456-8435
david.stein@gtlaw.com
Addison.schlatter@gtlaw.com

*Attorneys for Respondent*

# CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on September 1, 2026, the foregoing **RESPONDENT'S FIRST AMENDED SUPPLEMENTAL ANSWERS TO CLAIMANT'S FIRST SET OF INTERROGATORIES** was served on the following parties via the JAMS Electronic Filing System:

Charles Leclerc
400 W Ontario St. #603
Chicago, IL 60654
Charles_leclerc@outlook.com

*Claimant*

Robert Essetier
Vertical Power Systems
3424 Knoll Dr.
Twentynine Palms, CA 92277
essetier@verticalpowersystems.com

*Claimant's Representative*

*/s/ David J. Stein*